UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___5/7/2019___

------------------------------------------------------------X
GE OIL & GAS, LLC;     :
    :
         Plaintiff,     :
    :         18-CV-7555 (VEC)
      -against-     :
    :         OPINION AND ORDER
TURBINE GENERATION SERVICES, LLC and   :
MICHAEL MORENO;     :
    :
         Defendants.   :
------------------------------------------------------------X

------------------------------------------------------------X
GE OIL & GAS, LLC and GENERAL     :
ELECTRIC COMPANY;     :
    :
         Plaintiffs,     :         18-CV-7576 (VEC)
    :
      -against-     :
    :
MOR DOH HOLDINGS, LLC and MICHAEL   :
MORENO;     :
    :
         Defendants.   :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      This messy tale of two lawsuits arises from a business transaction gone bad. Turbine

Generation Services, LLC ("TGS") removed one action and part of a second action from New

York County Supreme Court to this Court under 28 U.S.C. § 1334(b). That statute grants district

courts original jurisdiction over all civil proceedings "arising under" or "arising in or related to

cases under" the bankruptcy laws of the United States. GE Oil & Gas, LLC ("GEOG") and

General Electric Company ("GEEC") (sometimes collectively referred to as the "GE Parties")

have moved to remand both cases to New York County Supreme Court. *See* Dkts. 20-23.[1] For the following reasons, Plaintiffs' motions are GRANTED.

## BACKGROUND[2]

### I. Breach-of-Contract Action (18-CV-7555)

In June 2015, in what the Court will refer to as the "Breach-of-Contract Action," GEOG[3] sued TGS[4] and its principal, Michael Moreno, in New York Supreme Court for failing to repay a $25 million loan ("the Loan") that GEOG alleged it had made to TGS. *See generally* App. A (GEOG state-court compl. in 18-CV-7555). According to GEOG's complaint, TGS—through its

---

[1]     Because the remand briefing and exhibits are mostly identical in both 18-CV-7555 and 18-CV-7576, all further docket citations are to the docket in 18-CV-7555 unless otherwise noted.

[2]     The Court takes judicial notice under Fed. R. Evid. 201(b) of the pleadings filed in other courts, but it does so "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (citations omitted); *see also, e.g.*, *Manta Indus., Ltd. v. TD Bank, N.A.*, No. 17-CV-2495, 2018 WL 2084167, at *6 (S.D.N.Y. Mar. 29, 2019).

In recounting the history of these cases, the Court relies on the parties' pleaded allegations regarding the historical events underlying their claims and counterclaims and refrains from making its own determinations about which party's narrative of those events is accurate. That said, the Court does "take[] the case[s] up where the State court left [them] off," *Granny Goose Foods, Inc. v. Bhd. of Teamsters Local No. 70*, 415 U.S. 423, 436 (1974) (quoting *Duncan v. Gegan*, 101 U.S. 810, 812 (1880)), meaning that the Court treats as final the New York County Supreme Court's summary-judgment rulings and its judgment against TGS and Moreno for their default on the Note—both of which, as will be addressed, the New York Appellate Division has affirmed. Moreover, the Court necessarily makes findings regarding the two cases' procedural history—a history that is (with a few exceptions) undisputed and that is almost entirely determinable from judicially noticeable documents issued by, and filed in, other courts.

In this connection, the Court does not address most of TGS's statement of facts in its opposition to the motion to remand the Breach-of-Contract Action. *See* Dkt. 23 (Mem. in Opp. to Remand) at 2-11. TGS's statement is curiously devoid of citations to the record, and elements of it appear to be at odds with the New York County Supreme Court's summary-judgment rulings (which this Court must treat as final)—in particular, its ruling that TGS, Moreno, GEOG, and GEEC never formed a joint venture. *See, e.g.*, *id.* at 7 ("Initially, the financial terms of the Joint Venture were that . . . ."), 8 ("At this point GE[EC] and GEOG were fully and unequivocally committed to exclusively providing the funding that was its monetary contribution to the Joint Venture."), 9 ("On March 7, 2013, in furtherance of the Joint Venture . . . .").

[3]     GEOG is a provider of oil- and gas-extraction equipment. *See* App. A (GEOG state-court compl. in 18-CV-7555) ¶ 5.

[4]     TGS is a Texas entity headquartered in Louisiana that is involved in oil production and exploration. *See* App. A (GEOG state-court compl. in 18-CV-7555) ¶¶ 6, 9.

authorized agent Moreno—executed a note ("the Note") as evidence of the Loan along with a security agreement. *Id.* ¶¶ 9-21, 23-56. Moreno also separately agreed to personally guarantee repayment of the Loan ("the Guarantee"). *Id.* ¶ 21.

In July 2015, TGS and Moreno moved to dismiss the Breach-of-Contract Action on two grounds. *See* Dkt. 22 ex. 10. First, they argued that the suit was duplicative of an action that GEOG had filed against them in the United States District Court for the Western District of Louisiana, *see* Compl. [Dkt. 1], *GE Oil & Gas Inc. v. Turbine Generation Servs. LLC*, No. 14-CV-760 (W.D. La. Apr. 7, 2014), and an action that TGS and Moreno had filed against GEOG in Louisiana state court, *see* Dkt. 22 ex. 23 (Louisiana state-court compl.); *see also* Dkt. 22 ex. 10 (TGS and Moreno state-court MTD) at 6-16, 24-25. Second, they argued that New York was an inconvenient forum for litigating GEOG's claims regarding the Loan. *See* Dkt. 22 ex. 10 at 16-24. The Supreme Court denied the motion to dismiss in December 2015. *See id.* ex. 13 (tr. of Mar. 20, 2016 hr'g in New York Supreme Court). The court held that the Note and related security agreement both contained mandatory, New York choice-of-law and forum-selection clauses, meaning that New York was not a legally inconvenient forum for litigation GEOG's claims. *See id.* at 2-3. The court also held that abstention in favor of the two Louisiana actions was unnecessary because (1) GEOG's federal action in Louisiana had already been dismissed for lack of subject-matter jurisdiction[5] and (2) although TGS and Moreno had filed their Louisiana state complaint against the GE Parties before GEOG filed its New York state complaint against TGS and Moreno, TGS and Moreno had not served their Louisiana complaint until *after* GEOG filed and served its New York action, meaning that the GE Parties' duly served New York action

---

[5] *See* R. & R. [Dkt. 105], *GE Oil & Gas Inc. v. Turbine Generation Servs. LLC*, No. 14-CV-760 (W.D. La. July 15, 2015); Order [Dkt. 107], *GE Oil & Gas Inc. v. Turbine Generation Servs. LLC*, No. 14-CV-760 (W.D. La. Aug. 20, 2015) (adopting R. & R.).

took precedence over TGS and Moreno's Louisiana action.  *See id.*; *see also id.* ex. 23

(Louisiana state-court compl.) at 39 (marked "**PLEASE WITHHOLD SERVICE**").  The

Appellate Division affirmed the denial of TGS and Moreno's motion to dismiss.  *See id.* ex. 12.

In January 2016, TGS and Moreno answered GEOG's suit and asserted a host of

counterclaims against GEOG and claims against third-party defendant GEEC.  *See generally*

App. B (Jan. 2016 answer with countercls.); App. C (Jan. 2016 third-party compl.).  TGS and

Moreno alleged that in the discussions leading up to the Loan agreement, Moreno and the GE

Parties had formed a joint venture in the fracking and power-generation industry.  *See* App. B

¶¶ 104-78; App. C ¶¶ 29-103.  According to TGS and Moreno, the parties had memorialized the

formation of the joint venture in emails and other documents, including—most importantly

here—a term sheet that was appended to the Note.  *See* App. B ¶¶ 157-241; App. C ¶¶ 82-166.

TGS and Moreno also alleged that, pursuant to the GE Parties' representations, the $25 million

Note was never intended to be repaid but was instead the first installment of a $100 million

investment by the GE Parties in the joint venture.  *See* App. B ¶¶ 190, 244(f); App. C ¶¶ 115,

169(f).  Based on these allegations, TGS and Moreno asserted—among other counterclaims not

relevant here—that by calling the Note, the GE Parties breached an alleged duty purportedly

incorporated into the term sheet to convert the Note into TGS equity.[6]  *See* App. B ¶¶ 212-21,

243-44, 310-20; App. C ¶¶ 137-66, 168-69, 235-45.  TGS and Moreno had alleged essentially

the same narrative of events and had asserted essentially the same counterclaims against GEOG

and GEEC in both the federal and state court actions in Louisiana.  *See* Dkt. 22 ex. 8 (first am.

---

[6]      Technically speaking, TGS and Moreno asserted counterclaims against GEOG, the sole Plaintiff in the
Breach-of-Contract Action, and third-party claims against GEEC, a third-party defendant.  Because TGS and
Moreno's counterclaims and third-party claims are virtually identical and rest on essentially the same factual
allegations, and to avoid any confusion between GEOG's claims against TGS and Moreno and TGS and Moreno's
claims against GEEC, the Court refers to TGS and Moreno's claims and counterclaims collectively as
"counterclaims."

countercl. against GEOG in W.D. La. action); *id.* ex. 9 (third-party compl. against GEEC in

W.D. La. action); *id.* ex. 23 (La. state-court compl. against GEOG and GEEC).

On March 4, 2016, the Supreme Court granted summary judgment to GEOG on its

breach-of-contract claim, holding that it was "undisputed that TGS did not repay the Note at

maturity and that Moreno unconditionally guaranteed payment." *See* Dkt. 22 ex. 4 (Mar. 4, 2016

order) at 8. Regarding TGS and Moreno's counterclaims alleging that the parties had formed a

joint venture and that the GE Parties had breached the term sheet by calling the Note, the court

held that the parties had never formed a joint venture and that the term sheet was merely "an

agreement to agree on the terms of the parties' contemplated business relationship." *Id.* at 9-10.

The court ordered TGS and Moreno to file pleadings amended to account for the court's ruling

that the parties had never formed a joint venture. *Id.* at 12.

At oral argument a few weeks later, in response to TGS and Moreno's representations

that they were continuing to pursue their Louisiana state action (which rested on the joint-venture

theory that the Supreme Court's summary-judgment order had rejected), the Supreme Court

enjoined TGS and Moreno from seeking an injunction from the Louisiana state court that would

have barred GEOG from pressing its lawsuit in New York. *See* Dkt. 22 ex. 5 (injunction order);

*see also id.* ex. 13 (Mar. 30, 2016 hr'g tr.). The Supreme Court also described as "almost

contemptuous" TGS and Moreno's election to file amended pleadings reasserting their already

rejected theory that they and the GE Parties had formed a joint venture. *Id.* ex. 13 (Mar. 30,

2016 hr'g tr.) at 10-15.

In April 2016, TGS and Moreno filed amended pleadings against the GE Parties. *See*

*generally* App. D (Apr. 2016 answer with am. countercls.); App. E (Apr. 2016 am. third-party

compl.). They also, however, continued to pursue their action in Louisiana state court in an

apparent effort to undermine the New York Supreme Court's summary-judgment rulings, prompting that court to issue an anti-suit injunction barring TGS and Moreno from "litigating the issues [pending] before [the New York County Supreme Court] in Louisiana," Dkt. 22 ex. 25 (May 18, 2016 order), and conditionally to hold TGS and Moreno in contempt for violating the Supreme Court's March 30, 2016 order on the same subject, *see id.* ex. 26 (May 27, 2016 order).

A few months later, in August 2016, the Supreme Court entered judgment against TGS and Moreno, jointly and severally, for $39,846,575.34, the amount of the Loan plus interest. *See* Dkt. 22 ex. 6. The Appellate Division affirmed the judgment in May 2017. *See id.* ex. 7. It also affirmed the Supreme Court's injunction barring TGS and Moreno from continuing to prosecute their action in Louisiana state court. *Id.*

In February 2017, having disposed of GEOG's claim against TGS and Moreno, the Supreme Court dismissed all of TGS and Moreno's counterclaims against the GE Parties with prejudice, save one: although the court reaffirmed its earlier ruling that the parties had never formed a joint venture, the court dismissed without prejudice TGS's counterclaim that the GE Parties had breached a purported obligation under the term sheet to negotiate in good faith the formation of a joint venture. *See* Dkt. 22 ex. 14 (Feb. 10, 2017 order dismissing TGS and Moreno's counterclaims) at 3-6, 12. Although the court gave TGS leave to amend its sole remaining counterclaim, the court made clear that "should [TGS] prevail" on the counterclaim, "the value of this claim is limited to out-of-pocket expenses"—an amount "miniscule relative to the . . . approximately $40 million" TGS and Moreno owed GEOG because they defaulted on the Note. *Id.* at 4-6. The court's order warned TGS that it would dismiss TGS's counterclaim with prejudice if TGS failed to timely file a motion for leave to amend. *Id.* at 12.

After a number of attempts to replead this surviving counterclaim—including two unsuccessful attempts by Moreno to re-join the counterclaim, *see* Dkt. ex. 16 (May 4, 2018 order)—in July 2017 TGS finally filed an amended counterclaim against the GE Parties, asserting a single claim of breach of a purported duty to negotiate in good faith the formation of a joint venture. *See* Dkt. 22 exs. 17 (July 2017 answer with third am. countercl.) ¶¶ 230-34, 18 (July 2017 third am. third-party compl.) ¶¶ 152-56. As will be explained in more detail below, this counterclaim is the only claim that was removed from the Breach-of-Contract Action and is now before this Court under docket number 18-CV-7555.[7]

## II. Indemnification Action (18-CV-7576)

In May 2018, the GE Parties filed a second action in New York Supreme Court against TGS, Moreno, and MOR DOH Holdings, LLC ("MOR DOH"), a Louisiana entity that (the GE Parties allege) Moreno has used to conceal assets from collection. *See* Dkt. 22 ex. 19 (18-CV-7576 Compl.) ¶¶ 41-56 (the "Indemnification Action"). In this action, the GE Parties allege that MOR DOH—through its authorized agent Moreno—agreed to indemnify GEOG for any losses or expenses incurred in connection with any litigation relating to the Loan. *Id.* ¶¶ 14-16, 29. The GE Parties further allege that the Note and Guarantee Moreno signed in connection with the Loan itself contained provisions indemnifying GEOG for any such losses or expenses. *Id.* ¶¶ 58, 60. The GE Parties seek to recover about $5 million in costs incurred in litigating the Breach-of-

---

[7]    In January 2019, the New York Appellate Division affirmed the Supreme Court's dismissal with prejudice of fraud and promissory-estoppel counterclaims that TGS and Moreno had asserted alongside TGS's surviving counterclaim regarding the term sheet. *See* Dkt. 35 ex. B at 100-02. The Appellate Division also affirmed the Supreme Court's refusal to grant Moreno leave to reassert (in parallel with TGS) his own counterclaim against the GE Parties for failure to negotiate in good faith the formation of a joint venture. *See id.* at 103. Even though the Appellate Division's judgment postdates the removal of TGS's sole remaining counterclaim to this Court, because the judgment did not purport to address that counterclaim, this Court has no reason to second-guess the Appellate Division's jurisdiction to resolve the issues that it did. *See* 28 U.S.C. § 1446(d) ("Promptly after the filing of such notice of removal of a civil action the defendant or defendants shall give written notice thereof to all adverse parties and shall file a copy of the notice with the clerk of such State court, which shall effect the removal *and the State court shall proceed no further unless and until the case is remanded*." (emphasis added)).

Contract Action and the two Louisiana actions.  *Id.* ¶¶ 61-66.  The GE Parties also seek a declaration that MOR DOH is Moreno's alter ego and thus liable for Moreno's indemnification obligations under the Guarantee.  *Id.* ¶¶ 68-76.  The GE Parties accompanied their Complaint with a motion for partial summary judgment.  *See* Dkt. 22 ex. 20.

## III.    Removal

With the pleadings on TGS's sole remaining counterclaim against the GE Parties in the Breach-of-Contract Action finally in order, the parties commenced discovery on TGS's counterclaim and on GEOG's efforts to collect its now final $40 million judgment against TGS and Moreno.  *See* Dkt. 22 exs. 27-31, 33.  After a series of discovery disputes spanning an entire year—including a successful motion by GEOG to compel TGS and Moreno to produce asset-related discovery, *see id.* exs. 28-29—on July 26, 2018, GEOG and GEEC moved to strike TGS's counterclaim as a sanction for discovery delays and to hold Moreno in contempt for his purported refusal to produce discovery in compliance with the Supreme Court's orders, *see id.* exs. 27 (Young decl. in supp. of mot. to strike), 31 (mem. in supp. of mot. to strike).

Four days later, on July 30, 2018, TGS filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Western District of Louisiana.  *See* Dkt. 22 ex. 32.  That same day, TGS and Moreno's counsel filed a motion to withdraw from the Breach-of-Contract Action, stating that TGS and Moreno had failed to pay attorney's fees and had rendered counsel's representation unreasonably difficult.  *See id.* ex. 34.  The Supreme Court granted the motion and stayed proceedings for two weeks to permit TGS and Moreno to retain replacement counsel.  *See id.* ex. 35.  The court warned, however, that TGS's counterclaim against GEOG and GEEC— "the only remaining claim[] in [the Breach-of-Contract] action"—would be dismissed with prejudice unless, among other conditions, TGS's replacement counsel filed a notice of

appearance no later than noon on August 20, 2018, and promptly conferred with GEOG and GEEC's counsel about fulfilling TGS's outstanding discovery obligations. *Id.* at 2.

At 12:10 p.m. on August 20, represented by new counsel, TGS filed a notice in this Court, pursuant to 28 U.S.C. § 1334(b), removing its counterclaim against the GE Parties; the removal left the ongoing litigation over GEOG's efforts to collect its judgment against TGS and Moreno in the New York Supreme Court. *See* Dkt. 22 ex. 37. TGS's removed counterclaim became 18-CV-7555.[8]

At 4:30 p.m. that same day, TGS, Moreno, and MOR DOH—all represented by TGS's new counsel—filed a notice in this Court removing the entirety of the Indemnification Action, again pursuant to 28 U.S.C. § 1334(b). *See* Dkt. 22 ex. 36. This removed case became 18-CV-7576. Although the parties had stipulated while the case was pending in the Supreme Court to a schedule for briefing GEOG and GEEC's summary-judgment motion, *see* Dkt. 22 exs. 21-22, given these motions to remand, the summary-judgment motion remains unbriefed.

On September 19, 2018, the GE Parties voluntarily dismissed all of their claims against TGS in the Indemnification Action, leaving Moreno and MOR DOH as the sole Defendants. *See* 18-CV-7576 Dkts. 21-22.

## DISCUSSION

### I. The GE Parties' Motion to Remand the Indemnification Action (18-CV-7576)

The GE Parties' motion to remand the Indemnification Action is granted. TGS's notice of removal invoked only "relating to" jurisdiction under 28 U.S.C. § 1334(b) as a basis for

---

[8]  Without any evidence, and contrary to this Court's own electronic records (of which the Court may take notice), TGS asserts that 18-CV-7555 "was opened at 11:13 am on August 20, 2018" but that "ECF rejected TGS' original filing, thereby requiring TGS to refile the notice of removal." Dkt. 23 (Mem. in Opp. to Mot. to Remand) at 2 n.2. Resolving the issue of the exact time of the removal is unnecessary; removal at 11:13 a.m. before the Supreme Court's noon deadline for filing a notice of appearance suggests that removal was strategically calculated, at least partially, to delay resolution of the Breach-of-Contract Action.

federal subject-matter jurisdiction. *See* Dkt. 22 ex. 36 (18-CV-7576 removal notice) ¶¶ 11-12 ("The indemnification claim . . . against TGS necessarily relates to the Bankruptcy Case as it seeks monetary damages from TGS."). TGS, the only party in bankruptcy and thus the only party with a bankruptcy estate on which a judgment in the Indemnification Action could have some conceivable effect, has been voluntarily dismissed from the case. *See* 18-CV-7576 Dkts. 21-22; *see also, e.g.*, *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) (noting that to "relate[] to" a bankruptcy case, a proceeding's outcome must have some "conceivable effect" on the bankrupt estate (citation omitted)). The GE Parties' claims against Moreno and MOR DOH, the remaining Defendants in the Indemnification Action, arise under state law and are based on Moreno's Guarantee and MOR DOH's pledge agreement, documents to which TGS is not even a party. *See* Dkt. 22 ex. 19 (18-CV-7576 Compl.) ¶¶ 28-29. Because the outcome of the Indemnification Action can have no conceivable effect on TGS's bankruptcy estate, *In re Cuyahoga*, 980 F.2d at 114, this Court lacks "relating to" jurisdiction over the case. Because no other basis for jurisdiction appears viable to the Court, the case must be remanded to the New York County Supreme Court. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").[9]

## II. The GE Parties' Motion to Remand the Breach-of-Contract Action (18-CV-7555)

The GE Parties' motion to remand the Breach-of-Contract Action is also granted. 28 U.S.C. § 1334(c)(2)—part of the statute pursuant to which TGS removed its counterclaim— provides for so-called "mandatory abstention" if six criteria are met:

(1) there is a "timely" motion for abstention;

(2) the action is based upon a state-law claim;

---

[9]     Neither Moreno nor MOR DOH opposes remanding the Indemnification Action, *see* 18-CV-7576 Dkt. 29 at 4-5, and TGS, no longer a party to the case, offers no position on the subject, *see* Dkt. 23 at 1 n.1.

(3) the action is "related to" a bankruptcy proceeding, as opposed to "arising under" title 11 or "arising in" a case under title 11;

(4) Section 1334 is the sole federal jurisdictional basis for the action;

(5) the action was "commenced" in state court; and

(6) the action is capable of being "timely adjudicated" in state court.

*Del. Tr. Co. v. Wilmington Tr., N.A.*, 534 B.R. 500, 512 (S.D.N.Y. 2015) (citations omitted); *see generally Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 446-50 (2d Cir. 2005).[10]

The parties do not dispute that the first, second, fourth, and fifth of these criteria are satisfied here. As to the first criterion, the GE Parties raised the issue of abstention in their first submission to this Court in preparation for the first pre-trial conference under Fed. R. Civ. P. 16(a). *See* 18-CV-7576 Dkt. 16 at 4-5. They also filed and briefed their remand motions in compliance with the Court's briefing schedule, *see* Dkt. 18 at 2, and before any proceedings on the merits of TGS's counterclaim occurred. As to the second criterion, TGS's counterclaim arises out of the GE Parties' alleged breach of a purported duty to negotiate in good faith that arose from the term sheet appended to the Loan documents; as TGS recognizes, the claim is based entirely on New York common law. *See* Dkt. 22 exs. 17 (answer with third am. countercl.) ¶¶ 230-34, 18 (third am. third-party compl.) ¶¶ 152-56; *see also* Dkt. 23 (Mem. in Opp. to Mot. to Remand) at 22 ("[S]tate law applies to the Claim . . . ."), 24 ("[T]he Claim is predicated on New York State law . . . ."). As to the fourth criterion, TGS's notice of removal invoked only Section 1334 as a basis for the Court's subject-matter jurisdiction, *see* Dkt. 22 ex.

---

[10] Section 1334(c)(2) provides in full: "Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction."

37 ¶ 11, and, given the absence of a federal question under 28 U.S.C. § 1331 and any pleadings or evidence establishing complete diversity of the parties, there is no other possible basis for such jurisdiction, a point TGS concedes, *see* Dkt. 23 (Mem. in Opp. to Mot. to Remand) at 22 ("[T]here is no other jurisdictional basis other than 28 U.S.C. § 1334 . . . ."). Finally, as to the fifth criterion, there is no doubt that the Breach-of-Contract Action was commenced in state court. *See* App. A (GEOG state-court compl. in 18-CV-7555).

The parties dispute only the third and sixth criterion—whether TGS's counterclaim "relates to" a bankruptcy proceeding rather than "aris[es] under" the bankruptcy laws or "aris[es] in" a case under the bankruptcy laws, and whether the New York Supreme Court is capable of timely adjudicating the counterclaim on remand. *See* Dkt. 23 (Mem. in Opp. to Mot. to Remand) at 12-21; Dkt. 32 (Reply in Supp. of Mot. to Remand) at 6-11.

The Court agrees with the GE Parties that the third criterion is satisfied. TGS's counterclaim—a claim for breach of contract under New York common law—does not "arise under" title 11 because it does not consist of a cause of action created by any provision of that title. *Del. Tr. Co.*, 534 B.R. at 511. Nor is it a cause of action that, although arising outside of Title 11, "would have no existence outside of the bankruptcy." *Baker v. Simpson*, 613 F.3d 346, 350-51 (2d Cir. 2010) (citing *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987)). TGS, it seems, agrees with this analysis: its notice removing its counterclaim to this Court invoked only "relating to" jurisdiction, *see* Dkt. 22 ex. 37 ¶ 16, and its briefing on GEOG's remand motion makes no argument that the Court has "arising in" or "arising under" jurisdiction, *see* Dkt. 23 (Mem. in Opp. to Mot. to Remand) at 12-18.[11]

---

[11]    TGS devotes substantial energy to explaining the distinction between a "core" and "non-core" proceeding under 28 U.S.C. § 157(b)(1) and attempting to persuade the Court that TGS's counterclaim against the GE Parties is a core proceeding. *See* Dkt. 23 (Mem. in Opp. to Mot. to Remand) at 12-18. It is well established, however, that "a proceeding that 'arises under' or 'arises in' Title 11 is a 'core' bankruptcy proceeding, but a proceeding that is

The sixth and final mandatory-abstention criterion is also satisfied. A state court's ability to timely adjudicate a claim is evaluated with reference to four factors:

> (1) the backlog of the state court's calendar relative to the federal court's calendar;
>
> (2) the complexity of the issues presented and the respective expertise of each forum;
>
> (3) the status of the title 11 bankruptcy proceeding to which the state law claims are related; and
>
> (4) whether the state court proceeding would prolong the administration or liquidation of the estate.

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.* (*Parmalat I*), 639 F.3d 572, 580 (2d Cir. 2011).

Applying these factors, the Court finds that the New York Supreme Court is entirely capable of timely adjudicating TGS's counterclaim. As to the first factor, the weightiness of this Court's case load is well documented,[12] while "[t]here is no allegation in the record that the [New York Supreme Courts] are backlogged" such that their resolution of a garden-variety contract claim like TGS's would be significantly delayed, *Parmalat Capital Fin. Ltd. v. Bank of*

---

[12] *See* Administrative Office of the U.S. Courts, Table C, Statistical Tables for the Federal Judiciary: Civil (Mar. 12, 2019) (recording 14,357 civil cases pending in Southern District of New York in 2018), https://www.uscourts.gov/statistics/table/c/statistical-tables-federal-judiciary/2018/12/31.

merely 'related to' a Title 11 case is not—and in a non-core proceeding, the doctrine of mandatory abstention applies." *Del. Tr. Co.*, 534 B.R. at 512 (citing *Baker*, 613 F.3d at 350); *see also, e.g.*, *Keybank Nat'l Assoc. v. Franklin Advisers, Inc.*, No. 18-CV-3755, 2019 WL 1349655, at *5-6 (S.D.N.Y. Mar. 26, 2019) (citing *Baker*, 613 F.3d at 350) ("The specific basis for jurisdiction dictates whether this case is deemed a 'core' or 'non-core' bankruptcy proceeding. If the Court has *only* 'related to' jurisdiction, then the case is a 'non-core' proceeding, and the doctrine of mandatory abstention applies."); *Credit Suisse AG v. Appaloosa Inv. Ltd. P'ship I*, No. 15-CV-3474, 2015 WL 5257003, at *6 (S.D.N.Y. Sept. 9, 2015) ("'Arising under' and 'arising in' cases are core matters, while 'related to' proceedings are non-core."). Because TGS invoked only "relating to" jurisdiction when removing this case, *see* Dkt. 22 ex. 37 ¶ 16; because TGS makes no argument that its counterclaim "arises under" title 11 or "arises in" a case under title 11; and because (as discussed) the Court sees no basis for "arising under" or "arising in" jurisdiction over the counterclaim, the Court concludes that TGS's counterclaim is a non-core proceeding to which mandatory abstention is applicable.

*Am. Corp.* (*Parmalat II*), 671 F.3d 261, 267 (2d Cir. 2012) (internal quotation marks omitted).[13]

As to the second timeliness factor, it is undisputed that TGS's counterclaim is wholly a creature of New York contract law, an area with which the New York Supreme Court has unquestioned expertise. And that court's deep familiarity with the twists and turns of this particular litigation—developed in the course of resolving TGS and Moreno's motion to dismiss, GEOG's summary-judgment motion, TGS and Moreno's efforts to prosecute their case in Louisiana state court despite the New York Supreme Court's rulings, and disputes over TGS and Moreno's discovery obligations—will no doubt assist that court in expeditiously resolving the counterclaim. *See Parmalat I*, 639 F.3d at 580-81 ("[W]hen the facts in a case are especially complex, the forum with greater familiarity with the record may likewise be expected to adjudicate the matter more quickly.").[14]

On balance, the third and fourth timeliness factors favor abstention as well. Although TGS makes no intelligible argument on this point, it is possible—and the GE Parties appear to concede—that "the status of [TGS's] ongoing title 11 bankruptcy proceeding" in the Western District of Louisiana requires that its "state law claim[] . . . be quickly resolved." *Parmalat I*, 639 F.3d at 581; *see also id.* ("[A] trustee in a chapter 11 reorganization may require expeditious resolution of the state law claims in order to determine what resources are available to fund the chapter 11 reorganization. For this reason, courts have found that what might be timely in the Chapter 7 context is not necessarily timely in Chapter 11 cases where time is of the essence.");

---

[13]     Strangely, TGS's briefing compares this Court's backlog to that of the Western District of Louisiana, where TGS filed for bankruptcy. *See* Dkt. 23 (Mem. in Opp. to Mot. to Remand) at 19-20, 24. Because the choice under Section 1334(c)(2) is between keeping a case in federal court or remanding it to the state court from whence it came, the Western District of Louisiana's case load is interesting but irrelevant. *See Parmalat I*, 639 F.3d at 580 (describing the inquiry under the first timeliness factor as "the comparative speeds of adjudication in the federal and state forums").

[14]     Even TGS agrees that the counterclaim's resolution will be "simple and straight forward." Dkt. 23 (Mem. in Opp. to Mot. to Remand) at 20.

Dkt. 21 (Mem. in Supp. of Mot. to Remand) at 17 (citing *Parmalat I* and recognizing that "in title 11 cases such as TGS'[s], quick resolution of state law claims is often important"). The Court is skeptical of any acute need for speed given that any recovery on the counterclaim has already been limited to out-of-pocket costs, an amount that is unlikely meaningfully to affect TGS's reorganization. But in any event, all the record evidence indicates that the New York Supreme Court is ready, willing, and able to resolve TGS's counterclaim quickly, meaning that a remand to that court would not "prolong the administration or liquidation of the estate," *Parmalat I*, 639 F.3d at 581. Indeed, before TGS suddenly removed the counterclaim, the Supreme Court had already dismissed the counterclaim without prejudice, had limited any recovery to out-of-pocket expenses, and was on the cusp of dealing with a request for discovery sanctions to punish allegedly willful discovery delays by TGS. Given the pace at which the Supreme Court was progressing to resolve TGS's counterclaim, and in light of its deep familiarity with the litigation, this Court sees no reason to believe that the Supreme Court will not be able to finish quickly what it started—assuming, of course, that TGS stops its delaying tactics. Remanding TGS's counterclaim therefore poses no discernible risk of unduly prolonging the administration or liquidation of TGS's estate, even if that administration or liquidation must proceed quickly. *See id.*; *see also In re Leco Enters.*, 144 B.R. 244, 251-52 (S.D.N.Y. 1992) (cited approvingly in *Parmalat I*, 639 F.3d at 581) (finding that state court could timely adjudicate case where a the state court action was "actively moving towards trial," "[d]iscovery in the state court [was] progressing," "motions [had] been resolved by the state court in a timely manner," and "it appear[ed] that at least some of the delays in the state court proceeding [were] directly attributable to the actions of" the parties opposing abstention); *Little Rest Twelve, Inc. v. Visan*, 458 B.R. 44, 59 (S.D.N.Y. 2011) (finding that remanded cases "would be litigated in a

very timely manner in state court" because "the cases [were] far along in state court," state court "was about to decide important issues when [the cases were] removed," "all claims [were] wholly based on New York state law, with which the state courts have great expertise," and "the considerable work that [the state court] ha[d] expended on each case provide[d] a wealth of experience and understanding of the cases that would have to be duplicated if the cases were not remanded," a "waste of judicial resources").

Because each of the 28 U.S.C. § 1334(c)(2) factors is satisfied, the Court must abstain from hearing TGS's counterclaim against the GE Parties, and the Breach-of-Contract Action (18-CV-7555) must be remanded to state court.[15]

---

[15] Because the Court remands both cases, it need not address the GE Parties' alternative arguments (1) that the cases should be remanded on equitable grounds under 28 U.S.C. § 1452(b) and (2) that permissive abstention under 28 U.S.C. § 1334(c)(1) is warranted. *See* Dkt. 21 (Mem. in Supp. of Mot. to Remand) at 18-25; Dkt. 23 (Mem. in Opp. to Mot. to Remand) at 21-25; Dkt. 32 (Reply in Supp. of Mot. to Remand) at 11-15.

With the Court's permission, *see* Dkt. 27, TGS supplemented the record with an October 22, 2018, notice filed by the GE Parties removing two consolidated cases pending against them in Louisiana state court to the Western District of Louisiana under 28 U.S.C. §§ 1334(b) and 1452. *See* Dkts. 28-29. One of those consolidated cases was the state-court action that TGS and Moreno had filed against GEOG in Louisiana state court in June 2015, *see* Dkt. 22 ex. 3 (Louisiana state-court compl.), and whose continued prosecution the New York Supreme Court had enjoined in March 2016, *see* Dkt. 22 ex. 5 (Mar. 30, 2016 order). The other consolidated case was a suit by a third party against both the GE Parties and TGS arising from the negotiations around the Loan. *See* Dkt. 29 ex. A at 10-11. TGS argues that the GE Parties' removal of these actions to the Western District of Louisiana evidences forum-shopping on their part, which, in turn, suggests that "the GE Parties' desire to remand the matters before this Court arises from the simple belief that a more favorable outcome will result." Dkt. 28 ¶¶ 10-11. TGS also points out that the GE Parties' notice removing the consolidated Louisiana state actions asserts that they are core proceedings, calling into question, TGS says, the Louisiana trustees does not involve TGS at all, let alone implicate TGS's *are not* core proceedings to which mandatory abstention is inapplicable. *Id.* at ¶¶ 6-9. As to TGS's first point, because the Court concludes that it must abstain from hearing the Breach-of-Contract Action under Section 1334(c), any forum-shopping on the GE Parties' part is irrelevant. As to TGS's second point, the Court has already concluded that TGS's claim against the GE Parties is not a core proceeding; the core status *vel non* of the Louisiana cases against TGS and the GE Parties that were removed is also irrelevant.

Finally, the Court grants TGS's second request to supplement the record, *see* Dkt. 33, but the document TGS submits—a Complaint that GEOG filed in the Western District of Louisiana against the trustees of certain Louisiana trusts that it alleges are concealing Moreno's assets—does not change the Court's conclusion that it must abstain from and remand the Breach-of-Contract Action. Part of an effort to collect GEOG's $40 million judgment against Moreno, GEOG's suit against the Louisiana trustees does not involve TGS at all, let alone implicate TGS's counterclaim against the GE Parties. *See id.* ex. A. Nor does TGS adequately support its amorphous contention that GEOG's commencement of the suit in the Western District of Louisiana "further confirm[s] that it is the proper venue in which to litigate disputes arising from or relating to the judgment and the transactions giving rise to the judgment and TGS' pending counterclaim." Dkt. 33. It is unclear to the Court where else GEOG could have

**III.    GEOG and GEEC's Request for Fees and Costs**

Citing 28 U.S.C. § 1447(c), the GE Parties request that they be awarded attorney's fees and costs incurred in briefing these remand motions.  *See* Dkt. 21 (Mem. in Supp. of Mot. to Remand) at 26; Dkt. 32 (Reply in Supp. of Mot. to Remand) at 5-6.  The request is denied.

After reviewing the procedural history of these cases, the Court tends to agree with the GE Parties that TGS (likely with the involvement of its principal, Moreno) strategically timed its removals of these actions as a delaying tactic.  The Court is wary of permitting flagrant gamesmanship and sharp practice—particularly involving the abuse of federal jurisdiction—to go unpenalized.  But the Court is not persuaded that Section 1447(c), whose text generally authorizes the award of fees and costs incurred because of a *defective* removal, authorizes fees and costs incurred in seeking mandatory abstention under Section 1334(c)(2) or in seeking remand based on a lack of subject-matter jurisdiction that arises after removal and because of the conduct of the party seeking remand.

"Section 1447(c) allows a court discretion to grant costs and fees in two circumstances: where subject matter [jurisdiction] is lacking and where there is a defect in the removal."  *In re Lawrence*, 233 B.R. 248, 253 (N.D.N.Y. 1999) (citing *LaMotte v. Roundy's, Inc.*, 27 F.3d 314, 316 ("§ 1447(c) allows a district court to award costs pursuant to an order remanding a case either on the grounds that the court lacks subject matter jurisdiction or on the basis that the procedures for removal were not satisfied.")).  A remand based on mandatory abstention under Section 1334(c)(2) is neither of those things; mandatory abstention is instead "the assertion by a party . . . of a superseding right to the state court forum," notwithstanding the existence of an otherwise legally sufficient removal.  *In re Lawrence*, 233 B.R. at 253.  Moreover, it is illogical

---

commenced its action against the trustees, all of whom, GEOG alleges, are domiciled in Louisiana, *see* Dkt. 33 ex. A ¶¶ 4-14.

to say that the expenses of briefing a motion for remand due to lack of subject-matter jurisdiction were incurred "as a result of the *removal*," as Section 1447(c) provides, when the lack of subject-matter jurisdiction arose *after* removal and only because the moving party itself took some action—here, dismissing the bankrupt defendant—that destroyed subject-matter jurisdiction and triggered the need for remand in the first place.  Because Section 1334(c) does not authorize the award of fees or costs incurred in seeking either (a) a remand based on mandatory abstention or (b) a remand for a lack of subject-matter jurisdiction that arose after the case was removed, the Court lacks any statutory basis on which to award fees or costs to the GE Parties.

## CONCLUSION

For the foregoing reasons, the GE Parties' motions to remand these cases to the New York County Supreme Court are GRANTED.  The GE Parties' motion for fees and costs incurred in bringing these remand motions is DENIED.  TGS's motion to supplement the record, Dkt. 33, is GRANTED.  The Clerk of Court is respectfully directed to terminate all open motions in 18-CV-7555 and 18-CV-7576 and remand both cases to the New York County Supreme Court.

**SO ORDERED.**

Date:  **May 7, 2019**
       **New York, New York**

                                    **VALERIE CAPRONI**
                                    **United States District Judge**

# Appendix A

FILED: NEW YORK COUNTY CLERK 01/13/2016 05:50 PM    INDEX NO. 652296/2015

FILED: NEW YORK COUNTY CLERK 06/26/2015 05:05 PM    INDEX NO. 652296/2015
NYSCEF DOC. NO. 137                                 RECEIVED NYSCEF: 01/13/2016
NYSCEF DOC. NO. 1                                   RECEIVED NYSCEF: 06/26/2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------- x

GE OIL & GAS, INC,                          :
                                            :     **Index No.**
                    Plaintiff,              :
                                            :
                                            :
    — against —                             :
                                            :
                                            :
TURBINE GENERATION SERVICES, L.L.C.,        :     <u>**SUMMONS**</u>
and MICHEL B. MORENO,                       :
                                            :
                    Defendants.             :
                                            :
---------------------------------------------------------------- x

TO THE ABOVE NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action, annexed

hereto, and to serve a copy of your answer on the Plaintiff within 20 days after the service of this

Summons and Complaint, exclusive of the day of service (or within 30 days after the service if

this Summons and Complaint is not personally delivered to you); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

Complaint.

Dated: New York, New York
      June 26, 2015                **REED SMITH LLP**


By: *s/Casey D. Laffey*
    Casey D. Laffey
    John L. Scott
    Geoffrey G. Young
599 Lexington Avenue
New York, New York 10022
Tel: (212) 521-5400
Fax: (212) 521-5450

John F. Hagan, Jr.
(*pro hac vice application forthcoming*)
10 South Wacker Drive, 40th Floor
Chicago, Illinois 60606
Tel: (312) 207-6525
Fax: (312) 207-6400


*Attorneys for Plaintiff*

<u>Defendants' Addresses:</u>

**TURBINE GENERATION SERVICES, L.L.C.**
4023 Ambassador Caffery Pkwy, Suite 200
Lafayette, LA 70503

*By Registered Agent: Frank Slavich, III*
1201 Camella Blvd, Suite 300
Lafayette, LA 70508

**MICHEL B. MORENO**
409 Worth Avenue
Lafayette, LA 70508

4023 Ambassador Caffery Pkwy, Suite 200
Lafayette, LA 70503

4209 Arcady St.
Dallas, TX 75205

4425 Highland Drive
Dallas, TX 75205

*By Registered Agent: Frank Slavich, III*
1201 Camella Blvd, Suite 300
Lafayette, LA 70508

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- x

GE OIL & GAS, INC,

                   Plaintiff,

     — against —

TURBINE GENERATION SERVICES, L.L.C.,
and MICHEL B. MORENO,

                   Defendants.

------------------------------------------------------------- x

**Index No.**

**COMPLAINT**

        Plaintiff GE Oil & Gas, Inc. ("GEOG" or "Plaintiff"), by its counsel Reed Smith LLP, commences this action against defendants Turbine Generation Services, L.L.C. ("TGS") and Michel B. Moreno ("Moreno") (together, "Defendants") seeking to recover over $25 million indisputably owed under a Promissory Note and Guarantee and for the expedited turnover of Collateral securing such debt, and respectfully alleges as follows:

## NATURE OF THE ACTION

        1.      This action arises out of Defendants' failure to honor their contractual obligations to Plaintiff under a Promissory Note, Security Agreement, Guarantee and related Loan Documents (defined below) despite Plaintiff's continual attempts to provide Defendants additional time to repay the monies owed.

        2.      As set forth fully below, Defendants have indisputably defaulted under the terms of the Loan Documents by failing to repay the Loan, and all accrued and unpaid interest and fees, by the maturity dates set forth in the Loan Documents. In addition, Defendants have defaulted under the terms of the Loan Documents by failing to permit Plaintiff to seize the collateral securing the Loan and failing to take steps to ensure that Plaintiff has a first-priority perfected security interest in that collateral.

3.     As a result, Plaintiff is entitled to a judgment against Defendants holding them jointly and severally liable for the full amount of principal, interest, and attorneys' fees owed to Plaintiff under the Loan Documents.

4.     In addition, because Defendants have failed to honor their payment obligations to Plaintiff and have refused to turn over the Collateral, Plaintiff is entitled to, *inter alia*, immediate and permanent injunctive relief enjoining and restraining Defendants from selling, transferring, or otherwise disposing of the Collateral, a declaration that Plaintiff is entitled to enforce its security interests in the Collateral and an order directing Defendants to immediately turnover the Collateral to Plaintiff.

## THE PARTIES

5.     Plaintiff GEOG is, and at all relevant times was, a Delaware corporation with its principal place of business in Houston, Texas.  GEOG is one of the world's leading equipment and services' providers in the oil and gas industry, and, in certain circumstances, provides financing for its products and services.

6.     Upon information and belief, defendant TGS is a Louisiana limited liability company with its principal place of business in Lafayette, Louisiana.  Upon information and belief, TGS is wholly owned by MOR DOH Holdings, L.L.C.

7.     Upon information and belief, defendant Moreno resides and maintains his domicile in the State of Louisiana.  Upon information and belief, Moreno is the principal of TGS.

## JURISDICTION AND VENUE

8.     Jurisdiction and venue is proper pursuant to General Obligations Law § 5-1402 because Defendants irrevocably and unconditionally submitted to the jurisdiction and venue of this Court in the agreements sued upon herein.

## FACTUAL BACKGROUND

### A.     The $25,000,000 Senior Secured Promissory Note

9.     Moreno formed TGS to design, assemble, lease, and service turbine or gas engine power generation units for use in oil field production.

10.     To enable TGS to buy engine inventory and other equipment, TGS borrowed $25,000,000.00 from GEOG on May 13, 2013 (the "**Loan**"). To evidence the Loan, through its authorized officer Moreno, TGS signed and delivered to GEOG a Senior Secured Promissory Note (the "**Note**") in the face amount of $25,000,000.00. A true and correct copy of said Note is attached hereto as **Exhibit A**, the terms and conditions of which are incorporated herein by reference.

11.     The Note, together with the Security Agreement and Guarantee Agreement, discussed below, are included in the definition of the "**Loan Documents**," as defined by Schedule 8 attached to the Note.

12.     TGS agreed to use the proceeds of the Loan to purchase engines to launch TGS' business, as provided in Section (4)(e) of the Note.

13.     At the Maturity Date, TGS was required to pay and satisfy the entire unpaid principal amount of the Note then outstanding to GEOG, together with all accrued and unpaid interest and other amounts due under the terms of the Note and other Loan Documents.

14.     The Note was originally scheduled to mature and become due and payable on September 13, 2013 – 90 days after the original "Outside Date" of June 15, 2013, as provided in Section 2(a) of the Note and Schedule 8 attached to the Note – but TGS and GEOG agreed to extend the Maturity Date under three written amendments to the Note.

15.     In the initial "Amendment to Senior Secured Promissory Note," dated June 14, 2013, and signed by TGS and GEOG, the Maturity Date of the Note was extended from

September 13, 2013 to October 20, 2013. A true and correct copy of the initial "Amendment to Senior Secured Promissory Note" is attached hereto as **Exhibit B**, the terms and conditions of which are incorporated herein by reference.

16. In the "Second Amendment to Senior Secured Promissory Note," dated July 22, 2013, and signed by TGS and GEOG, the Maturity Date of the Note was extended from October 20, 2013 to December 2, 2013. A true and correct copy of the "Second Amendment to Senior Secured Promissory Note" is attached hereto as **Exhibit C**, the terms and conditions of which are incorporated herein by reference.

17. In the "Third Amendment to Senior Secured Promissory Note," dated September 3, 2013, and signed by TGS and GEOG, the Maturity Date of the Note was extended from December 2, 2013 to December 29, 2013. A true and correct copy of the "Third Amendment to Senior Secured Promissory Note" is attached hereto as **Exhibit D**, the terms and conditions of which are incorporated herein by reference.

## B.    The Security Agreement

18. To secure TGS' Obligations (as defined by Schedule 8 attached to the Note) to perform in accordance with the Note, TGS, as "Pledgor," also executed a Security Agreement in favor of GEOG, as "Secured Party," on May 13, 2013 (the **"Security Agreement"**). A true and correct copy of the Security Agreement is attached hereto as **Exhibit E**, the terms and conditions of which are incorporated herein by reference.

19. In the Security Agreement, TGS granted GEOG a perfected security interest in "all of the following property now owned or at any time hereafter acquired by [TGS] or in which [TGS] now has or at any time in the future may acquire any right, title or interests, wherever located [...]" (collectively referred to as the **"Collateral"**):

    (a)    all Accounts;

(b)     all Deposit Accounts;

(c)     all Documents;

(d)     all Equipment, including, but not limited to, the equipment described in Annex A [of the Security Agreement];

(e)     all General Intangibles, including, but not limited to, the agreements listed on Annex B [of the Security Agreement];

(f)     all Instruments;

(g)     all Inventory;

(h)     all Investment Property;

(i)     all Letter-of-Credit Rights;

(j)     all Vehicles;

(k)     the Commercial Tort Claims described on *Schedule 1 (Commercial Tort Claims)* and on any supplement thereto received by [GEOG];

(l)     all books and records pertaining to the other property described in this [section];

(m)     all other goods and personal property of [TGS], whether tangible or intangible and wherever located, including, but not limited to, the assets reflected on [TGS'] balance sheet attached [...] as Annex C [of the Security Agreement];

(n)     all property of [TGS] held by [GEOG], including all property of every description, in the possession or custody of or in transit to [GEOG] for any purpose, including safekeeping, collection or pledge, for the account of [TGS] or as to which [TGS] may have any right or power; and

(o)     to the extent not otherwise included, all Proceeds.[1]

20.     On September 23, 2013, GEOG perfected its security interest in the Collateral by filing a Uniform Commercial Code Financing Statement ("UCC-1") in the mortgage records of

---

[1]     *See* Security Agreement, attached as Exhibit E, at Section 2.

Lafayette Parish, State of Louisiana. A true and correct copy of the UCC-1 is attached hereto as **Exhibit F**, the terms and conditions of which are incorporated herein by reference.

**C.** **Moreno's Personal Guarantee of the Loan**

21. To further secure the Loan, on May 13, 2013, Moreno executed a Guarantee Agreement ("**Guarantee**") in favor of GEOG, wherein he agreed to personally guarantee the full and punctual payment and performance when due of the Obligations owed by TGS to GEOG under the Note, in the event TGS defaulted on its Obligations in accordance with the terms of the Note and other Loan Documents. A true and correct copy of the Guarantee is attached hereto as **Exhibit G**, the terms and conditions of which are incorporated herein by reference.

**FIRST CAUSE OF ACTION**
**(Breach of the Note)**
**(Against Defendant TGS)**

22. Plaintiff restates and re-alleges each and every foregoing paragraph of this Complaint as if fully set forth herein.

23. Under the terms of the Note, as amended by the "Third Amendment to Senior Secured Promissory Note," the Note matured and became fully due and payable by TGS to GEOG on December 29, 2013, for all amounts due, including the principal in the amount of $25,000,000, together with interest and all other amounts as may be due under the Loan Documents.

24. TGS failed to re-pay in full the Loan evidenced by the Note on or prior to the parties' extended Maturity Date of December 29, 2013.

25. Under Section 6(a)(i) of the Note, attached as Exhibit A, "the failure of Borrower to pay when due and payable (whether at maturity or otherwise) the full amount of any principal payment, interest payment or other amount due on [the] Note" constitutes an "Event of Default."

26. Under Section 6(b) of the Note, attached as Exhibit A, "upon occurrence of an Event of Default, (i) the Lender may declare all or any portion of the unpaid Obligations to be immediately due and payable [...] and (ii) Lender may enforce any and all Liens and security interests created pursuant to the Collateral Documents and exercise all remedies thereunder."

27. Upon TGS's default, GEOG, through counsel, made amicable demand upon TGS for delivery of collateral and payment of all amounts due and payable under the Note. True and correct copies of the demands, each dated December 30, 2013, are attached as **Exhibits H and I**.

28. Accordingly, TGS is indebted to GEOG:

    (a)    for the principal Loan amount of $25,000,000, and

    (b)    for interest at a rate of twelve percent (12%) per annum, compounded quarterly during the life of the Loan through the Maturity Date, and

    (c)    for default interest at a rate of twenty percent (20%) per annum, compounded quarterly since the Maturity Date, and

    (d)    for reasonable attorney's fees and other costs and expenses due under the Loan Documents.

### SECOND CAUSE OF ACTION
**(Breach of the Guarantee)**
**(Against Defendant Moreno)**

29. Plaintiff restates and re-alleges each and every foregoing paragraph of this Complaint as if fully set forth herein.

30. The Guarantee provides, among other things, that: "The Individual Guarantor, as a primary obligor and not merely as a surety, unconditionally and irrevocably, guarantees to the Lender [...] the full and punctual payment and performance when due (whether at stated maturity, upon acceleration or otherwise) of the Obligations, including, without limitation, (i) the principal of and interest on the advance made to the Borrower pursuant to the Loan Agreement

and (ii) all other amounts [...] payable by the Borrower under the Loan Agreement and the other Loan Documents [...]."[2]

31.     Upon TGS's default, GEOG, through counsel, made amicable demand upon Moreno to pay and satisfy all Obligations due and payable under the Guarantee. A true and correct copy of GEOG's demand, dated December 30, 2013, is attached as **Exhibit I**.

32.     Accordingly, Moreno is indebted to GEOG:

    (a)     for the principal Loan amount of $25,000,000, and

    (b)     for interest at a rate of twelve percent (12%) per annum, compounded quarterly during the life of the Loan through the Maturity Date, and

    (c)     for default interest at a rate of twenty percent (20%) per annum, compounded quarterly since the Maturity Date, and

    (d)     for reasonable attorney's fees and other costs and expenses due under the Loan Documents.

33.     GEOG seeks a judgment against Moreno for all amounts due under the Note and performance of all Obligations due under the Note and pursuant to the other Loan Documents.


### THIRD CAUSE OF ACTION
### (Injunctive Relief)
### (Against All Defendants)

34.     Plaintiff restates and re-alleges each and every foregoing paragraph of this Complaint as if fully set forth herein.

35.     As set forth above, Defendants have materially breached the terms of the Note and the other Loan Documents, and they remain in default.

---

[2]     *See* Guarantee, attached as Exhibit G, at Section 2.

36. At present, Defendants are indebted to GEOG in an amount in excess of $25,000,000 in principal and interest, alone, and Defendants' indebtedness to GEOG is continuing, as set forth under the terms of the Note.

37. Upon an "Event of Default," Section 6(b) of the Note entitles GEOG to declare all the unpaid Obligations immediately due and payable, and to exercise all remedies under the Collateral Documents and the Loan Documents.

38. Upon an "Event of Default," GEOG is entitled to exercise remedies under the Security Agreement, the UCC, or any other applicable law, as set forth in Section 5 of the Security Agreement.

39. Thus, based upon the Loan Documents, GEOG has an immediate and unconditional right to possession of the Collateral.

40. Unless immediate, temporary and permanent injunctive relief are granted, GEOG will be irreparably harmed and it lacks an adequate remedy at law because there is a substantial risk that Defendants will sell or otherwise dispose of the Collateral, rendering Plaintiff's first priority security interest in the Collateral and a judgment in this action ineffectual.

41. Indeed, upon information and belief, Defendants have previously entered into contracts transferring portions of the Collateral to third parties without GEOG's consent in violation of the Loan Documents.

42. Accordingly, Plaintiff is entitled to an injunction temporarily, preliminarily and permanently restraining and enjoining Defendants from selling, transferring, or otherwise disposing of the Collateral.

## FOURTH CAUSE OF ACTION
### (Declaratory Relief)
### (Against All Defendants)

43.     Plaintiff restates and re-alleges each and every foregoing paragraph of this

Complaint as if fully set forth herein.

44.     As set forth above, Defendants have materially breached the terms of the Note

and the other Loan Documents, but the question of whether Defendants are in breach raises a

justiciable controversy for this Court.

45.     Upon an "Event of Default," Section 6(b) of the Note entitles GEOG to declare all

the unpaid Obligations immediately due and payable, and to exercise all remedies under the

Collateral Documents and the Loan Documents.

46.     Upon an "Event of Default," GEOG is entitled to exercise remedies under the

Security Agreement, the UCC, or any other applicable law, as set forth in Section 5 of the

Security Agreement.

47.     Thus, based upon the Loan Documents, GEOG has an immediate and

unconditional right to possession of the Collateral, including the following:

        (a)     all Accounts;

        (b)     all Deposit Accounts;

        (c)     all Documents;

        (d)     all Equipment, including, but not limited to, the equipment described in Annex A [of the Security Agreement];

        (e)     all General Intangibles, including, but not limited to, the agreements listed on Annex B [of the Security Agreement];

        (f)     all Instruments;

        (g)     all Inventory;

(h)    all Investment Property;

(i)    all Letter-of-Credit Rights;

(j)    all Vehicles;

(k)    the Commercial Tort Claims described on *Schedule 1 (Commercial Tort Claims)* and on any supplement thereto received by [GEOG];

(l)    all books and records pertaining to the other property described in this [section];

(m)    all other goods and personal property of [TGS], whether tangible or intangible and wherever located, including, but not limited to, the assets reflected on [TGS'] balance sheet attached [...] as Annex C [of the Security Agreement];

(n)    all property of [TGS] held by [GEOG], including all property of every description, in the possession or custody of or in transit to [GEOG] for any purpose, including safekeeping, collection or pledge, for the account of [TGS] or as to which [TGS] may have any right or power; and

(o)    to the extent not otherwise included, all Proceeds.

48.    Plaintiff has no adequate remedy at law because there is a substantial risk that Defendants will render a judgment ineffectual and strip Plaintiff of its first priority security interest in the Collateral by selling or otherwise disposing of the Collateral.

49.    Accordingly, Plaintiff is entitled to a judgment: (a) declaring Defendants in breach of the Loan Documents; (b) declaring that Plaintiff has security interests in the Collateral and that Plaintiff is first in rank and has priority against all other persons with respect to the Collateral; (c) declaring that Plaintiff may immediately take possession of and sell the Collateral; and (d) declaring that Defendants must take all actions reasonably requested by Plaintiff to provide Plaintiff with a first-priority perfected and enforceable security interest in the Collateral, along with such other and further relief the Court deems just, proper, and equitable.

## FIFTH CAUSE OF ACTION
### (Replevin)
### (Against All Defendants)

50.     Plaintiff restates and re-alleges each and every foregoing paragraph of this Complaint as if fully set forth herein.

51.     As set forth above, Defendants have materially breached the terms of the Note and the other Loan Documents.

52.     Upon an "Event of Default," Section 6(b) of the Note entitles GEOG to declare all the unpaid Obligations immediately due and payable, and to exercise all remedies under the Collateral Documents and the Loan Documents.

53.     Upon an "Event of Default," GEOG is entitled to exercise remedies under the Security Agreement, the UCC, or any other applicable law, as set forth in Section 5 of the Security Agreement.

54.     Thus, based upon the Loan Documents, GEOG has an immediate and unconditional right to possession of the Collateral.

55.     As of the date of this Complaint, Defendants have failed to comply with Plaintiff's demand for immediate possession of the Collateral.

56.     Accordingly, as the direct and proximate result of the foregoing, GEOG is entitled to an Order of Replevin ordering Defendants to immediately tender the Collateral to GEOG.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.  On the First and Second Causes of Action, damages in an amount to be determined at trial, which is in excess of $25,000,000 representing all outstanding principal plus interest owed to Plaintiff;

b. On the Third Cause of Action, an injunction temporarily, preliminarily and permanently restraining and enjoining Defendants from selling, transferring, and/or otherwise disposing of the Collateral;

c. On the Fourth Cause of Action, a judgment: (a) declaring Defendants in breach of the Loan Documents; (b) declaring that Plaintiff has security interests in the Collateral and that Plaintiff is first in rank and has priority against all other persons with respect to the Collateral; (c) declaring that Plaintiff may immediately take possession of and sell the Collateral; and (d) declaring that Defendants must take all actions reasonably requested by Plaintiff to provide Plaintiff with a first-priority perfected and enforceable security interest in the Collateral, along with such other and further relief the Court deems just, proper, and equitable;

d. On the Fifth Cause of Action, an Order of Replevin ordering Defendants to immediately tender the Collateral to Plaintiff;

e. On all Causes of Action, an award of costs in this action, including reasonable attorneys' fees, costs, and expenses;

f. On all Causes of Action, an award of pre-and post-judgment interest; and

g. Such other, further and different relief as the Court may deem just and proper.

Dated:  New York, New York
        June 26, 2015

                                    **REED SMITH LLP**

                                    By: s/ *Casey D. Laffey*
                                        Casey D. Laffey
                                        John L. Scott
                                        Geoffrey G. Young
                                    599 Lexington Avenue
                                    New York, New York 10022
                                    Tel: (212) 521-5400
                                    Fax: (212) 521-5450

                                    John F. Hagan, Jr.
                                    (*pro hac vice application forthcoming*)
                                    10 South Wacker Drive, 40th Floor
                                    Chicago, Illinois 60606
                                    Tel: (312) 207-1000
                                    Fax: (312) 207-6400

                                    *Attorneys for Plaintiff*

- 13 -

# Appendix B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

_____

GE OIL & GAS, INC.,

                    Plaintiff,

          v.

TURBINE GENERATION SERVICES, L.L.C., and
MICHEL B. MORENO,

                    Defendants.

_____

Index No. 652296/2015

**ANSWER WITH**
**COUNTERCLAIMS**

Defendants, Turbine Generation Services, L.L.C. ("TGS") and Michel B.

Moreno ("Mr. Moreno" and collectively with TGS "Defendants"), by their attorneys,

Phillips Lytle LLP, answering the Complaint of Plaintiff, GE Oil & Gas, Inc. ("Plaintiff" or

"GEOG") state as follows upon information and belief:

<u>NATURE OF THE ACTION</u>

        1.     In response to paragraph 1 of the Complaint, state that such paragraph

consists of conclusions of law to which no response is required.  To the extent a response is

required, deny the allegations of paragraph 1 of the Complaint.

        2.     Deny the allegations of paragraph 2 of the Complaint.

        3.     Deny the allegations of paragraph 3 of the Complaint.

        4.     Deny the allegations of paragraph 4 of the Complaint.

<u>THE PARTIES</u>

        5.     Lack knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 5 of the Complaint.

        6.     Admit the allegations of paragraph 6 of the Complaint.

7.	In response to paragraph 7 of the Complaint, deny that Mr. Moreno resides in the State of Louisiana and state that the remainder the paragraph consists of conclusions of law to which no response is required.

## JURISDICTION AND VENUE

8.	Deny the allegations of paragraph 8 of the Complaint for the reasons set forth in Defendants' motion to dismiss (Motion Seq. No. 001).

## FACTUAL BACKGROUND

9.	In response to paragraph 9 of the Complaint, state that Mr. Moreno formed TGS as a vehicle to carry out a joint venture between Mr. Moreno, TGS and GEOG involving the oil field power generation business. Defendants admit the allegation contained in Paragraph 9 of the Complaint to the extent that joint venture involved the design, assembly, leasing and servicing of turbine or gas engine power generation units for use in oil field production but deny the allegation contained in Paragraph 9 of the Complaint to the extent they allege that TGS was formed for any purpose other than as a vehicle to carry out the joint venture between Mr. Moreno, TGS and GEOG.

10.	In response to Paragraph 10 of the Complaint, (i) admit that the copy of the Note attached as Exhibit A to the Complaint is a true and correct copy of the Note that was signed by Mr. Moreno in his capacity as CEO of TGS (except that the signature page of the Term Sheet is not included in Exhibit A to the Complaint); (ii) state that Mr. Moreno did so in the furtherance of the joint venture between Mr. Moreno, TGS  and GEOG and that, under the joint venture agreement, GEOG's $25,000,000 "loan" was to be converted into an ownership interest in TGS; and (iii) deny the allegation contained in Paragraph 10 of the Complaint to the extent they allege that the "loan" was anything other than a part of GEOG's contribution to the joint venture.

11.     In response to paragraph 11 of the Complaint, state that the "Loan Documents" and "Note" speak for themselves.  To the extent a response is required, deny the allegations of paragraph 11 of the Complaint.

12.     In response to paragraph 12 of the Complaint, (i) state that the text of Section (4)(e) of the "Note" speaks for itself; and (ii) deny the allegation contained in Paragraph 12 of the Complaint to the extent they allege that the "Loan" was anything other than a part of GEOG's contribution to the joint venture.

13.     In response to paragraph 13 of the Complaint, deny the allegation contained in Paragraph 13 of the Complaint because, under the parties' joint venture agreement, GEOG's interest in the "Note" was to be converted into an ownership interest in TGS prior to the Maturity Date.

14.     In response to paragraph 14 of the Complaint, (i) admit that the Maturity Date was originally scheduled for September 13, 2013, 90 days after the original "Outside Date" of June 15, 2013, and that it was extended; and (ii) deny the remaining allegations in Paragraph 14 of the Complaint because, under the terms of the parties' joint venture agreement, the amounts due under the Note were not to ever become due and payable, but rather were to be converted to an ownership interest in TGS.

15.     In response to paragraph 15 of the Complaint, (i) admit that the Maturity Date was extended from September 13, 2013 to October 20, 2013 and that the copy of the Amendment to Senior Secured Promissory Note attached as Exhibit B to the Complaint is a true and correct copy thereof; and (ii) deny the remaining allegations in Paragraph 15 of the Complaint to the extent they allege that payment ever became due because, under the terms of the parties' joint venture agreement, the amounts due under

the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

16.     In response to paragraph 16 of the Complaint, (i) admit that the Maturity Date was extended from October 20, 2013 to December 2, 2013 and that the copy of the Second Amendment to Senior Secured Promissory Note attached as Exhibit C to the Complaint is a true and correct copy thereof; and (ii) deny the remaining allegations in Paragraph 16 of the Complaint to the extent they allege that payment ever became due because, under the terms of the parties' joint venture agreement, the amounts due under the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

17.     In response to paragraph 17 of the Complaint, (i) admit that the Maturity Date was extended from December 2, 2013 to December 29, 2013 and that the copy of the Third Amendment to Senior Secured Promissory Note attached as Exhibit D to the Complaint is a true and correct copy thereof; and (ii) deny the remaining allegations in Paragraph 17 of the Complaint to the extent they allege that payment ever became due because, under the terms of the parties' joint venture agreement, the amounts due under the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

18.     In response to paragraph 18 of the Complaint, (i) admit that TGS executed the Security Agreement referenced in paragraph 18 of the Complaint and that a true and correct copy thereof is attached as Exhibit E to the Complaint; and (ii) deny the remaining allegations in Paragraph 18 of the Complaint to the extent they allege that TGS was required to perform in accordance with the Note because, under the terms of the

parties' joint venture agreement, the amounts due under the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

19.     In response to paragraph 19 of the Complaint, state that text of the Security Agreement speaks for itself.

20.     In response to paragraph 20 of the Complaint, state that the allegations of paragraph 20 consist of conclusions of law to which no response is required.

21.     In response to paragraph 21 of the Complaint, (i) admit that Mr. Moreno executed the Guarantee Agreement referenced in Paragraph 21 of the Complaint and that the copy of the Guarantee Agreement attached as Exhibit G to the Complaint is a true and correct copy thereof; and (ii) deny the remaining allegations in paragraph 21 of the Complaint to the extent they allege that payment ever became due because, under the terms of the parties' joint venture agreement, the amounts due under the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

<u>FIRST CAUSE OF ACTION</u>
(Breach of the Note)
(Against Defendant TGS)

22.     Repeat and reallege their answers to paragraphs 1 through 21 of the Complaint.

23.     Deny the allegations of paragraph 23 of the Complaint.

24.     In response to paragraph 24 of the Complaint, deny that the Note evidences a loan and further deny that they are liable on the Note.

25.     Admit that  paragraph 25 of the Complaint accurately quotes from Section 6(a)(i) of the Note but deny that they are liable on the Note.

26.    Admit that  paragraph 26 of the Complaint accurately quotes a portion of Section 6(b) of the Note but deny that they are liable on the Note and further deny that Plaintiff has any right to any collateral.

27.    In response to paragraph 27 of the Complaint, admit that GEOG made a demand for delivery of collateral and payment on the Note but deny that TGS defaulted and further deny that they are liable on the Note.

28.    Deny the allegations of paragraph 28 of the Complaint.

SECOND CAUSE OF ACTION
(Breach of the Guarantee)
(Against Defendant Moreno)

29.    Repeat and reallege their answers to paragraphs 1 through 28 of the Complaint.

30.    Admit that  paragraph 30 of the Complaint accurately quotes a portion of the Guarantee Agreement attached as Exhibit G to the Complaint but deny that they are liable to Plaintiff on the Note, the Guarantee Agreement, or any other documents.

31.    In response to paragraph 31 of the Complaint, admit that GEOG made a demand for payment under the Guarantee Agreement but deny that TGS defaulted and further deny that they are liable to Plaintiff on the Note, the Guarantee Agreement, or any other document.

32.    Deny the allegations of paragraph 32 of the Complaint.

33.    In response to paragraph 33 of the Complaint, deny that GEOG is entitled to a judgment against Mr. Moreno for any amount in connection with the Note or any other document.

## THIRD CAUSE OF ACTION
### (Injunctive Relief)
### (Against All Defendants)

34.     Repeat and reallege their answers to paragraphs 1 through 33 of the Complaint.

35.     Deny the allegations of paragraph 35 of the Complaint.

36.     Deny the allegations of paragraph 36 of the Complaint.

37.     In response to paragraph 37 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 37 of the Complaint.

38.     In response to paragraph 38 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 38 of the Complaint.

39.     Deny the allegations of paragraph 39 of the Complaint.

40.     Deny the allegations of paragraph 40 of the Complaint.

41.     In response to paragraph 41 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 41 of the Complaint.

42.     Deny the allegations of paragraph 42 of the Complaint.

FOURTH CAUSE OF ACTION
(Declaratory Relief)
(Against All Defendants)

43.     Repeat and reallege their answers to paragraphs 1 through 42 of the Complaint.

44.     In response to paragraph 44 of the Complaint, deny that they have breached (materially or otherwise) the terms of the Note or any other documents and state that such paragraph consists of conclusions of law to which no response is required.

45.     In response to paragraph 45 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 45 of the Complaint.

46.     In response to paragraph 46 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 46 of the Complaint.

47.     Deny the allegations of paragraph 47 of the Complaint.

48.     In response to paragraph 48 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 48 of the Complaint.

49.     Deny the allegations of paragraph 49 of the Complaint.

FIFTH CAUSE OF ACTION
(Replevin)
(Against All Defendants)

50.     Repeat and reallege their answers to paragraphs 1 through 49 of the Complaint.

51.     Deny the allegations of paragraph 51 of the Complaint.

52.     In response to paragraph 52 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 52 of the Complaint.

53.     In response to paragraph 53 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 53 of the Complaint.

54.     Deny the allegations of paragraph 54 of the Complaint.

55.     In response to paragraph 55 of the Complaint, deny that Plaintiff is entitled to immediate possession of any collateral.

56.     Deny the allegations of paragraph 56 of the Complaint.

57.     Deny all other allegations not admitted above.

## FIRST DEFENSE

58.     The Complaint fails to state a cause of action.

## SECOND DEFENSE

59.     Plaintiff failed to perform one or more conditions precedent.

## THIRD DEFENSE

60.     Plaintiff failed to mitigate its alleged damages, if any.

## FOURTH DEFENSE

61.     The damages alleged in the Complaint were, or with reasonable certainty will be, replaced or indemnified, in whole or in part by collateral sources.

## FIFTH DEFENSE

62.     Plaintiff's claims are barred by the doctrines of waiver, estoppel, laches and unclean hands.

## SIXTH DEFENSE

63.     There is another action pending between the same parties in the 15th Judicial District Court of Louisiana, Lafayette Parish, and both suits arise out of the same subject matter.

## SEVENTH DEFENSE

64.     Any damages sustained by Plaintiff were caused in whole or in part by Plaintiff's own culpable conduct or by culpable conduct attributable to others over whom Defendants neither had, nor exercised any control.

## EIGHTH DEFENSE

65.     Plaintiff's claims fail under the doctrine of equitable estoppel and/or promissory estoppel.

66.     In the joint venture agreement between Mr. Moreno, TGS and Plaintiff, Plaintiff made a promise to TGS and Mr. Moreno that the $25,000,000 "loan" that is the subject of the claims in Plaintiff's Complaint would not actually be repaid, but would be converted into an ownership interest in TGS.

67.     Plaintiff also promised that the Guarantee Agreement would never be enforced.

68.     At the time they executed the Note and Guarantee Agreement, TGS and Mr. Moreno were not aware that Plaintiff would not carry through on its promises under the joint venture agreement, including converting the amounts described in the Note to an equity interest and never enforcing the Guarantee Agreement.

69.     In executing the Note and Guarantee Agreement, TGS and Mr. Moreno reasonably and substantially relied on Plaintiff's promise to convert the amounts

described in the Note to an ownership interest in TGS and its promise not to enforce the Guarantee Agreement.

70.     Plaintiff was aware that substantially all of TGS's assets would be tied up in the equipment purchased with the proceeds of the Note, and that repayment at the Maturity Date would not be feasible.

71.     Plaintiff knew or should have known that Mr. Moreno and TGS would rely on Plaintiff's promises to convert the Note to an ownership interest in TGS and to never enforce the Guarantee Agreement.

72.     Injustice can be avoided only by enforcing Plaintiff's promises.

73.     Accordingly, GEOG is estopped from prosecuting this action against Defendants.

## NINTH DEFENSE

74.     In order to induce Defendants to enter into the Loan Documents described in Plaintiff's Complaint, and with the intention that Defendants would rely upon Plaintiff's statement, Plaintiff stated to Mr. Moreno that the $25,000,000 "loan" that is the subject of Plaintiff's Complaint would not need to be repaid but, instead, would be converted into an ownership interest in TGS.

75.     Plaintiff also stated that the Guarantee Agreement would never be enforced.

76.     The statements made by Plaintiff were false and fraudulent when made, and were known by Plaintiff to be false.

77.     Defendants relied on Plaintiff's statements and were induced to execute the Loan Documents, which they would not have executed had they known the truth.

## TENTH DEFENSE

78.     Defendants incorporate each and every allegation contained in their Counterclaims set forth below to the extent they also constitute defenses to the claims in Plaintiff's Complaint.

## COUNTERCLAIMS

## FACTUAL BACKGROUND

**A.      Development and licensing of the "Frac Stack Pack™" technology**

79.     Mr. Moreno, a successful entrepreneur with years of experience in the oil and gas exploration and production industry, now resides in Texas, but continues to own property and business interests in Lafayette.

80.     In the 1990s and 2000s, Mr. Moreno founded, developed, and ultimately sold several successful companies in various sub-sectors of the oil and gas industry.

81.     In 2011, Mr. Moreno became involved with Green Field Energy Services, Inc. ("GFES" or "Green Field"), a Delaware corporation with its principal place of business in Lafayette, Louisiana.

82.     Green Field was a start-up company whose primary business was providing well services specializing in turbine-powered hydraulic fracturing services ("fracking services").

83.     At that time, hydraulic fracturing was a new and promising industry, and many companies were expanding into the market.

84.     Natural gas was seen as a much cleaner and cost effective alternative to coal for power generation, and U.S. consumption of natural gas was rising.  Green

Field's fracking services were in high demand; margins were high; and the technology being used by Green Field far exceeded that of its competitors.

85.     Green Field had exclusive access to turbine engines that utilized a patented technology for use in Well Services.[1]

86.     Several years earlier, in or around 2006, Ted Lee McIntyre, II ("McIntyre"), invented an oil field turbine stimulation pump that utilizes the split shaft turbine or free turbine to control the flow rate and fluid pressure during oilfield pumping operations (the "Invention").

87.     On January 1, 2006, McIntyre granted MTT Properties L.L.C. ("MTTP"), a Louisiana entity he owned, the exclusive right to make, have made, use, offer for sale, and sell the Invention.

88.     On or about August 25, 2010, McIntyre filed a Non-Provisional Patent Application ("Patent Application") for the Invention related to "hydraulic fracturing of earth formations, and more particularly to the hydraulic fracturing of hydrocarbon bearing formations, e.g. oil and gas sands, for the purpose of increasing the production rate and total amount of recovery of the hydrocarbons from a well completed in such a formation." Patent Application, line 20.

89.     The Patent Application was registered by the United States Patent and Trademark Office on July 19, 2011, under the mark "Frac Stack Pack."

90.     In general terms, the technology made it possible to take used helicopter engines (similar to those used by the military in the Iraq and Afghanistan wars)

---

[1] Under the Equipment Purchase Agreement (defined below), "Well Services" means only procedures or services performed down hole in oil and gas wells such as: pump down work, cementing services, acidizing and chemical pumping, fracturing services, gravel packing and sand control services, coiled tubing, nitrogen pumping services, wireline, turbine testing and handling and rig work including well services and plug and abandonment.

and refurbish and modify the engines to be used as turbine frac units in the oil fields of Texas and other shale plays around the country.

91.     With the Frac Stack Pack technology, the turbines are fueled with natural gas from the wellhead—thus avoiding the significant cost of providing diesel to power the turbine frac units used in hydraulic fracturing.

92.     After the Patent Application was filed, and shortly before the patent was registered, on July 8, 2011, MTTP entered an Equipment Purchase Agreement with Hub City Industries, the predecessor to Green Field.

93.     Under the Equipment Purchase Agreement, Hub City Industries (later Green Field) was granted the exclusive license and right to purchase the turbine engines used by MTTP in connection with McIntyre's Invention for use in Well Services.

94.     The Equipment Purchase Agreement did not transfer any ownership interests in MTTP's intellectual property.

95.     MTTP's rights and obligations under the Equipment Purchase Agreement were subsequently assigned to another entity, Turbine Powered Technology, L.L.C. ("TPT"), a Louisiana limited liability company located in Louisiana.

96.     McIntyre is the principal of TPT and TPT is owned 50% by MTTP and 50% by Green Field.

97.     Following MTTP's transfer to TPT, Green Field, through its ownership of TPT, held a 50% ownership interest in the right to make, have made, use, offer for sale, and sell the Invention.

98.     On September 22, 2011, TPT and Green Field entered the Turbine Driven Equipment License Agreement ("Green Field License Agreement"), under which TPT granted Green Field (1) a royalty-free, exclusive fully transferable and assignable

worldwide license to the Frac Stack Pack trademark and (2) a perpetual, irrevocable, royalty-free, fully transferable and assignable, exclusive license to the Frac Stack Pack technology.

99.     Pursuant to the Green Field License Agreement, Green Field had exclusive rights to use, sell, lease, commercialize, or otherwise deal with the Frac Stack Pack™ equipment that it purchased (under the exclusive Equipment Purchase Agreement) from TPT in the Well Services business.

100.    The Green Field License Agreement and the Equipment Purchase Agreement did not preclude TPT from using or practicing rights under its Intellectual Property outside the Well Services business.

101.    Although Green Field owned 50% of TPT, it did not otherwise have any rights to use or practice TPT's Intellectual Property in any business other than Well Services.

102.    Utilizing its exclusive access to the Frac Stack Pack technology equipment, Green Field negotiated a contract with Shell dated September 2, 2011 (the Contract for High Pressure Fracturing Services), under which Shell prepaid $42.5 million to Green Field for the purchase, mobilization, modification and preparation of equipment and services provided under the agreement.

103.    With a lucrative contract with Shell and plans of business expansion, Green Field was poised to be an extremely successful player in the emerging hydraulic fracturing industry.

**B.      Mr. Moreno, GE and GEOG negotiate and initiate joint venture opportunities.**

104.    Unexpectedly, the natural gas market trends reversed in 2012.

105. A mild winter reduced natural gas prices and caused producers to reduce drilling activity. Significant capacity additions and high costs combined with low natural gas prices to further depress margins in the fracture stimulation industry in mid to late 2012.

106. Shell, by far Green Field's most significant customer, pulled back significantly out of onshore natural gas development in North America, including completely eliminating its Eagle Ford shale position, and terminated its contract with Green Field.

107. Green Field was left in a precarious position in need of capital and revenue streams.

108. Beginning in September of 2012, Mr. Moreno began searching for capital investment partners for Green Field in its present fracking business and, because Green Field potentially had access to the Invention technology through its 50% ownership interest in TPT, for Green Field to diversify into what would be a new sector for Green Field, power generation.

109. The Intellectual Property owned by TPT that was involved in the Frac Stack Pack technology for hydraulic fracturing could also be used for turbine power generators applicable to other industries.

110. An acquaintance of Mr. Moreno, who had knowledge that General Electric Company ("GE") had long been interested in the commercialization of turbine power generation, introduced him to Mike Hosford ("Hosford") of GEOG and Kevin Skillern ("Skillern") of GE Capital.

111. With that introduction, Mr. Moreno approached GE and GEOG about forming a joint venture (hereinafter the "Joint Venture"), to be operated in Lafayette, Louisiana, involving both fracking and power generation businesses.

112. The initial conversations concerning the Joint Venture occurred in mid-September 2012 among Mr. Moreno, Hosford, Skillern, and other GE and GEOG representatives.

113. Having expressed a desire at the initial meeting to immediately form the Joint Venture, the parties began working together along three simultaneous tracks: (1) the financial details of the Joint Venture, including how profits and losses would be borne; (2) the operations of the Joint Venture, including the necessary paperwork and employees on each side; and (3) the engineering and manufacturing aspects of the Joint Venture, including what engines, safety specifications, and reports.

114. Over the next few weeks, a general exchange of marketing presentations took place.

115. Face-to-face meetings occurred on or about October 5, 2012, with Mr. Moreno explaining the unique turbine driven technology in fracking as well as power generation applications to the GE investment group.

116. On or about October 18, 2012, in Lafayette, Louisiana, Mr. Moreno met with GE and GEOG personnel in Lafayette, Louisiana, at Greenfield's offices and assembly facility.

117. During the period from October 2012 through February 2013, the Joint Venture negotiations among Green Field, GE, GEOG, and Mr. Moreno escalated quickly.

118.    The initial courtship that had included formal meetings between Mr. Moreno and various representatives of Green Field, GE, and GEOG, rapidly progressed into a full working Joint Venture, with GE and GEOG exercising substantial authority over the business operations of the turbine business ongoing in Lafayette, Louisiana.

119.    During this five (5) month period, the parties conducted engineering and production due diligence including field visits to Louisiana, product demonstrations, meetings with potential customers, financial reviews of the Joint Venture, and market evaluations.

120.    The parties were in constant communication, generating thousands of e-mails.

121.    From October to December of 2012, GE and GEOG looked at several avenues of investment in the Invention technology while working with Mr. Moreno on the details of both Green Field's fracking business and the power generation side.

122.    The Joint Venture was known internally at GE and GEOG as "Project Cayenne" and, at that time, included both power generation and fracking.

123.    The financial terms of the Joint Venture were that GE, through one of its subsidiaries, would invest $200 million into the venture with $100 million committed to fracking and $100 million committed to power generation, all of which was to be conducted in Lafayette, Louisiana.

**C.     The parties enter non-disclosure agreements, a supplier agreement, and a memorandum of understanding in furtherance of the Joint Venture.**

124.    As an integral part of the Joint Venture, Green Field entered into broad ranging non-disclosure agreements with GEOG, GE Aero, and GE Capital.

125. On November 16, 2012, Mr. Moreno and his team met with a large number of GE and GEOG executives and employees, and a wide range of topics were discussed, including: (1) the value of the product and expected availability of equipment; (2) the technology, including engine acquisition and intellectual property and licensing issues; (3) customers, contract terms, and the customer's specifications; (4) the competitive landscape; (5) who would comprise the management team; and (6) financial considerations, including projected financials, capital expenditure requirements, methods of funding, and projected cash needs.

126. As another key element of the Joint Venture, the parties entered a Supplier Agreement that detailed where and how the parties would work together, who would be in charge of various aspects of the business, and what each party would be contributing to the business.

127. Yet another key element of the Joint Venture, GE Aero and Green Field signed a Memorandum of Understanding on January 7, 2013, addressing a joint development study, supply agreement and commercialization of 1-5 megawatt power generators.

128. The agreements and joint business operations between the parties were so far developed that GE and GEOG made Mr. Moreno commit to transition to all GE products for use in the turbine production process.

129. Prior to the Joint Venture, the business was using Honeywell engines to convert to turbine generators.

130. GE, however, had access to surplus jet engines that it manufactured.

131.    Seeing an additional benefit to its own company operations, GE and GEOG insisted that the Joint Venture would refurbish GE engines instead of Honeywell engines so that GE could sell its surplus engines to the Joint Venture.

132.    Much more than just a lender or investor in the business, GE and GEOG demonstrated its active involvement and right of control, inserting itself into the engineering operations of the business, visiting the factory floor multiple times in Louisiana to dictate that the Joint Venture operations must conform to "GE standards" including safety protocols and the use of safety gear.

133.    When GE and GEOG gave these directions, it was not merely giving advice to plan for a prospective joint venture in the future; the directions were issued as orders to be implemented immediately in the agreed-upon Joint Venture.

134.    As expected, GE's and GEOG's instructions were followed, consistent with GE's and GEOG's rights to control the operations as a partner in the Joint Venture.

**D.    The Joint Venture is publicly announced.**

135.    On January 7, 2013, Green Field, GE, and GEOG issued a joint press release announcing their collaboration.

136.    That release demonstrated the mutual excitement about the project, quoting Mr. Moreno saying, "We're thrilled to be collaborating with GE," and Hosford of GEOG saying, "This collaboration may help us deliver innovative solutions that solve some of the biggest industry challenges."

137.    Having quickly translated initial discussions to a fully functioning Joint Venture, run according to GE and GEOG standards, on January 27-29, 2013, GE, GEOG, and Mr. Moreno announced the Joint Venture at GE's Oil & Gas Worldwide

Forum in Florence, Italy with over 200 of GE and GEOG's top customers worldwide in attendance.

138. The actual presentation of the Joint Venture was made by Mr. Moreno and Hosford.

139. The presentation, entitled "Facing the Challenge: Unlocking the Potential of Unconventional Resources through Collaboration," was touted by GE and GEOG as an example of GE's and GEOG's joint venture strategies with emerging new technologies.

140. During this time, GE and GEOG made technical visits to Louisiana to assess the progress and status of the first power generation units.

**E.     The parties negotiate capital funding and financing of the Joint Venture and Mr. Moreno discontinues his search for joint venture partners.**

141. It was made clear to GE and GEOG that Mr. Moreno was seeking a total of $200 million in capital, divided $100 million for the ongoing fracking business and $100 million for the power generation business opportunity.

142. On or about March 8, 2013, Hosford and Lee Cooper ("Cooper") of GE corporate offices presented the idea of capital finance for both fracking and power generation to GE CEO Jeffrey R. Immelt ("Immelt").

143. Immelt instructed them to focus the Joint Venture around the power generation business.

144. Immelt decided to fund the Joint Venture out of his "own" corporate budget to facilitate a quicker closing and to demonstrate his commitment to the Joint Venture internally within the GE organization.

145.     Immelt told Hosford to get Mr. Moreno $25 million by the end of the week.  *See* **Exhibit A**.

146.     Following this meeting, Hosford and Cooper phoned Mr. Moreno to relay Immelt's approval of the Joint Venture funding by GE.

147.     During that phone call, Hosford and Cooper told Mr. Moreno that he should cease pitching joint venture relationships with other companies and/or private equity firms.

148.     At this point GE and GEOG were fully and unequivocally committed to exclusively providing the funding that was its contribution to the Joint Venture.

149.     The parties moved forward in continuation of the Joint Venture and in reliance on GE and GEOG's commitment to be a funding source for the Joint Venture.

150.     Mr. Moreno acted in reliance upon, and complied with, GE's and GEOG's instruction to cease searching for other potential joint venture partners, because he felt that the GE family of corporations was a good fit as a partner in light of GE's heritage and experience in the generator and turbine lines of business, GE as a financial partner committed sufficient capital investment, and as a strategic partner contributed greater benefit for the Joint Venture than a mere investor or lender would supply.

151.     GE and GEOG knew that Mr. Moreno stopped discussions with potential joint venture partners based on their instruction and commitment to fully fund the amounts they agreed were needed by the Joint Venture.

152.     Later in March 2013, Mr. Moreno was invited by Daniel C. Heintzelmen, President and CEO of GEOG, to attend a dinner in New Orleans, Louisiana, held on April 23, 2013, the night before GE's annual shareowners meeting,

saying "We are extending this invitation to some of our key partners and would be delighted if you could join us . . . ."

153.    At the dinner in New Orleans, Mr. Moreno was introduced as GE's partner in the Joint Venture to GE CEO Jeffrey Immelt, Beth Comstock, GE's senior vice president and Chief Marketing Officer, and more than a dozen GE board members and/or top executives.

**F.      GE and GEOG require that Green Field divest power generation line of business.**

154.    In or around late March or early April 2013, the parties agreed to exclude the fracking side of the business from the Joint Venture and focus on power generation only.

155.    GE and GEOG insisted that Green Field divest itself of the power generation line of business and move it into a separate company.  In return, Green Field would have the new company as a valuable client providing a lucrative source of revenue.

156.    GE, through its subsidiary GEOG, remained committed to invest $100 million in the power generation business with the separate company.

**G.      The parties further document the terms of the Joint Venture.**

157.    In April 2013, Mr. Moreno was called by Cooper and Comstock and was informed that Colleen Harkness Calhoun ("Calhoun"), Senior Executive Director of Energy Ventures for GE, was assigned and given authority to further document the Joint Venture terms.

158.    On April 3, 2013, Calhoun and Mr. Moreno met in Schenectady, New York to further document the details of the Joint Venture.

159.    By the evening of April 3, 2013, all remaining material elements of the Joint Venture had been agreed to by Mr. Moreno, on one hand, and GE and GEOG, on

the other. Afterwards, a celebratory dinner was had in Schenectady amongst Mr. Moreno, Calhoun of GE, and Steve Bolze ("Bolze") of GE Power and Water.

160. The business plan agreed upon by Mr. Moreno, GE, and GEOG was to ramp up the production of the turbines in Louisiana, establish a steady revenue stream, and then sell the business in 3 to 4 years.

161. In addition to facilitating the formation of the Joint Venture, the parties agreed that Mr. Moreno would contribute capital to the Joint Venture and would provide customer contacts and the expertise he gained during his many years of experience in the oil and gas exploration and production industry.

162. GE and GEOG's calculations forecast that the business would have substantial net worth within 4 years.

163. On April 4, 2013, Calhoun sent Mr. Moreno an e-mail confirming the "key terms" of the Joint Venture. *See* **Exhibit B**.

164. Among other things, the "key terms" included the following:

> $200 MM commitment by GE for Preferred equity in PowerGen New Co. (PGNC)
>
> PGNC will have IP, PG contracts, and pledge of equipment that is purchased by the entity
>
> . . . .
>
> GE to have negative control rights over the entity for items such as leverage on entity, change of control, replacement of key personnel, etc.
>
> . . . .
>
> TPT to package powergen and frac spreads exclusively for PGNC.
>
> Prior to funding determination by GE that safety and quality issues for existing equipment in field and

equipment to be deployed meets mutually agreed upon thresholds.

Initial GE funding of $50 MM by [April 29]

- $MM for product development to industrialize the GE C7 and the C35 GE.

- $[25]MM for equipment 2 frac spreads

  o Payments to TPT. When complete units will be leases to Greenfield for deployment to [Shell]. PGNC to receive lease payment at agreed upon rate over useful life of asset

- $[20]MM for equipment to be used for powergen units

  o Funds to be used to pay TPT for 100MW of power gen equipment

  o Equipment for [40 MW] of power under contract
    . . . .

PGNC will liquidate at the earlier of [three years from date of agreement] or as mutually agreed by shareholders and preferred equity

- GE will have the right to buy the PGNC for the [the higher of X multiple of EBIDTA or 20% less than 1 year GE's trailing EBITDA multiple]

- In the event that GE does not exercise its option to buy the company then Greenfield can purchase PGNC for same amount

- In the event that neither party exercises its purchase option than entity will be sold to a 3rd party or shares registered for public sale

165.    After a couple of phone calls between Mr. Moreno and Calhoun and some brief additional emails, it was clear that the parties were in agreement.  Mr. Moreno, GE, and GEOG had agreed to all of the essential terms of the Joint Venture.

166.    For example, the parties had agreed to what each side would contribute to the Joint Venture  (IP, technology, funding, skill and experience, etc.), how profits and losses would be shared (ownership interests and preferred equity), and control of the Joint Venture's activities (GE to have negative control rights on important aspects of the business).

167.    Stated differently, there was a mutual promise or undertaking by the parties to share in the profits and losses of the Joint Venture; an understanding of what each party's contribution to the Joint Venture would be; and a measure of joint proprietorship, management or control over the Joint Venture.

168.    In addition, by their emails, words and conduct, GE and GEOG manifested an intention to be bound as joint venturers with Mr. Moreno.

169.    In the months that followed, Mr. Moreno, who also intended to be bound as a joint venturer with GE and GEOG, continued to fulfill his obligations to the Joint Venture.

**H.    Mr. Moreno forms TGS, as required by GE and GEOG.**

170.    As described above, GE and GEOG had refused to partner with Green Field and insisted that the power generation Joint Venture be placed into a new entity.

171.    Thus, there was no opportunity for Green Field, whose business had always been in fracking services, to receive funding directly from GE and GEOG for a power generation business.

172.  Moreover, Green Field did not have a license or any rights to the Invention technology for use outside of Well Services, those rights belonged to TPT.

173.  Because Green Field was a 50% owner of TPT, Mr. Moreno presented Green Field and its bondholders with the business opportunity related to the development, construction, sale, and rental of turbine and gas-engine powered power generation.

174.  Green Field did not have the capacity to enter a new business industry.

175.  However, Green Field would benefit from the venture continuing in an entity separate from Green Field by gaining the new business as a customer.

176.  Green Field's shareholders and directors gave consent for Mr. Moreno and TPT to pursue the power generation business opportunity with GE and GEOG outside of Green Field.

177.  On May 7, 2013, in furtherance of the Joint Venture, Mr. Moreno formed TGS to serve as  the new company insisted upon by GE and GEOG.

178.  Per the Joint Venture, GEOG's ownership interest in TGS would accrue upon funding of the Joint Venture by GEOG.

I.  **GEOG issues a $25 million convertible bridge loan, secured by TGS's assets and Mr. Moreno's personal guarantee, which GE promised would never be called.**

179.  After TGS was formed in furtherance of the Joint Venture, GE and GEOG delayed the $100 million of funding that they had committed to provide.

180.  GE and GEOG first claimed that a "safety engineering study" had to be completed before the full funding could take place.

181.  However, recognizing that the Joint Venture needed funding before that study could be finalized, Calhoun, on behalf of GE and GEOG, provided $25 million in May 2013, to TGS in the form of a convertible loan as a short-term work-around to

uphold GE and GEOG's funding obligations. GE and GEOG required TGS to execute a Senior Secured Promissory Note (the "Note") for the $25 million investment.

182. On May 13, 2013, the Note was signed, and GEOG wired $25 million to TGS's bank account in Lafayette, Louisiana.

183. The Note contained Negative Covenants that materially restricted TGS operations and prohibited TGS from, among other items, selling its property, incurring debt, making investments, paying dividends, lending or advancing money to employees, or forming subsidiaries.

184. In short, through the Note, GE and GEOG exerted nearly complete operational and managerial control over TGS.

185. Unlike an ordinary note evidencing a loan, this Note also included the "Term Sheet," that described many of the key terms of the Joint Venture. A copy of the Term Sheet is attached as **Exhibit C** and is incorporated herein by reference.

186. Consistent with what the parties already had agreed to as partners, the terms set forth in the Term Sheet included, among other things, that the $25 million "convertible loan" from GEOG to TGS would be converted into TGS preferred membership interest on or about June 15, 2013 (the time the parties expected the safety study and other formal paperwork to be completed).

187. Ultimately, GEOG was to invest $100 million in the Joint Venture for a 50% stake in TGS.

188. As the parties had agreed previously, TGS used the $25 million to purchase the turbines and other equipment in furtherance of the business plan of the Joint Venture.

189.   Shortly before May 13, 2013, Calhoun requested that Mr. Moreno personally guarantee the loan and execute a Guarantee Agreement to "make finance folks happy."

190.   Calhoun told Mr. Moreno "not to worry" about the personal guarantee, because the loan would be converted to equity within 30 days and the Guarantee Agreement "would never be called."

191.   GE and GEOG also required that TGS execute a Security Agreement granting GEOG a security interest in all of TGS' assets, including both tangible and intangible assets, which notably includes TGS' rights to the Intellectual Property and technology that made the Joint Venture attractive to GE and GEOG.

192.   By obtaining a secured interest in TGS' rights to the Intellectual Property and technology, if GE and GEOG later reneged on its obligations to the Joint Venture and called its investment a loan—knowing that it could not be repaid—GE and GEOG could exploit the situation by foreclosing on the intangible assets and seize the rights to the technology, leaving its partners, Mr. Moreno and TGS, with nothing.

193.   The parties never intended for the Note, Guarantee Agreement, or Security Agreement to be enforceable by GE and GEOG.

194.   In fact, these documents are legal simulations.

195.   The $25,000,000.00 payment to TGS by GEOG was its initial equity investment in the Joint Venture.

**J.      The Term Sheet.**

196.   The eleven (11) page Term Sheet further memorializes the Joint Venture that already existed among Mr. Moreno, TGS, GE and GEOG, with TGS being the vehicle through which the Joint Venture would continue to operate.

197.    The Term Sheet evidences in writing the previously-existing Joint Venture, which had been functioning for months and provides additional details of the agreed-upon terms.

198.    For instance, under the heading of TGS Tax Treatment, the Term Sheet says:

> TGS will be treated **as a partnership** for US tax purposes and none of TGS, its directors or officers, Moreno, MMH or any of their affiliates will take any action that may result in TGS not being treated as a partnership (*e.g.*, filing a "check the box" election to treat TGS as a corporation for US tax purposes).
>
> The **parties will discuss and agree to relevant partnership tax provisions** (including income allocation and IRC Section 704(c) methods) prior to the completion of the First Contribution. (emphasis added).

199.    The Term Sheet evidences in writing the community of interest and combination of property, financial resources, effort, skill or knowledge already committed verbally in support of the Joint Venture.

200.    The Term Sheet contains no merger or integration clause; and therefore, did not negate the existing Joint Venture agreement among the parties.

201.    The Term Sheet further memorialized the parties' agreement to share profits and losses.

202.    Although the Distribution Waterfall set out in the Term Sheet calls for a repayment of investment first, it ultimately provides both parties with the right to share in the profits.

203.    The Term Sheet references that GE and GEOG's contribution of $100 million (including conversion of the Loan to Preferred Interests in TGS) would not be

repaid if the business failed and, likewise, Mr. Moreno's contribution would likewise be lost if the business failed.

204. Consistent with the terms previously agreed to by the parties, the Term Sheet notes a mutual right of control over the Joint Venture.

205. The Term Sheet provides that both GE and MOR DOH Holdings, L.L.C. ("MMH"), TGS' parent company, be represented on the Board of Managers.

206. Although the Term Sheet allows MMH to appoint three board members to GE's 2 (with 2 independent members appointed by the Board of Managers), the Term Sheet also provides that the approval of GE's designees is required for a number of actions.

207. In addition, the Term Sheet states that following the funding of the $25 million convertible loan, GE and GEOG were to make the First Contribution on or about June 15, 2013.

208. The First Contribution consists of converting the $25 million convertible loan into preferred membership equity plus $25 million in additional cash.

209. This total of $50 million in initial funding from GE and GEOG is consistent with the agreement previously reached by the parties and noted in Calhoun's April 4, 2013 e-mail to Mr. Moreno.

210. Clearly, the Term Sheet was exceptionally detailed and contained the material rights and obligations of the parties including, but not limited to, the Joint Venture's business plan and assets, as well as each party's contributions to the Joint Venture.

211.   In sum, the Term Sheet memorialized the parties' agreement on all material terms of the Joint Venture, which created a binding agreement to jointly participate in the Joint Venture.

**K.    GE and GEOG fail to execute the final documents memorializing the Joint Venture and fail to provide additional funding it promised to provide.**

212.   During the period May 13, 2013 through June 15, 2013, GE and GEOG made no efforts whatsoever toward honoring their obligations to execute final documents memorializing the Joint Venture or to provide required funding, despite repeated e-mail requests from Mr. Moreno to do so.

213.   According to the Term Sheet, funding of the First Contribution was subject to completion of the following:

(i)     Definitive agreements for the overall transaction,

(ii)    TGS, GFES, and TPT entering into assembly, installation, product, development, maintenance and licensing agreements,

(iii)   GFES board and GFES minority stockholder, TPT governing body and Marine Turbine Technologies, L.L.C. governing body approvals and consents, including, with respect to GFES, board and minority stockholder waivers of corporate opportunities regarding the transactions,

(iv)    Fairness opinion regarding related party assets of the transactions among TGS, GFES and TPT,

(v)     GE internal approvals,

(vi)    The turbine powergen units ("TPU") passing a GE engineering peer and risk review,

(vii)   GE approval of applicable TPU engineering designs, and

(viii)  Completion of environmental, health and safety and product safety/liability due diligence, including, but not limited to, site visits and written assessments/reports by GE personnel and/or GE consultants, discussions with TPT management and responses from TPT management to due diligence questions raised by GE.

214.    All such conditions pertaining to the First Contribution were either fully performed by TGS and Mr. Moreno or waived by GE and GEOG.

215.    As such, GE and GEOG breached their obligations under the Joint Venture and their fiduciary duties to TGS and Mr. Moreno by, among other things, failing to make the First Contribution and failing to put forth good faith efforts towards the execution of definitive documents memorializing the Joint Venture and prior agreed funding transactions.

216.    For example, under the terms of the Joint Venture, GE and GEOG required TGS, Green Field, and TPT to enter into an assembly, installation, product development, maintenance and licensing agreement for turbine power generators.

217.    In June 2013, TGS complied and executed an Agreement for the Manufacture and Sale of Turbine Powered Generators with TPT, a contractor, and Green Field, the contract manager.

218.    Under this Agreement, TPT was required to manufacture and deliver to TGS, and TGS was required to purchase from TPT, a minimum of 100 Mw of Turbine Powered Generators per annual production cycle.

219.    TGS was required to make deposits to Green Field by July 1, 2013 for the first production cycle.

220.    TGS made the required payments to Green Field and TPT under that Agreement—totaling in excess of $28,000,000—in reliance on the promises by GE and GEOG that they would fund the Joint Venture as agreed.

221.    In addition to entering into the Agreement for the Manufacture and Sale, TPT, whose offices and operations are located in Louisiana, commenced a search for

real estate to build a new, larger facility to accommodate the production demands set forth by GE and GEOG.

**L.** **GE and GEOG misrepresent to Mr. Moreno that the Joint Venture is going forward and will be funded as promised.**

222.   Despite the breaches by GE and GEOG, representatives of GE and GEOG continued to mislead and induce Mr. Moreno into relying on the promise that the Joint Venture funding was imminent.

223.   In or around July 2013, Hosford phoned Mr. Moreno to inform him that Edoardo Padeletti of GEOG would be replacing Calhoun and that he would facilitate the Joint Venture and "button up" all loose ends so that funding could occur.

224.   Mr. Moreno received a call from Padeletti who apologized to Mr. Moreno for GE's lack of action and assured Mr. Moreno that the Joint Venture power generation business was moving forward.

225.   Indeed, Padeletti told Mr. Moreno that "I only have a one-way ticket from Italy and have been instructed by upper management not to leave the U.S. until all matters involving the joint venture have been finalized and funded."

226.   GE and GEOG did not fulfill that promise as they refused to fund the Joint Venture in breach of their obligations and fiduciary duties.

227.   In or around August 2013, a meeting was held in Houston, Texas with Mr. Moreno, Hosford, Padeletti and Husan Dandashly, GE's Operation Chief.

228.   At that meeting, Mr. Moreno was again given assurances that the power generation Joint Venture was moving forward; and Dandashly personally stated that "although new to the job," he was instructed by corporate management to finalize all pending matters and get the business operational.

229.   On or about August 14, 2013, GE and GEOG completed the second "Product Engineering Review of Power Generation Units."

230.   Both reviews passed GE standards and were approved.

**M.   GE's new director attempts to repudiate the Joint Venture agreement.**

231.   On or about September 29, 2013, Mr. Moreno was informed by Padeletti that GE's New Corporate Mergers and Acquisitions director, John Flannery, did not feel comfortable with the Joint Venture, as it existed, claiming that the Green Field financial situation was the reason for the "buyers' remorse."

232.   In or around October 2013, Hosford and Padeletti informed Mr. Moreno that Flannery unilaterally decided to "kill" the Joint Venture.

233.   On or about October 27, 2013, Green Field filed for bankruptcy protection.  The Green Field bankruptcy did not involve TGS.

**N.   Breach of the Joint Venture agreement and attempt to collect on the Note, enforce The Guarantee Agreement and Security Agreement.**

234.   After repudiating the parties' Joint Venture agreement, GE and GEOG refused to perform any of their obligations thereunder.

235.   Although obligated to do so, GE and GEOG did not provide the additional necessary funding to TGS; failed to exchange the obligations due under the Note for Preferred Interests; and refused to cancel the Note and surrender it to TGS.

236.   Rather, in breach of its promise not to call the Note, the Security Agreement, or Guarantee Agreement, and contrary to the parties' Joint Venture agreement, GE and GEOG demanded repayment of the $25 million convertible loan.

237.   On April 7, 2014, GEOG filed a lawsuit against Moreno and TGS in the United States District Court for the Western District of Louisiana seeking to collect the

Note, enforce the Guarantee Agreement and Security Agreement, and obtain turnover of the collateral.

238.    As a result of GE and GEOG's breaches of their obligations and fiduciary duties, Mr. Moreno and TGS suffered substantial damages.

239.    GE and GEOG's breaches deprived TGS of the funds necessary to operate as a business, resulting in lost profits and a diminution in the value of TGS.

240.    Due to GE's and GEOG's breaches, TPT has placed Mr. Moreno and TGS in default of the Agreement for the Manufacture and Sale of Turbine Power Generators and has made additional claims against them for accounts payables incurred in manufacturing the TPUs, including accounts payables for components which were mandated by GE and GEOG and increased the cost to build the TPUs by nearly 50%.

241.    Moreover, but for GE's and GEOG's breaches, Mr. Moreno would have acquired ownership of a 50% share of the Joint Venture that by GE's and GEOG's own calculations would have had substantial net worth in four years.

## FIRST COUNTERCLAIM
### (Declaratory Judgment)

242.    Mr. Moreno and TGS repeat and reallege paragraphs 1 through 241 of this Answer with Counterclaims.

243.    There is a present, actual, justifiable, and substantial controversy between the parties as to (1) whether a binding Joint Venture was created between them and, if so, whether GE and GEOG have breached the parties' agreement and (2) whether the Note, Guarantee Agreement and Security Agreement executed by Mr. Moreno and TGS are enforceable.

244.    Pursuant to CPLR 3001, Mr. Moreno and TGS are entitled to a judgment declaring that:

a. Mr. Moreno, on one hand, and GE and GEOG, on the other hand, had reached mutual agreement on all essential elements of the Joint Venture agreement;

b. a binding Joint Venture agreement was created among Mr. Moreno, on one hand, and GE and GEOG, on the other hand;

c. TGS was formed pursuant to the Joint Venture agreement of the parties as the vehicle through which the Joint Venture would act;

d. the terms agreed to by the parties and further memorialized in the Term Sheet are binding on GE and GEOG;

e. GE's and GEOG's attempt to repudiate the Joint Venture with Mr. Moreno was without any legal effect;

f. the Note, Security Agreement, and Guarantee Agreement executed by Mr. Moreno and TGS are simulations, and are unenforceable, because the parties never intended that they be enforceable by GE and GEOG as written;

g. GE and GEOG may not enforce the Note, Guarantee Agreement, or Security Agreement against Mr. Moreno and TGS; and

h. GE's and GEOG's $25,000,000.00 payment to TGS was an investment in equity and shall be treated as such, as the parties intended.

## SECOND COUNTERCLAIM
### (Breach Of Fiduciary Duty)

245. Paragraphs 1 through 244 are realleged.

246.   As partners in the Joint Venture, GE and GEOG owed fiduciary duties to the Joint Venture, Mr. Moreno and TGS, including but not limited to:  (1) the duty of loyalty and the utmost good faith; (2) the duty of fairness and honesty in their dealings; (3) the duty to render a full and fair disclosure of all facts which materially affect the Joint Venture, Mr. Moreno, and TGS's rights and interests; and (4) the duty not to conduct any activity for themselves or on behalf of a third person that is contrary to these fiduciary duties or that is prejudicial to the Joint Venture, Mr. Moreno, or TGS.

247.   TGS and Mr. Moreno trusted and relied upon GE and GEOG and fully performed their obligations under the Joint Venture agreement.

248.   GE and GEOG breached their fiduciary duties to the Joint Venture, TGS, and Mr. Moreno by engaging in the wrongful and unfair conduct described above, including but not limited to the following acts of disloyalty, dishonesty, and bad faith: (i) making no effort whatsoever toward execution of the final documents memorializing the Joint Venture; (ii) refusing to perform their obligations under the Joint Venture; (iii) refusing to make the First Contribution; (iv) refusing to convert the Note into preferred membership equity in TGS; (v) refusing to cancel and surrender the Note and Guarantee Agreement to Mr. Moreno and TGS; (vi) misinforming Mr. Moreno that the Note and Guarantee Agreement never would be called or enforced; (vii) misleading Mr. Moreno into believing that GE and GEOG intended to fulfill their obligations under the Joint Venture, when in fact, GE and GEOG were planning to repudiate the parties' agreements; and (viii) placing TGS and Mr. Moreno in default on the Note and Guarantee Agreement.

249.   Mr. Moreno and TGS suffered significant damages as a result of GE's and GEOG's misconduct and breaches of their fiduciary duties, including but not limited

to lost profits, diminution of the value of TGS, attorneys' fees and interest, and other damages in such amounts as shall be proven at trial.

250. Additionally, and pursuant to the terms of the First Contribution, GE and GEOG owe an additional $25 million to TGS.

### THIRD COUNTERCLAIM
**(Breach Of Contract)**

251. Paragraphs 1 through 250 are realleged.

252. Mr. Moreno and TGS, on one hand, and GE and GEOG, on the other hand, entered into a binding Joint Venture agreement.

253. Mr. Moreno and TGS have complied with all of their obligations under the Joint Venture agreement.

254. At the time they entered into the agreement to form the Joint Venture, the parties contemplated that they would be responsible for profits lost as a result of a breach of the Joint Venture agreement.

255. GE and GEOG have breached their obligations under the Joint Venture agreement in the following non-exclusive ways, and in such other ways as may be proven at trial:

a. refusing to tender the additional funding called for under the Joint Venture agreement;

b. refusing to convert the Note into preferred membership equity in TGS;

c. refusing to cancel and surrender the Note, the Security Agreement, and the Guarantee Agreement to Mr. Moreno and TGS; and

d. placing TGS and Mr. Moreno in default on the Note, the Security Agreement, and the Guarantee Agreement.

256. Mr. Moreno and TGS have incurred damages, including damages caused by GE's and GEOG's delay in performance, as a result of these breaches for which GE and GEOG are liable, including but not limited to lost profits, diminution of the value of TGS, attorneys' fees and interest, and other damages in such amounts as shall be proven at trial.

257. Mr. Moreno and TGS are also entitled to the remedy of specific performance against GE and GEOG ordering them to perform their agreed to obligations including but not limited to: (1) delivery of all funding due and owing to TGS under the Joint Venture; (2) conversion of the $25 million "loan" to an equity interest in TGS; and (3) cancellation of the Note, Guarantee Agreement and Security Agreement and delivery of the cancelled documents to Mr. Moreno and TGS.

## FOURTH COUNTERCLAIM
### (Intentional and/or Negligent Misrepresentation)

258. Paragraphs 1 through 257 are realleged.

259. As fiduciaries, GE and GEOG had a special, privity-like relationship with Mr. Moreno and TGS that imposed a duty upon GE and GEOG to impart correct information to Mr. Moreno and TGS.

260. GE and GEOG intentionally and/or negligently made several misrepresentations of fact and/or failed to disclose material facts which they were bound to disclose to Mr. Moreno and TGS as more particularly described above and as may be discovered in the course of this litigation including but not limited to:

a. advising Mr. Moreno and TGS that a "safety engineering study" had to be completed prior to funding the Joint Venture;

b.	advising Mr. Moreno and TGS that the Note and Security Agreement were merely a stop-gap measure; and

c.	advising Mr. Moreno that the Guarantee Agreement "would never be called" because the Note would be converted into equity within 30 days.

261.	The information imparted to Mr. Moreno and TGS by GE and GEOG was incorrect and Mr. Moreno and TGS relied upon the incorrect information to their detriment.

262.	Mr. Moreno and TGS had no reason to know that GE's and GEOG's statements were not truthful and had no reason to know that GE and GEOG did not intend to perform the Joint Venture agreement or fund the Joint Venture, but rather intended to enforce the Note, Security Agreement and Guarantee Agreement.

263.	But for GE's and GEOG's material misrepresentations and nondisclosures, Moreno and TGS would have pursued other opportunities for investment in the venture, which said opportunities have now been lost.

264.	But for GE's and GEOG's material misrepresentations and nondisclosures, Mr. Moreno and TGS never would have executed the Note, Security Agreement or the Guarantee Agreement.

265.	But for GE's and GEOG's material misrepresentations and nondisclosures, Mr. Moreno and TGS never would have entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT.

266.	Accordingly, Mr. Moreno and TGS are entitled to recover damages from GE and GEOG as a result of their negligent and/or intentional misrepresentations,

including but not limited to, lost profits, diminution of the value of TGS, attorneys' fees and interest, and other damages in such amounts as shall be proven at trial.

## FIFTH COUNTERCLAIM
### (Promissory Estoppel)

267. Paragraphs 1 through 266 are realleged.

268. As set forth above, GE and GEOG owed fiduciary duties to Mr. Moreno and TGS.

269. GE and GEOG clearly and unambiguously made representations and promises to Mr. Moreno and TGS that they would, among other things, provide additional funding to the Joint Venture, totaling $100 million, including an additional $25 million by June 13, 2013.

270. GE and GEOG also clearly and unambiguously represented to TGS and Mr. Moreno that the $25,000,000 "loan" to TGS would not need to be repaid, but instead, would be converted into an ownership interest in TGS.

271. In executing the Note, Security Agreement and Guarantee Agreement, TGS and Mr. Moreno reasonably and justifiably relied on GE's and GEOG's representations.

272. GE and GEOG were aware that substantially all of TGS's assets would be tied up in the equipment purchased with the proceeds of the Note, and that repayment at the Maturity Date would not be possible.

273. GE and GEOG knew or should have known that Mr. Moreno and TGS would rely on their representations and it was foreseeable that Mr. Moreno and TGS would rely on their representations.

274.	In reliance on GE's and GEOG's representations, Mr. Moreno ceased searching for other potential joint venture partners and contributed capital, customer contacts, skill and experience to the Joint Venture.

275.	In reliance on GE's and GEOG's representations, TGS and Mr. Moreno also changed their position to their detriment by, among other things, using the $25,000,000 to purchase the engines and other equipment in furtherance of the Joint Venture.

276.	TGS and Mr. Moreno also entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and made payments thereunder in excess of $28,000,000 in reliance on GE's and GEOG's representations that the Joint Venture would be fully funded.

277.	When GE and GEOG demanded payment on the Note, rather than converting the Note to an ownership interest in TGS, all of the Joint Venture's funds were tied up in equipment.

278.	Moreover, as a result of GE's and GEOG's repudiation of the Joint Venture agreement and refusal to provide the promised funding, TPT has placed Mr. Moreno and TGS in default of the Agreement for the Manufacture and Sale of Turbine Power Generators and has made additional claims against them for accounts payables, among other things.

279.	TGS and Mr. Moreno have incurred, and will continue to incur, actual damages and unconscionable injuries in an amount to be determined at trial as a result of their detrimental reliance on GEOG's and GE's representations, as well as their attorneys' fees.

## SIXTH COUNTERCLAIM
### (Fraud and Fraud in the Inducement)

280.　Paragraphs 1 through 279 are realleged

281.　GE and GEOG knowingly and intentionally made several material misrepresentations of fact, suppressed the truth, and/or failed to disclose material facts, as more particularly described above and as may be discovered in the course of this litigation, in order to induce Mr. Moreno and TGS to execute the Note, Guarantee Agreement and Security Agreement and/or in order to obtain an unjust advantage over them or to cause a loss or inconvenience to them, including but not limited to:

a.　advising Mr. Moreno and TGS that a "safety engineering study" had to be completed prior to funding the Joint Venture;

b.　advising Mr. Moreno and TGS that the Note and Security Agreement were merely a stop-gap measure;

c.　advising Mr. Moreno that the Guarantee Agreement "would never be called" because the Note would be converted into equity within 30 days;

d.　making representations and engaging in other intentional conduct to cause Mr. Moreno and TGS to believe that they were committed to the Joint Venture and would provide all promised funding, when in fact, they had no intention of going forward; and

e.　failing to disclose to Mr. Moreno and TGS that they did not intend to fund the Joint Venture as promised.

282.　GE and GEOG knew that these material representations were false and never intended to fund the Joint Venture or become an equal partner in the business.

283.    GE and GEOG made these material representations with the intention of inducing Mr. Moreno and TGS to rely upon them to their detriment.

284.    As fiduciaries, GE and GEOG had a duty to disclose to Mr. Moreno and TGS that they did not intend to fund the Joint Venture.

285.    Mr. Moreno and TGS had no reason to know that GE's and GEOG's representations were not truthful and had no reason to know that GE and GEOG did not intend to perform the Joint Venture agreement or fund the Joint Venture, but rather intended to enforce the Note, Security Agreement and Guarantee Agreement.

286.    Mr. Moreno and TGS relied upon GE's and GEOG's material representations to their detriment.

287.    But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS would have pursued other opportunities for investment in the venture, which said opportunities have now been lost.

288.    But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS never would have executed the Note, the Security Agreement in which TGS pledged all of its tangible and intangible assets under the promise that the "loan" would be converted to equity in TGS, or the Guarantee Agreement.

289.    But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS never would have entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT.

290.    Accordingly, TGS and Mr. Moreno are entitled to rescission of the Loan Documents, including but not limited to the Note, the Security Agreement, and Guarantee Agreement, plus damages including lost profits, diminution of the value of

TGS, attorneys' fees and interest, and all other damages in such amounts as shall be proven at trial.

## SEVENTH COUNTERCLAIM
### (Breach of Agreement to Form Partnership/Joint Venture)

291.   Paragraphs 1 through 290 are realleged.

292.   In the event that this Court does not find that Mr. Moreno, on one hand, and GE and GEOG, on the other hand, formed a valid and binding Joint Venture, then Mr. Moreno and TGS plead in the alternative, pursuant to CPLR 3014, that GE and GEOG breached the parties' agreement to form a joint venture and/or partnership and demand specific performance thereof.

293.   More specifically, GE and GEOG agreed to form a joint venture and/or partnership with Mr. Moreno and TGS and the terms were further memorialized in the Term Sheet.

294.   All conditions precedent to the formation of the joint venture and/or partnership have been performed or have occurred.

295.   Mr. Moreno has performed, and/or is willing to perform, all of his obligations under the parties' agreement to form a joint venture.  Indeed, among other things, Mr. Moreno contributed capital; formed TGS in accordance with the instructions of GE and GEOG; and provided customer contacts and valuable experience he gained during his many years operating in the oil and gas exploration and production industry.

296.   Mr. Moreno executed the Note and Security Agreement in his capacity as TGS's CEO, and as the CEO of TGS's parent, and TGS used the proceeds of the Note to purchase equipment to conduct the business of the joint venture and/or partnership.

297.   Mr. Moreno also executed the Guarantee Agreement.

298.    In addition, Mr. Moreno and TGS entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and made substantial payments thereunder.

299.    GE and GEOG, however, repudiated their agreement to enter into the joint venture and/or partnership and have failed and refused to execute the documents memorializing the terms of the agreement and have failed and refused to perform their obligations as described above.

300.    GE and GEOG have also refused to convert the Note to an ownership interest in TGS.  Rather, GE and GEOG have demanded payment on the Note and filed this action against Mr. Moreno and TGS to enforce the Note, the Guarantee Agreement, and the Security Agreement.

301.    If GE and GEOG had not breached their agreement to form a joint venture and/or partnership with Mr. Moreno, the joint venture and/or partnership would have been duly formed.

302.    At the time they agreed to form a joint venture and/or partnership, the parties contemplated that they would be responsible for profits lost by the joint venture and/or partnership as a result of a breach of the agreement to form a joint venture and/or partnership.

303.    Mr. Moreno and TGS are entitled to recover all damages, including damages caused by GE and GEOG's delay in performance, incurred as a result of GE's and GEOG's breach of the agreement to form a joint venture and/or partnership with Mr. Moreno and TGS.

304.    Mr. Moreno and TGS are also entitled to the remedy of specific performance against GE and GEOG ordering them to perform their agreed to obligations

including but not limited to: (1) execution of any and all documents necessary to formalize the parties' agreement; (2) delivery of all funding due and owing to TGS under the parties' agreement; (3) conversion of the $25 million "loan" to an equity interest in TGS; and (4) cancellation of the Note, Guarantee Agreement and Security Agreement and delivery of the cancelled documents to Mr. Moreno and TGS.

## EIGHTH COUNTERCLAIM
### (Unjust Enrichment)

305. Paragraphs 1 through 304 are realleged.

306. Recovery of the Note, Security Agreement and Guarantee Agreement, contrary to the promises and representations made by GE and GEOG, would result in unjust enrichment of GE and GEOG at the expense of Mr. Moreno and TGS.

307. Such enrichment contravenes equity and good conscience.

308. Accordingly, Mr. Moreno and TGS are entitled to be compensated to the extent to which GE and GEOG have been unjustly enriched.

## NINTH COUNTERCLAIM
### (Breach of Duty of Good Faith and Fair Dealing)

309. Paragraphs 1 through 308 are realleged.

310. The parties reached agreement on all of the material terms of the Joint Venture and completed their negotiations of what they regarded as the essential elements of the Joint Venture.

311. While the Term Sheet reflects that certain matters were left open for further discussion, those matters were not deemed by the parties to be material.

312. In fact, performance of the Joint Venture had begun on the good faith understanding that agreement on the non-material, yet unsettled, matters would follow.

313. In that regard, the Term Sheet imposed an express duty upon GEOG and GE to work diligently and in good faith towards the execution of documents reflecting all terms so as to finalize the Joint Venture.

314. The Term Sheet also imposed implied duties of good faith and fair dealing upon GEOG and GE to fulfill their obligations to Mr. Moreno and TGS and to refrain from any actions that could impair or injure the rights of Mr. Moreno and TGS in the Joint Venture. These duties were in addition to, and were separate and distinct from, GEOG's and GE's express duties under the Term Sheet.

315. GEOG and GE breached their express duty to work diligently and in good faith towards the execution of documents reflecting all terms so as to finalize the Joint Venture. In fact, despite repeated requests from Mr. Moreno, GEOG and GE took no steps whatsoever towards preparing and executing any documentation subsequent to entering into the Term Sheet.

316. Such conduct also resulted in a breach of GEOG's and GE's implied duties of good faith and fair dealing.

317. In the alternative, if the finder of fact were to conclude that the parties had not reached agreement on all of the material terms of the Joint Venture, the Term Sheet nonetheless imposed an express duty upon GEOG and GE to work diligently and in good faith towards the execution of definitive documents necessary to consummate the Joint Venture.

318. GEOG and GE breached their express duty to work diligently and in good faith towards the execution of definitive documents necessary to consummate the Joint Venture. In fact, despite repeated requests from Mr. Moreno, GEOG and GE took

no steps whatsoever towards preparing and executing any documents subsequent to entering into the Term Sheet.

319. GEOG and GE also breached their express and implied duties of good faith and fair dealing by acting in concert with each other in an attempt to defeat the rights that Mr. Moreno and TGS had in the Joint Venture, as well as the rights that Mr. Moreno and TGS had under the Term Sheet.

320. As a direct and proximate result of GEOG's and GE's breach of their express and implied duties of good faith and fair dealing, Mr. Moreno and TGS have suffered damages in an amount to be determined at trial, plus attorneys' fees.

## JURY DEMAND

321. Mr. Moreno and TGS demand a trial by jury on all issues.

**WHEREFORE**, Defendants Turbine Generation Services L.L.C. and Michel B. Moreno demand judgment:

1. Dismissing Plaintiff's Complaint with prejudice;

2. Declaring that:

    a. Mr. Moreno, on one hand, and GE and GEOG, on the other hand, had reached mutual agreement on all essential elements of the Joint Venture agreement;

    b. a binding Joint Venture agreement was created among Mr. Moreno, on one hand, and GE and GEOG, on the other hand;

    c. TGS was formed pursuant to the Joint Venture agreement of the parties as the vehicle through which the Joint Venture would act;

d.    the terms agreed to by the parties and further memorialized in the Term Sheet are binding on GE and GEOG;

e.    GE and GEOG's attempt to repudiate the Joint Venture with Mr. Moreno was without any legal effect;

f.    the Note, Security Agreement, and Guarantee Agreement executed by Mr. Moreno and TGS are simulations, and are unenforceable, because the parties never intended that they be enforceable by GE and GEOG as written;

g.    GE and GEOG may not enforce the Note, Guarantee Agreement, or Security Agreement against Mr. Moreno and TGS; and

h.    GE and GEOG's $25,000,000.00 payment to TGS was an investment in equity and shall be treated as such, as the parties intended.

3.    Awarding damages to Mr. Moreno and TGS incurred as a result of GE's and GEOG's breaches of fiduciary duty, breaches of contract, breaches of express and implied duties of good faith and fair dealing, intentional and/or negligent misrepresentations, and for promissory estoppel, fraud and fraud in the inducement, including but not limited to damages for delay, lost profits, diminution of the value of TGS, attorneys' fees and interest, and such other damages in such amounts as shall be proven at trial;

4.    Ordering GE and GEOG to specifically perform all of their obligations under the parties' Joint Venture, including but not limited to:   (1) delivery of all funding due and owing to TGS under the Joint Venture; (2) conversion of the $25 million "loan" to

an equity interest in TGS; and (3) cancellation of the Note, Guarantee Agreement and Security Agreement and delivery of the cancelled documents to Mr. Moreno and TGS, or a judgment standing for the cancellation;

5. Alternatively, in the event the Court does not find that a Joint Venture was entered, in lieu of damages for GE and GEOG's breaches of fiduciary duty, and breaches of contract Mr. Moreno and TGS are entitled to:

 a. damages for breach of the parties' agreement to form a joint venture and/or partnership, including damages for delay in performance, lost profits, diminution of the value of TGS,

 b. attorneys' fees and interest, and such other damages in such amounts as shall be proven at trial;

 c. judgment ordering GE and GEOG to specifically perform their obligations under the parties' agreement to form a joint venture and/or partnership, including but not limited to: (1) execution of any and all documents necessary to formalize the parties' agreement, or a judgment standing for same; (2) delivery of all funding due and owing to TGS under the parties' agreement; (3) conversion of the $25 million "loan" to an equity interest in TGS; and (4) cancellation of the Note, Guarantee Agreement and Security Agreement and delivery of the cancelled documents to Mr. Moreno and TGS, or a judgment standing for same; and/or

 d. compensation for unjust enrichment; and

6.   Granting such other and further relief as the Court deems just and

proper.

Dated:   New York, New York         PHILLIPS LYTLE LLP
         January 6, 2016

         By: *Sean C. McPhee*
             Sean C. McPhee
             Anna Mercado Clark
         Attorneys for Defendants
         *Turbine Generation Services, L.L.C.*
         *and Michel B. Moreno*
         The New York Times Building
         620 Eighth Avenue, 23rd Floor
         New York, NY  10018-1405
         Telephone No. (212) 759-4888
         smcphee@phillipslytle.com
         aclark@phillipslytle.com

Doc #01-2910664

# Appendix C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

―――――――――――――――――――――――――――

GE OIL & GAS, INC.,

        Plaintiff,

    v.

TURBINE GENERATION SERVICES, L.L.C., and
MICHEL B. MORENO,

        Defendants.

―――――――――――――――――――――――――――

Index No. 652296/2015

―――――――――――――――――――――――――――

TURBINE GENERATION SERVICES, L.L.C., and
MICHEL B. MORENO,

        Third-Party Plaintiffs,

    v.

GENERAL ELECTRIC COMPANY,

        Third-Party Defendant.

―――――――――――――――――――――――――――

Index No. 652296/2015 TP

**THIRD-PARTY
<u>SUMMONS</u>**

TO THE ABOVE-NAMED THIRD-PARTY DEFENDANT:

      You are hereby summoned to appear in this action and to serve a copy of
your answer upon the attorneys for Defendants/Third-Party Plaintiffs within twenty days
after service of this summons, exclusive of the day of service (or within thirty days after
service is complete if the summons is not personally delivered to you within the State of
New York).  In case of your failure to answer or appear, judgment will be taken against you
by default for the relief demanded in the Third-Party Complaint.

Dated: New York, New York
January 6, 2016

PHILLIPS LYTLE LLP


By: *Sean C. McPhee*
       Sean C. McPhee
       Anna Mercado Clark
Attorneys for Defendants and
  Third-Party Plaintiffs
*Turbine Generation Services, L.L.C.*
*and Michel B. Moreno*
The New York Times Building
620 Eighth Avenue, 23rd Floor
New York, NY 10018-1405
Telephone No. (212) 759-4888
smcphee@phillipslytle.com
aclark@phillipslytle.com

Doc #01-2914448.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
——————————————————————————————

GE OIL & GAS, INC.,

                Plaintiff,                      Index No. 652296/2015

      v.

TURBINE GENERATION SERVICES, L.L.C., and
MICHEL B. MORENO,

                Defendants.
——————————————————————————————

TURBINE GENERATION SERVICES, L.L.C., and
MICHEL B. MORENO,

                Third-Party Plaintiffs,    Index No. 652296/2015 TP

      v.                               **THIRD-PARTY**

GENERAL ELECTRIC COMPANY,           **<u>COMPLAINT</u>**

                Third-Party Defendant.
——————————————————————————————

          Defendants/Third-Party Plaintiffs, Turbine Generation Services, L.L.C.

("TGS") and Michel B. Moreno ("Mr. Moreno" and collectively with TGS "Defendants"),

by their attorneys, Phillips Lytle LLP, for their Third-Party Complaint against Third-Party

Defendant, General Electric Company ("GE" or "Third-Party Defendant") allege as follows

upon information and belief:

<h3 align="center"><u>THE PARTIES</u></h3>

          1.    TGS is a limited liability company with a principal place of business in

Lafayette, Louisiana.

          2.    Mr. Moreno is an individual who resides in the State of Texas.

3.      GE is a domestic business corporation with a principal executive office located at 3135 Easton Turnpike, Fairfield, Connecticut 06828.

## FACTUAL BACKGROUND

**A.      Development and licensing of the "Frac Stack Pack™" technology**

4.      Mr. Moreno, a successful entrepreneur with years of experience in the oil and gas exploration and production industry, now resides in Texas, but continues to own property and business interests in Lafayette.

5.      In the 1990s and 2000s, Mr. Moreno founded, developed, and ultimately sold several successful companies in various sub-sectors of the oil and gas industry.

6.      In 2011, Mr. Moreno became involved with Green Field Energy Services, Inc. ("GFES" or "Green Field"), a Delaware corporation with its principal place of business in Lafayette, Louisiana.

7.      Green Field was a start-up company whose primary business was providing well services specializing in turbine-powered hydraulic fracturing services ("fracking services").

8.      At that time, hydraulic fracturing was a new and promising industry, and many companies were expanding into the market.

9.      Natural gas was seen as a much cleaner and cost effective alternative to coal for power generation, and U.S. consumption of natural gas was rising.  Green Field's fracking services were in high demand; margins were high; and the technology being used by Green Field far exceeded that of its competitors.

10.     Green Field had exclusive access to turbine engines that utilized a patented technology for use in Well Services.[1]

11.     Several years earlier, in or around 2006, Ted Lee McIntyre, II ("McIntyre"), invented an oil field turbine stimulation pump that utilizes the split shaft turbine or free turbine to control the flow rate and fluid pressure during oilfield pumping operations (the "Invention").

12.     On January 1, 2006, McIntyre granted MTT Properties L.L.C. ("MTTP"), a Louisiana entity he owned, the exclusive right to make, have made, use, offer for sale, and sell the Invention.

13.     On or about August 25, 2010, McIntyre filed a Non-Provisional Patent Application ("Patent Application") for the Invention related to "hydraulic fracturing of earth formations, and more particularly to the hydraulic fracturing of hydrocarbon bearing formations, e.g. oil and gas sands, for the purpose of increasing the production rate and total amount of recovery of the hydrocarbons from a well completed in such a formation." Patent Application, line 20.

14.     The Patent Application was registered by the United States Patent and Trademark Office on July 19, 2011, under the mark "Frac Stack Pack."

15.     In general terms, the technology made it possible to take used helicopter engines (similar to those used by the military in the Iraq and Afghanistan wars) and refurbish and modify the engines to be used as turbine frac units in the oil fields of Texas and other shale plays around the country.

---

[1] Under the Equipment Purchase Agreement (defined below), "Well Services" means only procedures or services performed down hole in oil and gas wells such as: pump down work, cementing services, acidizing and chemical pumping, fracturing services, gravel packing and sand control services, coiled tubing, nitrogen pumping services, wireline, turbine testing and handling and rig work including well services and plug and abandonment.

16. With the Frac Stack Pack technology, the turbines are fueled with natural gas from the wellhead—thus avoiding the significant cost of providing diesel to power the turbine frac units used in hydraulic fracturing.

17. After the Patent Application was filed, and shortly before the patent was registered, on July 8, 2011, MTTP entered an Equipment Purchase Agreement with Hub City Industries, the predecessor to Green Field.

18. Under the Equipment Purchase Agreement, Hub City Industries (later Green Field) was granted the exclusive license and right to purchase the turbine engines used by MTTP in connection with McIntyre's Invention for use in Well Services.

19. The Equipment Purchase Agreement did not transfer any ownership interests in MTTP's intellectual property.

20. MTTP's rights and obligations under the Equipment Purchase Agreement were subsequently assigned to another entity, Turbine Powered Technology, L.L.C. ("TPT"), a Louisiana limited liability company located in Louisiana.

21. McIntyre is the principal of TPT and TPT is owned 50% by MTTP and 50% by Green Field.

22. Following MTTP's transfer to TPT, Green Field, through its ownership of TPT, held a 50% ownership interest in the right to make, have made, use, offer for sale, and sell the Invention.

23. On September 22, 2011, TPT and Green Field entered the Turbine Driven Equipment License Agreement ("Green Field License Agreement"), under which TPT granted Green Field (1) a royalty-free, exclusive fully transferable and assignable worldwide license to the Frac Stack Pack trademark and (2) a perpetual, irrevocable,

royalty-free, fully transferable and assignable, exclusive license to the Frac Stack Pack technology.

24.     Pursuant to the Green Field License Agreement, Green Field had exclusive rights to use, sell, lease, commercialize, or otherwise deal with the Frac Stack Pack™ equipment that it purchased (under the exclusive Equipment Purchase Agreement) from TPT in the Well Services business.

25.     The Green Field License Agreement and the Equipment Purchase Agreement did not preclude TPT from using or practicing rights under its Intellectual Property outside the Well Services business.

26.     Although Green Field owned 50% of TPT, it did not otherwise have any rights to use or practice TPT's Intellectual Property in any business other than Well Services.

27.     Utilizing its exclusive access to the Frac Stack Pack technology equipment, Green Field negotiated a contract with Shell dated September 2, 2011 (the Contract for High Pressure Fracturing Services), under which Shell prepaid $42.5 million to Green Field for the purchase, mobilization, modification and preparation of equipment and services provided under the agreement.

28.     With a lucrative contract with Shell and plans of business expansion, Green Field was poised to be an extremely successful player in the emerging hydraulic fracturing industry.

**B.     Mr. Moreno, GE and GEOG negotiate and initiate joint venture opportunities.**

29.     Unexpectedly, the natural gas market trends reversed in 2012.

30. A mild winter reduced natural gas prices and caused producers to reduce drilling activity. Significant capacity additions and high costs combined with low natural gas prices to further depress margins in the fracture stimulation industry in mid to late 2012.

31. Shell, by far Green Field's most significant customer, pulled back significantly out of onshore natural gas development in North America, including completely eliminating its Eagle Ford shale position, and terminated its contract with Green Field.

32. Green Field was left in a precarious position in need of capital and revenue streams.

33. Beginning in September of 2012, Mr. Moreno began searching for capital investment partners for Green Field in its present fracking business and, because Green Field potentially had access to the Invention technology through its 50% ownership interest in TPT, for Green Field to diversify into what would be a new sector for Green Field, power generation.

34. The Intellectual Property owned by TPT that was involved in the Frac Stack Pack technology for hydraulic fracturing could also be used for turbine power generators applicable to other industries.

35. An acquaintance of Mr. Moreno, who had knowledge that GE had long been interested in the commercialization of turbine power generation, introduced him to Mike Hosford ("Hosford") of GE Oil & Gas, Inc. ("GEOG") and Kevin Skillern ("Skillern") of GE Capital.

36.     With that introduction, Mr. Moreno approached GE and GEOG about forming a joint venture (hereinafter the "Joint Venture"), to be operated in Lafayette, Louisiana, involving both fracking and power generation businesses.

37.     The initial conversations concerning the Joint Venture occurred in mid-September 2012 among Mr. Moreno, Hosford, Skillern, and other GE and GEOG representatives.

38.     Having expressed a desire at the initial meeting to immediately form the Joint Venture, the parties began working together along three simultaneous tracks: (1) the financial details of the Joint Venture, including how profits and losses would be borne; (2) the operations of the Joint Venture, including the necessary paperwork and employees on each side; and (3) the engineering and manufacturing aspects of the Joint Venture, including what engines, safety specifications, and reports.

39.     Over the next few weeks, a general exchange of marketing presentations took place.

40.     Face-to-face meetings occurred on or about October 5, 2012, with Mr. Moreno explaining the unique turbine driven technology in fracking as well as power generation applications to the GE investment group.

41.     On or about October 18, 2012, in Lafayette, Louisiana, Mr. Moreno met with GE and GEOG personnel in Lafayette, Louisiana, at Greenfield's offices and assembly facility.

42.     During the period from October 2012 through February 2013, the Joint Venture negotiations among Green Field, GE, GEOG, and Mr. Moreno escalated quickly.

43.     The initial courtship that had included formal meetings between Mr. Moreno and various representatives of Green Field, GE, and GEOG, rapidly progressed into a full working Joint Venture, with GE and GEOG exercising substantial authority over the business operations of the turbine business ongoing in Lafayette, Louisiana.

44.     During this five (5) month period, the parties conducted engineering and production due diligence including field visits to Louisiana, product demonstrations, meetings with potential customers, financial reviews of the Joint Venture, and market evaluations.

45.     The parties were in constant communication, generating thousands of e-mails.

46.     From October to December of 2012, GE and GEOG looked at several avenues of investment in the Invention technology while working with Mr. Moreno on the details of both Green Field's fracking business and the power generation side.

47.     The Joint Venture was known internally at GE and GEOG as "Project Cayenne" and, at that time, included both power generation and fracking.

48.     The financial terms of the Joint Venture were that GE, through one of its subsidiaries, would invest $200 million into the venture with $100 million committed to fracking and $100 million committed to power generation, all of which was to be conducted in Lafayette, Louisiana.

**C.      The parties enter non-disclosure agreements, a supplier agreement, and a memorandum of understanding in furtherance of the Joint Venture.**

49.     As an integral part of the Joint Venture, Green Field entered into broad ranging non-disclosure agreements with GEOG, GE Aero, and GE Capital.

50.	On November 16, 2012, Mr. Moreno and his team met with a large number of GE and GEOG executives and employees, and a wide range of topics were discussed, including: (1) the value of the product and expected availability of equipment; (2) the technology, including engine acquisition and intellectual property and licensing issues; (3) customers, contract terms, and the customer's specifications; (4) the competitive landscape; (5) who would comprise the management team; and (6) financial considerations, including projected financials, capital expenditure requirements, methods of funding, and projected cash needs.

51.	As another key element of the Joint Venture, the parties entered a Supplier Agreement that detailed where and how the parties would work together, who would be in charge of various aspects of the business, and what each party would be contributing to the business.

52.	Yet another key element of the Joint Venture, GE Aero and Green Field signed a Memorandum of Understanding on January 7, 2013, addressing a joint development study, supply agreement and commercialization of 1-5 megawatt power generators.

53.	The agreements and joint business operations between the parties were so far developed that GE and GEOG made Mr. Moreno commit to transition to all GE products for use in the turbine production process.

54.	Prior to the Joint Venture, the business was using Honeywell engines to convert to turbine generators.

55.	GE, however, had access to surplus jet engines that it manufactured.

56.     Seeing an additional benefit to its own company operations, GE and GEOG insisted that the Joint Venture would refurbish GE engines instead of Honeywell engines so that GE could sell its surplus engines to the Joint Venture.

57.     Much more than just a lender or investor in the business, GE and GEOG demonstrated its active involvement and right of control, inserting itself into the engineering operations of the business, visiting the factory floor multiple times in Louisiana to dictate that the Joint Venture operations must conform to "GE standards" including safety protocols and the use of safety gear.

58.     When GE and GEOG gave these directions, it was not merely giving advice to plan for a prospective joint venture in the future; the directions were issued as orders to be implemented immediately in the agreed-upon Joint Venture.

59.     As expected, GE's and GEOG's instructions were followed, consistent with GE's and GEOG's rights to control the operations as a partner in the Joint Venture.

**D.     The Joint Venture is publicly announced.**

60.     On January 7, 2013, Green Field, GE, and GEOG issued a joint press release announcing their collaboration.

61.     That release demonstrated the mutual excitement about the project, quoting Mr. Moreno saying, "We're thrilled to be collaborating with GE," and Hosford of GEOG saying, "This collaboration may help us deliver innovative solutions that solve some of the biggest industry challenges."

62.     Having quickly translated initial discussions to a fully functioning Joint Venture, run according to GE and GEOG standards, on January 27-29, 2013, GE, GEOG, and Mr. Moreno announced the Joint Venture at GE's Oil & Gas Worldwide

- 10 -

Forum in Florence, Italy with over 200 of GE and GEOG's top customers worldwide in attendance.

63. The actual presentation of the Joint Venture was made by Mr. Moreno and Hosford.

64. The presentation, entitled "Facing the Challenge: Unlocking the Potential of Unconventional Resources through Collaboration," was touted by GE and GEOG as an example of GE's and GEOG's joint venture strategies with emerging new technologies.

65. During this time, GE and GEOG made technical visits to Louisiana to assess the progress and status of the first power generation units.

**E.      The parties negotiate capital funding and financing of the Joint Venture and Mr. Moreno discontinues his search for joint venture partners.**

66. It was made clear to GE and GEOG that Mr. Moreno was seeking a total of $200 million in capital, divided $100 million for the ongoing fracking business and $100 million for the power generation business opportunity.

67. On or about March 8, 2013, Hosford and Lee Cooper ("Cooper") of GE corporate offices presented the idea of capital finance for both fracking and power generation to GE CEO Jeffrey R. Immelt ("Immelt").

68. Immelt instructed them to focus the Joint Venture around the power generation business.

69. Immelt decided to fund the Joint Venture out of his "own" corporate budget to facilitate a quicker closing and to demonstrate his commitment to the Joint Venture internally within the GE organization.

70.    Immelt told Hosford to get Mr. Moreno $25 million by the end of the week. *See* **Exhibit A**.

71.    Following this meeting, Hosford and Cooper phoned Mr. Moreno to relay Immelt's approval of the Joint Venture funding by GE.

72.    During that phone call, Hosford and Cooper told Mr. Moreno that he should cease pitching joint venture relationships with other companies and/or private equity firms.

73.    At this point GE and GEOG were fully and unequivocally committed to exclusively providing the funding that was its contribution to the Joint Venture.

74.    The parties moved forward in continuation of the Joint Venture and in reliance on GE and GEOG's commitment to be a funding source for the Joint Venture.

75.    Mr. Moreno acted in reliance upon, and complied with, GE's and GEOG's instruction to cease searching for other potential joint venture partners, because he felt that the GE family of corporations was a good fit as a partner in light of GE's heritage and experience in the generator and turbine lines of business, GE as a financial partner committed sufficient capital investment, and as a strategic partner contributed greater benefit for the Joint Venture than a mere investor or lender would supply.

76.    GE and GEOG knew that Mr. Moreno stopped discussions with potential joint venture partners based on their instruction and commitment to fully fund the amounts they agreed were needed by the Joint Venture.

77.    Later in March 2013, Mr. Moreno was invited by Daniel C. Heintzelmen, President and CEO of GEOG, to attend a dinner in New Orleans, Louisiana, held on April 23, 2013, the night before GE's annual shareowners meeting,

saying "We are extending this invitation to some of our key partners and would be delighted if you could join us . . . ."

78. At the dinner in New Orleans, Mr. Moreno was introduced as GE's partner in the Joint Venture to GE CEO Jeffrey Immelt, Beth Comstock, GE's senior vice president and Chief Marketing Officer, and more than a dozen GE board members and/or top executives.

**F.  GE and GEOG require that Green Field divest power generation line of business.**

79. In or around late March or early April 2013, the parties agreed to exclude the fracking side of the business from the Joint Venture and focus on power generation only.

80. GE and GEOG insisted that Green Field divest itself of the power generation line of business and move it into a separate company.  In return, Green Field would have the new company as a valuable client providing a lucrative source of revenue.

81. GE, through its subsidiary GEOG, remained committed to invest $100 million in the power generation business with the separate company.

**G.  The parties further document the terms of the Joint Venture.**

82. In April 2013, Mr. Moreno was called by Cooper and Comstock and was informed that Colleen Harkness Calhoun ("Calhoun"), Senior Executive Director of Energy Ventures for GE, was assigned and given authority to further document the Joint Venture terms.

83. On April 3, 2013, Calhoun and Mr. Moreno met in Schenectady, New York to further document the details of the Joint Venture.

84. By the evening of April 3, 2013, all remaining material elements of the Joint Venture had been agreed to by Mr. Moreno, on one hand, and GE and GEOG, on the other. Afterwards, a celebratory dinner was had in Schenectady amongst Mr. Moreno, Calhoun of GE, and Steve Bolze ("Bolze") of GE Power and Water.

85. The business plan agreed upon by Mr. Moreno, GE, and GEOG was to ramp up the production of the turbines in Louisiana, establish a steady revenue stream, and then sell the business in 3 to 4 years.

86. In addition to facilitating the formation of the Joint Venture, the parties agreed that Mr. Moreno would contribute capital to the Joint Venture and would provide customer contacts and the expertise he gained during his many years of experience in the oil and gas exploration and production industry.

87. GE and GEOG's calculations forecast that the business would have substantial net worth within 4 years.

88. On April 4, 2013, Calhoun sent Mr. Moreno an e-mail confirming the "key terms" of the Joint Venture. *See* **Exhibit B**.

89. Among other things, the "key terms" included the following:

> $200 MM commitment by GE for Preferred equity in PowerGen New Co. (PGNC)

> PGNC will have IP, PG contracts, and pledge of equipment that is purchased by the entity

> . . . .

> GE to have negative control rights over the entity for items such as leverage on entity, change of control, replacement of key personnel, etc.

> . . . .

TPT to package powergen and frac spreads exclusively for PGNC.

Prior to funding determination by GE that safety and quality issues for existing equipment in field and equipment to be deployed meets mutually agreed upon thresholds.

Initial GE funding of $50 MM by [April 29]

- $MM for product development to industrialize the GE C7 and the C35 GE.

- $[25]MM for equipment 2 frac spreads

  o Payments to TPT. When complete units will be leases to Greenfield for deployment to [Shell]. PGNC to receive lease payment at agreed upon rate over useful life of asset

- $[20]MM for equipment to be used for powergen units

  o Funds to be used to pay TPT for 100MW of power gen equipment

  o Equipment for [40 MW] of power under contract
    . . . .

PGNC will liquidate at the earlier of [three years from date of agreement] or as mutually agreed by shareholders and preferred equity

- GE will have the right to buy the PGNC for the [the higher of X multiple of EBIDTA or 20% less than 1 year GE's trailing EBITDA multiple]

- In the event that GE does not exercise its option to buy the company then Greenfield can purchase PGNC for same amount

- In the event that neither party exercises its purchase option than entity will be sold to a 3rd party or shares registered for public sale

90. After a couple of phone calls between Mr. Moreno and Calhoun and some brief additional emails, it was clear that the parties were in agreement. Mr. Moreno, GE, and GEOG had agreed to all of the essential terms of the Joint Venture.

91. For example, the parties had agreed to what each side would contribute to the Joint Venture (IP, technology, funding, skill and experience, etc.), how profits and losses would be shared (ownership interests and preferred equity), and control of the Joint Venture's activities (GE to have negative control rights on important aspects of the business).

92. Stated differently, there was a mutual promise or undertaking by the parties to share in the profits and losses of the Joint Venture; an understanding of what each party's contribution to the Joint Venture would be; and a measure of joint proprietorship, management or control over the Joint Venture.

93. In addition, by their emails, words and conduct, GE and GEOG manifested an intention to be bound as joint venturers with Mr. Moreno.

94. In the months that followed, Mr. Moreno, who also intended to be bound as a joint venturer with GE and GEOG, continued to fulfill his obligations to the Joint Venture.

**H.** **Mr. Moreno forms TGS, as required by GE and GEOG.**

95. As described above, GE and GEOG had refused to partner with Green Field and insisted that the power generation Joint Venture be placed into a new entity.

96.     Thus, there was no opportunity for Green Field, whose business had always been in fracking services, to receive funding directly from GE and GEOG for a power generation business.

97.     Moreover, Green Field did not have a license or any rights to the Invention technology for use outside of Well Services, those rights belonged to TPT.

98.     Because Green Field was a 50% owner of TPT, Mr. Moreno presented Green Field and its bondholders with the business opportunity related to the development, construction, sale, and rental of turbine and gas-engine powered power generation.

99.     Green Field did not have the capacity to enter a new business industry.

100.    However, Green Field would benefit from the venture continuing in an entity separate from Green Field by gaining the new business as a customer.

101.    Green Field's shareholders and directors gave consent for Mr. Moreno and TPT to pursue the power generation business opportunity with GE and GEOG outside of Green Field.

102.    On May 7, 2013, in furtherance of the Joint Venture, Mr. Moreno formed TGS to serve as  the new company insisted upon by GE and GEOG.

103.    Per the Joint Venture, GEOG's ownership interest in TGS would accrue upon funding of the Joint Venture by GEOG.

**I.      GEOG issues a $25 million convertible bridge loan, secured by TGS's assets and Mr. Moreno's personal guarantee, which GE promised would never be called.**

104.    After TGS was formed in furtherance of the Joint Venture, GE and GEOG delayed the $100 million of funding that they had committed to provide.

105. GE and GEOG first claimed that a "safety engineering study" had to be completed before the full funding could take place.

106. However, recognizing that the Joint Venture needed funding before that study could be finalized, Calhoun, on behalf of GE and GEOG, provided $25 million in May 2013, to TGS in the form of a convertible loan as a short-term work-around to uphold GE and GEOG's funding obligations. GE and GEOG required TGS to execute a Senior Secured Promissory Note (the "Note") for the $25 million investment.

107. On May 13, 2013, the Note was signed, and GEOG wired $25 million to TGS's bank account in Lafayette, Louisiana.

108. The Note contained Negative Covenants that materially restricted TGS operations and prohibited TGS from, among other items, selling its property, incurring debt, making investments, paying dividends, lending or advancing money to employees, or forming subsidiaries.

109. In short, through the Note, GE and GEOG exerted nearly complete operational and managerial control over TGS.

110. Unlike an ordinary note evidencing a loan, this Note also included the "Term Sheet," that described many of the key terms of the Joint Venture. A copy of the Term Sheet is attached as **Exhibit C** and is incorporated herein by reference.

111. Consistent with what the parties already had agreed to as partners, the terms set forth in the Term Sheet included, among other things, that the $25 million "convertible loan" from GEOG to TGS would be converted into TGS preferred membership interest on or about June 15, 2013 (the time the parties expected the safety study and other formal paperwork to be completed).

112.    Ultimately, GEOG was to invest $100 million in the Joint Venture for a 50% stake in TGS.

113.    As the parties had agreed previously, TGS used the $25 million to purchase the turbines and other equipment in furtherance of the business plan of the Joint Venture.

114.    Shortly before May 13, 2013, Calhoun requested that Mr. Moreno personally guarantee the loan and execute a Guarantee Agreement to "make finance folks happy."

115.    Calhoun told Mr. Moreno "not to worry" about the personal guarantee, because the loan would be converted to equity within 30 days and the Guarantee Agreement "would never be called."

116.    GE and GEOG also required that TGS execute a Security Agreement granting GEOG a security interest in all of TGS' assets, including both tangible and intangible assets, which notably includes TGS' rights to the Intellectual Property and technology that made the Joint Venture attractive to GE and GEOG.

117.    By obtaining a secured interest in TGS' rights to the Intellectual Property and technology, if GE and GEOG later reneged on its obligations to the Joint Venture and called its investment a loan—knowing that it could not be repaid—GE and GEOG could exploit the situation by foreclosing on the intangible assets and seize the rights to the technology, leaving its partners, Mr. Moreno and TGS, with nothing.

118.    The parties never intended for the Note, Guarantee Agreement, or Security Agreement to be enforceable by GE and GEOG.

119.    In fact, these documents are legal simulations.

120. The $25,000,000.00 payment to TGS by GEOG was its initial equity investment in the Joint Venture.

**J.      The Term Sheet.**

121. The eleven (11) page Term Sheet further memorializes the Joint Venture that already existed among Mr. Moreno, TGS, GE and GEOG, with TGS being the vehicle through which the Joint Venture would continue to operate.

122. The Term Sheet evidences in writing the previously-existing Joint Venture, which had been functioning for months and provides additional details of the agreed-upon terms.

123. For instance, under the heading of TGS Tax Treatment, the Term Sheet says:

> TGS will be treated **as a partnership** for US tax purposes and none of TGS, its directors or officers, Moreno, MMH or any of their affiliates will take any action that may result in TGS not being treated as a partnership (*e.g.*, filing a "check the box" election to treat TGS as a corporation for US tax purposes).
>
> The **parties will discuss and agree to relevant partnership tax provisions** (including income allocation and IRC Section 704(c) methods) prior to the completion of the First Contribution. (emphasis added).

124. The Term Sheet evidences in writing the community of interest and combination of property, financial resources, effort, skill or knowledge already committed verbally in support of the Joint Venture.

125. The Term Sheet contains no merger or integration clause; and therefore, did not negate the existing Joint Venture agreement among the parties.

126. The Term Sheet further memorialized the parties' agreement to share profits and losses.

127. Although the Distribution Waterfall set out in the Term Sheet calls for a repayment of investment first, it ultimately provides both parties with the right to share in the profits.

128. The Term Sheet references that GE and GEOG's contribution of $100 million (including conversion of the Loan to Preferred Interests in TGS) would not be repaid if the business failed and, likewise, Mr. Moreno's contribution would likewise be lost if the business failed.

129. Consistent with the terms previously agreed to by the parties, the Term Sheet notes a mutual right of control over the Joint Venture.

130. The Term Sheet provides that both GE and MOR DOH Holdings, L.L.C. ("MMH"), TGS' parent company, be represented on the Board of Managers.

131. Although the Term Sheet allows MMH to appoint three board members to GE's 2 (with 2 independent members appointed by the Board of Managers), the Term Sheet also provides that the approval of GE's designees is required for a number of actions.

132. In addition, the Term Sheet states that following the funding of the $25 million convertible loan, GE and GEOG were to make the First Contribution on or about June 15, 2013.

133. The First Contribution consists of converting the $25 million convertible loan into preferred membership equity plus $25 million in additional cash.

134.  This total of $50 million in initial funding from GE and GEOG is consistent with the agreement previously reached by the parties and noted in Calhoun's April 4, 2013 e-mail to Mr. Moreno.

135.  Clearly, the Term Sheet was exceptionally detailed and contained the material rights and obligations of the parties including, but not limited to, the Joint Venture's business plan and assets, as well as each party's contributions to the Joint Venture.

136.  In sum, the Term Sheet memorialized the parties' agreement on all material terms of the Joint Venture, which created a binding agreement to jointly participate in the Joint Venture.

**K.  GE and GEOG fail to execute the final documents memorializing the Joint Venture and fail to provide additional funding it promised to provide.**

137.  During the period May 13, 2013 through June 15, 2013, GE and GEOG made no efforts whatsoever toward honoring their obligations to execute final documents memorializing the Joint Venture or to provide required funding, despite repeated e-mail requests from Mr. Moreno to do so.

138.  According to the Term Sheet, funding of the First Contribution was subject to completion of the following:

(i)    Definitive agreements for the overall transaction,

(ii)   TGS, GFES, and TPT entering into assembly, installation, product, development, maintenance and licensing agreements,

(iii)  GFES board and GFES minority stockholder, TPT governing body and Marine Turbine Technologies, L.L.C. governing body approvals and consents, including, with respect to GFES, board and minority stockholder waivers of corporate opportunities regarding the transactions,

<blockquote>

(iv)    Fairness opinion regarding related party assets of the transactions among TGS, GFES and TPT,

(v)    GE internal approvals,

(vi)    The turbine powergen units ("TPU") passing a GE engineering peer and risk review,

(vii)    GE approval of applicable TPU engineering designs, and

(viii)    Completion of environmental, health and safety and product safety/liability due diligence, including, but not limited to, site visits and written assessments/reports by GE personnel and/or GE consultants, discussions with TPT management and responses from TPT management to due diligence questions raised by GE.

</blockquote>

139.    All such conditions pertaining to the First Contribution were either fully performed by TGS and Mr. Moreno or waived by GE and GEOG.

140.    As such, GE and GEOG breached their obligations under the Joint Venture and their fiduciary duties to TGS and Mr. Moreno by, among other things, failing to make the First Contribution and failing to put forth good faith efforts towards the execution of definitive documents memorializing the Joint Venture and prior agreed funding transactions.

141.    For example, under the terms of the Joint Venture, GE and GEOG required TGS, Green Field, and TPT to enter into an assembly, installation, product development, maintenance and licensing agreement for turbine power generators.

142.    In June 2013, TGS complied and executed an Agreement for the Manufacture and Sale of Turbine Powered Generators with TPT, a contractor, and Green Field, the contract manager.

143. Under this Agreement, TPT was required to manufacture and deliver to TGS, and TGS was required to purchase from TPT, a minimum of 100 Mw of Turbine Powered Generators per annual production cycle.

144. TGS was required to make deposits to Green Field by July 1, 2013 for the first production cycle.

145. TGS made the required payments to Green Field and TPT under that Agreement—totaling in excess of $28,000,000—in reliance on the promises by GE and GEOG that they would fund the Joint Venture as agreed.

146. In addition to entering into the Agreement for the Manufacture and Sale, TPT, whose offices and operations are located in Louisiana, commenced a search for real estate to build a new, larger facility to accommodate the production demands set forth by GE and GEOG.

**L.      GE and GEOG misrepresent to Mr. Moreno that the Joint Venture is going forward and will be funded as promised.**

147. Despite the breaches by GE and GEOG, representatives of GE and GEOG continued to mislead and induce Mr. Moreno into relying on the promise that the Joint Venture funding was imminent.

148. In or around July 2013, Hosford phoned Mr. Moreno to inform him that Edoardo Padeletti of GEOG would be replacing Calhoun and that he would facilitate the Joint Venture and "button up" all loose ends so that funding could occur.

149. Mr. Moreno received a call from Padeletti who apologized to Mr. Moreno for GE's lack of action and assured Mr. Moreno that the Joint Venture power generation business was moving forward.

150.   Indeed, Padeletti told Mr. Moreno that "I only have a one-way ticket from Italy and have been instructed by upper management not to leave the U.S. until all matters involving the joint venture have been finalized and funded."

151.   GE and GEOG did not fulfill that promise as they refused to fund the Joint Venture in breach of their obligations and fiduciary duties.

152.   In or around August 2013, a meeting was held in Houston, Texas with Mr. Moreno, Hosford, Padeletti and Husan Dandashly, GE's Operation Chief.

153.   At that meeting, Mr. Moreno was again given assurances that the power generation Joint Venture was moving forward; and Dandashly personally stated that "although new to the job," he was instructed by corporate management to finalize all pending matters and get the business operational.

154.   On or about August 14, 2013, GE and GEOG completed the second "Product Engineering Review of Power Generation Units."

155.   Both reviews passed GE standards and were approved.

**M.   GE's new director attempts to repudiate the Joint Venture agreement.**

156.   On or about September 29, 2013, Mr. Moreno was informed by Padeletti that GE's New Corporate Mergers and Acquisitions director, John Flannery, did not feel comfortable with the Joint Venture, as it existed, claiming that the Green Field financial situation was the reason for the "buyers' remorse."

157.   In or around October 2013, Hosford and Padeletti informed Mr. Moreno that Flannery unilaterally decided to "kill" the Joint Venture.

158.   On or about October 27, 2013, Green Field filed for bankruptcy protection.  The Green Field bankruptcy did not involve TGS.

**N.** **Breach of the Joint Venture agreement and attempt to collect on the Note, enforce The Guarantee Agreement and Security Agreement.**

159. After repudiating the parties' Joint Venture agreement, GE and GEOG refused to perform any of their obligations thereunder.

160. Although obligated to do so, GE and GEOG did not provide the additional necessary funding to TGS; failed to exchange the obligations due under the Note for Preferred Interests; and refused to cancel the Note and surrender it to TGS.

161. Rather, in breach of its promise not to call the Note, the Security Agreement, or Guarantee Agreement, and contrary to the parties' Joint Venture agreement, GE and GEOG demanded repayment of the $25 million convertible loan.

162. On April 7, 2014, GEOG filed a lawsuit against Mr. Moreno and TGS in the United States District Court for the Western District of Louisiana seeking to collect the Note, enforce the Guarantee Agreement and Security Agreement, and obtain turnover of the collateral.

163. As a result of GE and GEOG's breaches of their obligations and fiduciary duties, Mr. Moreno and TGS suffered substantial damages.

164. GE and GEOG's breaches deprived TGS of the funds necessary to operate as a business, resulting in lost profits and a diminution in the value of TGS.

165. Due to GE's and GEOG's breaches, TPT has placed Mr. Moreno and TGS in default of the Agreement for the Manufacture and Sale of Turbine Power Generators and has made additional claims against them for accounts payables incurred in manufacturing the TPUs, including accounts payables for components which were mandated by GE and GEOG and increased the cost to build the TPUs by nearly 50%.

166.   Moreover, but for GE's and GEOG's breaches, Mr. Moreno would have acquired ownership of a 50% share of the Joint Venture that by GE's and GEOG's own calculations would have had substantial net worth in four years.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment)**

167.   Mr. Moreno and TGS repeat and reallege paragraphs 1 through 166 of this Third-Party Complaint.

168.   There is a present, actual, justifiable, and substantial controversy between the parties as to (1) whether a binding Joint Venture was created between them and, if so, whether GE and GEOG have breached the parties' agreement and (2) whether the Note, Guarantee Agreement and Security Agreement executed by Mr. Moreno and TGS are enforceable.

169.   Pursuant to CPLR 3001, Mr. Moreno and TGS are entitled to a judgment declaring that:

   a.   Mr. Moreno, on one hand, and GE and GEOG, on the other hand, had reached mutual agreement on all essential elements of the Joint Venture agreement;

   b.   a binding Joint Venture agreement was created among Mr. Moreno, on one hand, and GE and GEOG, on the other hand;

   c.   TGS was formed pursuant to the Joint Venture agreement of the parties as the vehicle through which the Joint Venture would act;

   d.   the terms agreed to by the parties and further memorialized in the Term Sheet are binding on GE and GEOG;

e.    GE's and GEOG's attempt to repudiate the Joint Venture with Mr. Moreno was without any legal effect;

f.    the Note, Security Agreement, and Guarantee Agreement executed by Mr. Moreno and TGS are simulations, and are unenforceable, because the parties never intended that they be enforceable by GE and GEOG as written;

g.    GE and GEOG may not enforce the Note, Guarantee Agreement, or Security Agreement against Mr. Moreno and TGS; and

h.    GE's and GEOG's $25,000,000.00 payment to TGS was an investment in equity and shall be treated as such, as the parties intended.

## SECOND CAUSE OF ACTION
### (Breach Of Fiduciary Duty)

170.   Paragraphs 1 through 169 are realleged.

171.   As partners in the Joint Venture, GE and GEOG owed fiduciary duties to the Joint Venture, Mr. Moreno and TGS, including but not limited to: (1) the duty of loyalty and the utmost good faith; (2) the duty of fairness and honesty in their dealings; (3) the duty to render a full and fair disclosure of all facts which materially affect the Joint Venture, Mr. Moreno, and TGS's rights and interests; and (4) the duty not to conduct any activity for themselves or on behalf of a third person that is contrary to these fiduciary duties or that is prejudicial to the Joint Venture, Mr. Moreno, or TGS.

172.   TGS and Mr. Moreno trusted and relied upon GE and GEOG and fully performed their obligations under the Joint Venture agreement.

173. GE and GEOG breached their fiduciary duties to the Joint Venture, TGS, and Mr. Moreno by engaging in the wrongful and unfair conduct described above, including but not limited to the following acts of disloyalty, dishonesty, and bad faith: (i) making no effort whatsoever toward execution of the final documents memorializing the Joint Venture; (ii) refusing to perform their obligations under the Joint Venture; (iii) refusing to make the First Contribution; (iv) refusing to convert the Note into preferred membership equity in TGS; (v) refusing to cancel and surrender the Note and Guarantee Agreement to Mr. Moreno and TGS; (vi) misinforming Mr. Moreno that the Note and Guarantee Agreement never would be called or enforced; (vii) misleading Mr. Moreno into believing that GE and GEOG intended to fulfill their obligations under the Joint Venture, when in fact, GE and GEOG were planning to repudiate the parties' agreements; and (viii) placing TGS and Mr. Moreno in default on the Note and Guarantee Agreement.

174. Mr. Moreno and TGS suffered significant damages as a result of GE's and GEOG's misconduct and breaches of their fiduciary duties, including but not limited to lost profits, diminution of the value of TGS, attorneys' fees and interest, and other damages in such amounts as shall be proven at trial.

175. Additionally, and pursuant to the terms of the First Contribution, GE and GEOG owe an additional $25 million to TGS.

### THIRD CAUSE OF ACTION
**(Breach Of Contract)**

176. Paragraphs 1 through 175 are realleged.

177. Mr. Moreno and TGS, on one hand, and GE and GEOG, on the other hand, entered into a binding Joint Venture agreement.

178. Mr. Moreno and TGS have complied with all of their obligations under the Joint Venture agreement.

179. At the time they entered into the agreement to form the Joint Venture, the parties contemplated that they would be responsible for profits lost as a result of a breach of the Joint Venture agreement.

180. GE and GEOG have breached their obligations under the Joint Venture agreement in the following non-exclusive ways, and in such other ways as may be proven at trial:

       a.     refusing to tender the additional funding called for under the Joint Venture agreement;

       b.     refusing to convert the Note into preferred membership equity in TGS;

       c.     refusing to cancel and surrender the Note, the Security Agreement, and the Guarantee Agreement to Mr. Moreno and TGS; and

       d.     placing TGS and Mr. Moreno in default on the Note, the Security Agreement, and the Guarantee Agreement.

181. Mr. Moreno and TGS have incurred damages, including damages caused by GE's and GEOG's delay in performance, as a result of these breaches for which GE and GEOG are liable, including but not limited to lost profits, diminution of the value of TGS, attorneys' fees and interest, and other damages in such amounts as shall be proven at trial.

182.   Mr. Moreno and TGS are also entitled to the remedy of specific performance against GE and GEOG ordering them to perform their agreed to obligations including but not limited to:  (1) delivery of all funding due and owing to TGS under the Joint Venture; (2) conversion of the $25 million "loan" to an equity interest in TGS; and (3) cancellation of the Note, Guarantee Agreement and Security Agreement and delivery of the cancelled documents to Mr. Moreno and TGS.

### FOURTH CAUSE OF ACTION
**(Intentional and/or Negligent Misrepresentation)**

183.   Paragraphs 1 through 182 are realleged.

184.   As fiduciaries, GE and GEOG had a special, privity-like relationship with Mr. Moreno and TGS that imposed a duty upon GE and GEOG to impart correct information to Mr. Moreno and TGS.

185.   GE and GEOG intentionally and/or negligently made several misrepresentations of fact and/or failed to disclose material facts which they were bound to disclose to Mr. Moreno and TGS as more particularly described above and as may be discovered in the course of this litigation including but not limited to:

a.   advising Mr. Moreno and TGS that a "safety engineering study" had to be completed prior to funding the Joint Venture;

b.   advising Mr. Moreno and TGS that the Note and Security Agreement were merely a stop-gap measure; and

c.   advising Mr. Moreno that the Guarantee Agreement "would never be called" because the Note would be converted into equity within 30 days.

186. The information imparted to Mr. Moreno and TGS by GE and GEOG was incorrect and Mr. Moreno and TGS relied upon the incorrect information to their detriment.

187. Mr. Moreno and TGS had no reason to know that GE's and GEOG's statements were not truthful and had no reason to know that GE and GEOG did not intend to perform the Joint Venture agreement or fund the Joint Venture, but rather intended to enforce the Note, Security Agreement and Guarantee Agreement.

188. But for GE's and GEOG's material misrepresentations and nondisclosures, Moreno and TGS would have pursued other opportunities for investment in the venture, which said opportunities have now been lost.

189. But for GE's and GEOG's material misrepresentations and nondisclosures, Mr. Moreno and TGS never would have executed the Note, Security Agreement or the Guarantee Agreement.

190. But for GE's and GEOG's material misrepresentations and nondisclosures, Mr. Moreno and TGS never would have entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT.

191. Accordingly, Mr. Moreno and TGS are entitled to recover damages from GE and GEOG as a result of their negligent and/or intentional misrepresentations, including but not limited to, lost profits, diminution of the value of TGS, attorneys' fees and interest, and other damages in such amounts as shall be proven at trial.

## FIFTH CAUSE OF ACTION
### (Promissory Estoppel)

192. Paragraphs 1 through 191 are realleged.

193. As set forth above, GE and GEOG owed fiduciary duties to Mr. Moreno and TGS.

194. GE and GEOG clearly and unambiguously made representations and promises to Mr. Moreno and TGS that they would, among other things, provide additional funding to the Joint Venture, totaling $100 million, including an additional $25 million by June 13, 2013.

195. GE and GEOG also clearly and unambiguously represented to TGS and Mr. Moreno that the $25,000,000 "loan" to TGS would not need to be repaid, but instead, would be converted into an ownership interest in TGS.

196. In executing the Note, Security Agreement and Guarantee Agreement, TGS and Mr. Moreno reasonably and justifiably relied on GE's and GEOG's representations.

197. GE and GEOG were aware that substantially all of TGS's assets would be tied up in the equipment purchased with the proceeds of the Note, and that repayment at the Maturity Date would not be possible.

198. GE and GEOG knew or should have known that Mr. Moreno and TGS would rely on their representations and it was foreseeable that Mr. Moreno and TGS would rely on their representations.

199. In reliance on GE's and GEOG's representations, Mr. Moreno ceased searching for other potential joint venture partners and contributed capital, customer contacts, skill and experience to the Joint Venture.

200. In reliance on GE's and GEOG's representations, TGS and Mr. Moreno also changed their position to their detriment by, among other things, using the

$25,000,000 to purchase the engines and other equipment in furtherance of the Joint Venture.

201.   TGS and Mr. Moreno also entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and made payments thereunder in excess of $28,000,000 in reliance on GE's and GEOG's representations that the Joint Venture would be fully funded.

202.   When GE and GEOG demanded payment on the Note, rather than converting the Note to an ownership interest in TGS, all of the Joint Venture's funds were tied up in equipment.

203.   Moreover, as a result of GE's and GEOG's repudiation of the Joint Venture agreement and refusal to provide the promised funding, TPT has placed Mr. Moreno and TGS in default of the Agreement for the Manufacture and Sale of Turbine Power Generators and has made additional claims against them for accounts payables, among other things.

204.   TGS and Mr. Moreno have incurred, and will continue to incur, actual damages and unconscionable injuries in an amount to be determined at trial as a result of their detrimental reliance on GEOG's and GE's representations, as well as their attorneys' fees.

### SIXTH CAUSE OF ACTION
**(Fraud and Fraud in the Inducement)**

205.   Paragraphs 1 through 204 are realleged

206.   GE and GEOG knowingly and intentionally made several material misrepresentations of fact, suppressed the truth, and/or failed to disclose material facts, as more particularly described above and as may be discovered in the course of this litigation,

in order to induce Mr. Moreno and TGS to execute the Note, Guarantee Agreement and Security Agreement and/or in order to obtain an unjust advantage over them or to cause a loss or inconvenience to them, including but not limited to:

a.  advising Mr. Moreno and TGS that a "safety engineering study" had to be completed prior to funding the Joint Venture;

b.  advising Mr. Moreno and TGS that the Note and Security Agreement were merely a stop-gap measure;

c.  advising Mr. Moreno that the Guarantee Agreement "would never be called" because the Note would be converted into equity within 30 days;

d.  making representations and engaging in other intentional conduct to cause Mr. Moreno and TGS to believe that they were committed to the Joint Venture and would provide all promised funding, when in fact, they had no intention of going forward; and

e.  failing to disclose to Mr. Moreno and TGS that they did not intend to fund the Joint Venture as promised.

207.  GE and GEOG knew that these material representations were false and never intended to fund the Joint Venture or become an equal partner in the business.

208.  GE and GEOG made these material representations with the intention of inducing Mr. Moreno and TGS to rely upon them to their detriment.

209.  As fiduciaries, GE and GEOG had a duty to disclose to Mr. Moreno and TGS that they did not intend to fund the Joint Venture.

210. Mr. Moreno and TGS had no reason to know that GE's and GEOG's representations were not truthful and had no reason to know that GE and GEOG did not intend to perform the Joint Venture agreement or fund the Joint Venture, but rather intended to enforce the Note, Security Agreement and Guarantee Agreement.

211. Mr. Moreno and TGS relied upon GE's and GEOG's material representations to their detriment.

212. But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS would have pursued other opportunities for investment in the venture, which said opportunities have now been lost.

213. But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS never would have executed the Note, the Security Agreement in which TGS pledged all of its tangible and intangible assets under the promise that the "loan" would be converted to equity in TGS, or the Guarantee Agreement.

214. But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS never would have entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT.

215. Accordingly, TGS and Mr. Moreno are entitled to rescission of the Loan Documents, including but not limited to the Note, the Security Agreement, and Guarantee Agreement, plus damages including lost profits, diminution of the value of TGS, attorneys' fees and interest, and all other damages in such amounts as shall be proven at trial.

## SEVENTH CAUSE OF ACTION
### (Breach of Agreement to Form Partnership/Joint Venture)

216. Paragraphs 1 through 215 are realleged.

217.  In the event that this Court does not find that Mr. Moreno, on one hand, and GE and GEOG, on the other hand, formed a valid and binding Joint Venture, then Mr. Moreno and TGS plead in the alternative, pursuant to CPLR 3014, that GE and GEOG breached the parties' agreement to form a joint venture and/or partnership and demands specific performance thereof.

218.  More specifically, GE and GEOG agreed to form a joint venture and/or partnership with Mr. Moreno and TGS and the terms were further memorialized in the Term Sheet.

219.  All conditions precedent to the formation of the joint venture and/or partnership have been performed or have occurred.

220.  Mr. Moreno has performed, and/or is willing to perform, all of his obligations under the parties' agreement to form a joint venture.  Indeed, among other things, Mr. Moreno contributed capital; formed TGS in accordance with the instructions of GE and GEOG; and provided customer contacts and valuable experience he gained during his many years operating in the oil and gas exploration and production industry.

221.  Mr. Moreno executed the Note and Security Agreement in his capacity as TGS's CEO, and as the CEO of TGS's parent, and TGS used the proceeds of the Note to purchase equipment to conduct the business of the joint venture and/or partnership.

222.  Mr. Moreno also executed the Guarantee Agreement.

223.  In addition, Mr. Moreno and TGS entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and made substantial payments thereunder.

224. GE and GEOG, however, repudiated their agreement to enter into the joint venture and/or partnership and have failed and refused to execute the documents memorializing the terms of the agreement and have failed and refused to perform their obligations as described above.

225. GE and GEOG have also refused to convert the Note to an ownership interest in TGS. Rather, GE and GEOG have demanded payment on the Note and filed this action against Mr. Moreno and TGS to enforce the Note, the Guarantee Agreement, and the Security Agreement.

226. If GE and GEOG had not breached their agreement to form a joint venture and/or partnership with Mr. Moreno, the joint venture and/or partnership would have been duly formed.

227. At the time they agreed to form a joint venture and/or partnership, the parties contemplated that they would be responsible for profits lost by the joint venture and/or partnership as a result of a breach of the agreement to form a joint venture and/or partnership.

228. Mr. Moreno and TGS are entitled to recover all damages, including damages caused by GE and GEOG's delay in performance, incurred as a result of GE's and GEOG's breach of the agreement to form a joint venture and/or partnership with Mr. Moreno and TGS.

229. Mr. Moreno and TGS are also entitled to the remedy of specific performance against GE and GEOG ordering them to perform their agreed to obligations including but not limited to: (1) execution of any and all documents necessary to formalize the parties' agreement; (2) delivery of all funding due and owing to TGS under the parties'

agreement; (3) conversion of the $25 million "loan" to an equity interest in TGS; and (4) cancellation of the Note, Guarantee Agreement  and Security Agreement and delivery of the cancelled documents to Mr. Moreno and TGS.

## EIGHTH CAUSE OF ACTION
### (Unjust Enrichment)

230.   Paragraphs 1 through 229 are realleged.

231.   Recovery of the Note, Security Agreement and Guarantee Agreement, contrary to the promises and representations made by GE and GEOG, would result in unjust enrichment of GE and GEOG at the expense of Mr. Moreno and TGS.

232.   Such enrichment contravenes equity and good conscience.

233.   Accordingly, Mr. Moreno and TGS are entitled to be compensated to the extent to which GE and GEOG have been unjustly enriched.

## NINTH CAUSE OF ACTION
### (Breach of Duty of Good Faith and Fair Dealing)

234.   Paragraphs 1 through 233 are realleged.

235.   The parties reached agreement on all of the material terms of the Joint Venture and completed their negotiations of what they regarded as the essential elements of the Joint Venture.

236.   While the Term Sheet reflects that certain matters were left open for further discussion, those matters were not deemed by the parties to be material.

237.   In fact, performance of the Joint Venture had begun on the good faith understanding that agreement on the non-material, yet unsettled, matters would follow.

238. In that regard, the Term Sheet imposed an express duty upon GEOG and GE to work diligently and in good faith towards the execution of documents reflecting all terms so as to finalize the Joint Venture.

239. The Term Sheet also imposed implied duties of good faith and fair dealing upon GEOG and GE to fulfill their obligations to Mr. Moreno and TGS and to refrain from any actions that could impair or injure the rights of Mr. Moreno and TGS in the Joint Venture. These duties were in addition to, and were separate and distinct from, GEOG's and GE's express duties under the Term Sheet.

240. GEOG and GE breached their express duty to work diligently and in good faith towards the execution of documents reflecting all terms so as to finalize the Joint Venture. In fact, despite repeated requests from Mr. Moreno, GEOG and GE took no steps whatsoever towards preparing and executing any documentation subsequent to entering into the Term Sheet.

241. Such conduct also resulted in a breach of GEOG's and GE's implied duties of good faith and fair dealing.

242. In the alternative, if the finder of fact were to conclude that the parties had not reached agreement on all of the material terms of the Joint Venture, the Term Sheet nonetheless imposed an express duty upon GEOG and GE to work diligently and in good faith towards the execution of definitive documents necessary to consummate the Joint Venture.

243. GEOG and GE breached their express duty to work diligently and in good faith towards the execution of definitive documents necessary to consummate the Joint Venture. In fact, despite repeated requests from Mr. Moreno, GEOG and GE took

no steps whatsoever towards preparing and executing any documents subsequent to entering into the Term Sheet.

244.     GEOG and GE also breached their express and implied duties of good faith and fair dealing by acting in concert with each other in an attempt to defeat the rights that Mr. Moreno and TGS had in the Joint Venture, as well as the rights that Mr. Moreno and TGS  had under the Term Sheet.

245.     As a direct and proximate result of GEOG's and GE's breach of their express and implied duties of good faith and fair dealing, Mr. Moreno and TGS have suffered damages in an amount to be determined at trial, plus attorneys' fees.

## TENTH CAUSE OF ACTION
### (Contribution and Indemnity)

246.     Paragraphs 1 through 245 are realleged.

247.     GE undertook the obligation to enter into the Joint Venture with Mr. Moreno and TGS.

248.     As set forth above, GE was required, among other things, to make the First Contribution and put forth good faith efforts towards the execution of documents finalizing the Joint Venture.

249.     GE breached its obligations and, as a result, GEOG has commenced the main action underlying this third-party action, exposing Mr. Moreno and TGS to potential liability.

250.     In addition, as set forth above, GE negligently and/or fraudulently induced Mr. Moreno to execute the Note, Security Agreement and Guaranty Agreement.

251.     By reason of the foregoing, TGS and Mr. Moreno are entitled to common law indemnity and/or contribution from GE in the amount of any liability of

TGS and/or Mr. Moreno to GEOG, plus attorneys' fees incurred herein, costs and interest.

**WHEREFORE**, Defendants and Third-Party Plaintiffs Turbine Generation Services L.L.C. and Michel B. Moreno demand judgment:

1) Declaring that:

    a.    Mr. Moreno, on one hand, and GE and GEOG, on the other hand, had reached mutual agreement on all essential elements of the Joint Venture agreement;

    b.    a binding Joint Venture agreement was created among Mr. Moreno, on one hand, and GE and GEOG, on the other hand;

    c.    TGS was formed pursuant to the Joint Venture agreement of the parties as the vehicle through which the Joint Venture would act;

    d.    the terms agreed to by the parties and further memorialized in the Term Sheet are binding on GE and GEOG;

    e.    GE and GEOG's attempt to repudiate the Joint Venture with Mr. Moreno was without any legal effect;

    f.    the Note, Security Agreement, and Guarantee Agreement executed by Mr. Moreno and TGS are simulations, and are unenforceable, because the parties never intended that they be enforceable by GE and GEOG as written;

g. GE and GEOG may not enforce the Note, Guarantee Agreement, or Security Agreement against Mr. Moreno and TGS; and

h. GE and GEOG's $25,000,000.00 payment to TGS was an investment in equity and shall be treated as such, as the parties intended.

2) Awarding damages to Mr. Moreno and TGS incurred as a result of GE's and GEOG's breaches of fiduciary duty, breaches of contract, breaches of express and implied duties of good faith and fair dealing, intentional and/or negligent misrepresentations, and for promissory estoppel, fraud and fraud in the inducement, including but not limited to damages for delay, lost profits, diminution of the value of TGS, attorneys' fees and interest, and such other damages in such amounts as shall be proven at trial;

3) Ordering GE and GEOG to specifically perform all of their obligations under the parties' Joint Venture, including but not limited to: (1) delivery of all funding due and owing to TGS under the Joint Venture; (2) conversion of the $25 million "loan" to an equity interest in TGS; and (3) cancellation of the Note, Guarantee Agreement and Security Agreement and delivery of the cancelled documents to Mr. Moreno and TGS, or a judgment standing for the cancellation;

4) Alternatively, in the event the Court does not find that a Joint Venture was entered, in lieu of damages for GE and GEOG's breaches of fiduciary duty and breaches of contract, Mr. Moreno and TGS are entitled to:

a.    damages for breach of the parties' agreement to form a joint venture and/or partnership, including damages for delay in performance, lost profits, diminution of the value of TGS, attorneys' fees and interest, and such other damages in such amounts as shall be proven at trial;

b.    judgment ordering GE and GEOG to specifically perform their obligations under the parties' agreement to form a joint venture and/or partnership, including but not limited to:  (1) execution of any and all documents necessary to formalize the parties' agreement, or a judgment standing for same; (2) delivery of all funding due and owing to TGS under the parties' agreement; (3) conversion of the $25 million "loan" to an equity interest in TGS; and (4) cancellation of the Note, Guarantee Agreement and Security Agreement and delivery of the cancelled documents to Mr. Moreno and TGS, or a judgment standing for same; and/or

c.    compensation for unjust enrichment;

5)    Ordering GE to provide indemnity and/or contribution to TGS and Mr. Moreno for any potential liability of TGS and/or Mr. Moreno to GEOG; and

6)    Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York  
       January 6, 2016

PHILLIPS LYTLE LLP


By: *Sean C. McPhee*
       Sean C. McPhee
       Anna Mercado Clark
Attorneys for Defendants and
  Third-Party Plaintiffs
*Turbine Generation Services, L.L.C.*
*and Michel B. Moreno*
The New York Times Building
620 Eighth Avenue, 23rd Floor
New York, NY 10018-1405
Telephone No. (212) 759-4888
smcphee@phillipslytle.com
aclark@phillipslytle.com

Doc #01-2914453.2

# Appendix D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

—————————————————————————

GE OIL & GAS, INC.,

                Plaintiff,

        v.

TURBINE GENERATION SERVICES, L.L.C., and
MICHEL B. MORENO,

                Defendants.

—————————————————————————

Index No. 652296/2015

**ANSWER WITH
AMENDED
COUNTERCLAIMS**

As required by the Court's March 30, 2016 Decision and Order (NYSCEF Doc. No. 171), without waiver and with full reservation of all rights and remedies, defendants Turbine Generation Services, L.L.C. ("TGS") and Michel B. Moreno ("Mr. Moreno" and collectively with TGS "Defendants"), by their attorneys, Phillips Lytle LLP, answering the Complaint of Plaintiff, GE Oil & Gas, Inc. ("Plaintiff" or "GEOG") and re-alleging their counterclaims so as to conform to the Court's March 4, 2016 Decision and Order on Plaintiff's motion for partial summary judgment (NYSCEF Doc. No. 159), state as follows upon information and belief:

<u>NATURE OF THE ACTION</u>

1. In response to paragraph 1 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required. To the extent a response is required, deny the allegations of paragraph 1 of the Complaint.

2. Deny the allegations of paragraph 2 of the Complaint.

3. Deny the allegations of paragraph 3 of the Complaint.

4. Deny the allegations of paragraph 4 of the Complaint.

<u>THE PARTIES</u>

5.      Lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 of the Complaint.

6.      Admit the allegations of paragraph 6 of the Complaint.

7.      In response to paragraph 7 of the Complaint, deny that Mr. Moreno resides in the State of Louisiana and state that the remainder the paragraph consists of conclusions of law to which no response is required.

<u>JURISDICTION AND VENUE</u>

8.      Deny the allegations of paragraph 8 of the Complaint for the reasons set forth in Defendants' motion to dismiss (Motion Seq. No. 001).

<u>FACTUAL BACKGROUND</u>

9.      In response to paragraph 9 of the Complaint, state that Mr. Moreno formed TGS as a vehicle to carry out a joint venture between Mr. Moreno, TGS and GEOG involving the oil field power generation business. Defendants admit the allegation contained in Paragraph 9 of the Complaint to the extent the joint venture involved the design, assembly, leasing and servicing of turbine or gas engine power generation units for use in oil field production but deny the allegation contained in Paragraph 9 of the Complaint to the extent they allege that TGS was formed for any purpose other than as a vehicle to carry out the joint venture between Mr. Moreno, TGS and GEOG.

10.      In response to Paragraph 10 of the Complaint, (i) admit that the copy of the Note attached as Exhibit A to the Complaint is a true and correct copy of the Note that was signed by Mr. Moreno in his capacity as CEO of TGS (except that the signature page of the Term Sheet is not included in Exhibit A to the Complaint); (ii) state that Mr. Moreno did so in the furtherance of the joint venture that he understood existed between

him, TGS and GEOG and that, under that joint venture agreement, GEOG's $25,000,000 "loan" was to be converted into an ownership interest in TGS; and (iii) deny the allegation contained in Paragraph 10 of the Complaint to the extent they allege that the "loan" was anything other than a part of GEOG's contribution to the joint venture.

11.    In response to paragraph 11 of the Complaint, state that the "Loan Documents" and "Note" speak for themselves.  To the extent a response is required, deny the allegations of paragraph 11 of the Complaint.

12.    In response to paragraph 12 of the Complaint, (i) state that the text of Section (4)(e) of the "Note" speaks for itself; and (ii) deny the allegation contained in Paragraph 12 of the Complaint to the extent they allege that the "Loan" was anything other than a part of GEOG's contribution to the joint venture.

13.    In response to paragraph 13 of the Complaint, deny the allegation contained in Paragraph 13 of the Complaint because GEOG's interest in the "Note" was to be converted into an ownership interest in TGS prior to the Maturity Date.

14.    In response to paragraph 14 of the Complaint, (i) admit that the Maturity Date was originally scheduled for September 13, 2013, 90 days after the original "Outside Date" of June 15, 2013, and that it was extended; and (ii) deny the remaining allegations in Paragraph 14 of the Complaint because the amounts due under the Note were not to ever become due and payable, but rather were to be converted to an ownership interest in TGS.

15.    In response to paragraph 15 of the Complaint, (i) admit that the Maturity Date was extended from September 13, 2013 to October 20, 2013 and that the copy of the Amendment to Senior Secured Promissory Note attached as Exhibit B to the Complaint is a true and correct copy thereof; and (ii) deny the remaining allegations in

Paragraph 15 of the Complaint to the extent they allege that payment ever became due because the amounts due under the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

16. In response to paragraph 16 of the Complaint, (i) admit that the Maturity Date was extended from October 20, 2013 to December 2, 2013 and that the copy of the Second Amendment to Senior Secured Promissory Note attached as Exhibit C to the Complaint is a true and correct copy thereof; and (ii) deny the remaining allegations in Paragraph 16 of the Complaint to the extent they allege that payment ever became due because the amounts due under the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

17. In response to paragraph 17 of the Complaint, (i) admit that the Maturity Date was extended from December 2, 2013 to December 29, 2013 and that the copy of the Third Amendment to Senior Secured Promissory Note attached as Exhibit D to the Complaint is a true and correct copy thereof; and (ii) deny the remaining allegations in Paragraph 17 of the Complaint to the extent they allege that payment ever became due because the amounts due under the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

18. In response to paragraph 18 of the Complaint, (i) admit that TGS executed the Security Agreement referenced in paragraph 18 of the Complaint and that a true and correct copy thereof is attached as Exhibit E to the Complaint; and (ii) deny the remaining allegations in Paragraph 18 of the Complaint to the extent they allege that TGS was required to perform in accordance with the Note because the amounts due under the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

- 4 -

19.     In response to paragraph 19 of the Complaint, state that text of the Security Agreement speaks for itself.

20.     In response to paragraph 20 of the Complaint, state that the allegations of paragraph 20 consist of conclusions of law to which no response is required.

21.     In response to paragraph 21 of the Complaint, (i) admit that Mr. Moreno executed the Guarantee Agreement referenced in Paragraph 21 of the Complaint and that the copy of the Guarantee Agreement attached as Exhibit G to the Complaint is a true and correct copy thereof; and (ii) deny the remaining allegations in paragraph 21 of the Complaint to the extent they allege that payment ever became due because the amounts due under the Note were not to become due and payable but, instead, were to be converted to an ownership interest in TGS.

FIRST CAUSE OF ACTION
(Breach of the Note)
(Against Defendant TGS)

22.     Repeat and reallege their answers to paragraphs 1 through 21 of the Complaint.

23.     Deny the allegations of paragraph 23 of the Complaint.

24.     In response to paragraph 24 of the Complaint, deny that the Note evidences a loan and further deny that they are liable on the Note.

25.     Admit that  paragraph 25 of the Complaint accurately quotes from Section 6(a)(i) of the Note but deny that they are liable on the Note.

26.     Admit that  paragraph 26 of the Complaint accurately quotes a portion of Section 6(b) of the Note but deny that they are liable on the Note and further deny that Plaintiff has any right to any collateral.

27.     In response to paragraph 27 of the Complaint, admit that GEOG made a demand for delivery of collateral and payment on the Note but deny that TGS defaulted and further deny that they are liable on the Note.

28.     Deny the allegations of paragraph 28 of the Complaint.

## SECOND CAUSE OF ACTION
(Breach of the Guarantee)
(Against Defendant Moreno)

29.     Repeat and reallege their answers to paragraphs 1 through 28 of the Complaint.

30.     Admit that  paragraph 30 of the Complaint accurately quotes a portion of the Guarantee Agreement attached as Exhibit G to the Complaint but deny that they are liable to Plaintiff on the Note, the Guarantee Agreement, or any other documents.

31.     In response to paragraph 31 of the Complaint, admit that GEOG made a demand for payment under the Guarantee Agreement but deny that TGS defaulted and further deny that they are liable to Plaintiff on the Note, the Guarantee Agreement, or any other document.

32.     Deny the allegations of paragraph 32 of the Complaint.

33.     In response to paragraph 33 of the Complaint, deny that GEOG is entitled to a judgment against Mr. Moreno for any amount in connection with the Note or any other document.

## THIRD CAUSE OF ACTION
(Injunctive Relief)
(Against All Defendants)

34.     Repeat and reallege their answers to paragraphs 1 through 33 of the Complaint.

35.     Deny the allegations of paragraph 35 of the Complaint.

36.     Deny the allegations of paragraph 36 of the Complaint.

37.     In response to paragraph 37 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 37 of the Complaint.

38.     In response to paragraph 38 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 38 of the Complaint.

39.     Deny the allegations of paragraph 39 of the Complaint.

40.     Deny the allegations of paragraph 40 of the Complaint.

41.     In response to paragraph 41 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 41 of the Complaint.

42.     Deny the allegations of paragraph 42 of the Complaint.

<u>FOURTH CAUSE OF ACTION</u>
(Declaratory Relief)
(Against All Defendants)

43.     Repeat and reallege their answers to paragraphs 1 through 42 of the Complaint.

44.     In response to paragraph 44 of the Complaint, deny that they have breached (materially or otherwise) the terms of the Note or any other documents and state that such paragraph consists of conclusions of law to which no response is required.

45.     In response to paragraph 45 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 45 of the Complaint.

46.     In response to paragraph 46 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 46 of the Complaint.

47.     Deny the allegations of paragraph 47 of the Complaint.

48.     In response to paragraph 48 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 48 of the Complaint.

49.     Deny the allegations of paragraph 49 of the Complaint.

<u>FIFTH CAUSE OF ACTION</u>
(Replevin)
(Against All Defendants)

50.     Repeat and reallege their answers to paragraphs 1 through 49 of the Complaint.

51.     Deny the allegations of paragraph 51 of the Complaint.

52.     In response to paragraph 52 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 52 of the Complaint.

53.     In response to paragraph 53 of the Complaint, state that such paragraph consists of conclusions of law to which no response is required.  To the extent a response is required, deny the allegations of paragraph 53 of the Complaint.

54.     Deny the allegations of paragraph 54 of the Complaint.

55.     In response to paragraph 55 of the Complaint, deny that Plaintiff is entitled to immediate possession of any collateral.

56.     Deny the allegations of paragraph 56 of the Complaint.

57.     Deny all other allegations not admitted above.

- 8 -

## FIRST DEFENSE

58. The Complaint fails to state a cause of action.

## SECOND DEFENSE

59. Plaintiff failed to perform one or more conditions precedent.

## THIRD DEFENSE

60. Plaintiff failed to mitigate its alleged damages, if any.

## FOURTH DEFENSE

61. The damages alleged in the Complaint were, or with reasonable certainty will be, replaced or indemnified, in whole or in part by collateral sources.

## FIFTH DEFENSE

62. Plaintiff's claims are barred by the doctrines of waiver, estoppel, laches and unclean hands.

## SIXTH DEFENSE

63. There is another action pending between the same parties in the 15th Judicial District Court of Louisiana, Lafayette Parish, and both suits concern the same subject matter.

## SEVENTH DEFENSE

64. Any damages sustained by Plaintiff were caused in whole or in part by Plaintiff's own culpable conduct or by culpable conduct attributable to others over whom Defendants neither had, nor exercised any control.

## EIGHTH DEFENSE

65. Plaintiff's claims fail under the doctrine of equitable estoppel and/or promissory estoppel.

66.     Plaintiff promised TGS and Mr. Moreno that the $25,000,000 "loan" that is the subject of the claims in Plaintiff's Complaint would not actually be repaid, but would be converted into an ownership interest in TGS.

67.     Plaintiff also promised that the Guarantee Agreement would never be enforced.

68.     At the time they executed the Note and Guarantee Agreement, TGS and Mr. Moreno were not aware that Plaintiff would not carry through on its promises to convert the amounts described in the Note to an equity interest and refrain from ever enforcing the Guarantee Agreement.

69.     In executing the Note and Guarantee Agreement, TGS and Mr. Moreno reasonably and substantially relied on Plaintiff's promise to convert the amounts described in the Note to an ownership interest in TGS and its promise not to enforce the Guarantee Agreement.

70.     Plaintiff was aware that substantially all of TGS's assets would be tied up in the equipment purchased with the proceeds of the Note, and that repayment at the Maturity Date would not be feasible.

71.     Plaintiff knew or should have known that Mr. Moreno and TGS would rely on Plaintiff's promises to convert the Note to an ownership interest in TGS and to never enforce the Guarantee Agreement.

72.     Injustice can be avoided only by enforcing Plaintiff's promises.

73.     Accordingly, GEOG is estopped from prosecuting this action against Defendants.

**NINTH DEFENSE**

74.     In order to induce Defendants to enter into the Loan Documents described in Plaintiff's Complaint, and with the intention that Defendants would rely upon Plaintiff's statement, Plaintiff stated to Mr. Moreno that the $25,000,000 "loan" that is the subject of Plaintiff's Complaint would not need to be repaid but, instead, would be converted into an ownership interest in TGS.

75.     Plaintiff also stated that the Guarantee Agreement would never be enforced.

76.     The statements made by Plaintiff were false and fraudulent when made, and were known by Plaintiff to be false.

77.     Defendants relied on Plaintiff's statements and were induced to execute the Loan Documents, which they would not have executed had they known the truth.

**TENTH DEFENSE**

78.     Defendants incorporate each and every allegation contained in their Counterclaims set forth below to the extent they also constitute defenses to the claims in Plaintiff's Complaint.

**COUNTERCLAIMS**

**FACTUAL BACKGROUND**

**A.     Development and licensing of the "Frac Stack Pack™" technology**

79.     Mr. Moreno, a successful entrepreneur with years of experience in the oil and gas exploration and production industry, now resides in Texas, but continues to own property and business interests in Louisiana.

80. In the 1990s and 2000s, Mr. Moreno founded, developed, and ultimately sold several successful companies in various sub-sectors of the oil and gas industry.

81. In 2011, Mr. Moreno became involved with Green Field Energy Services, Inc. ("GFES" or "Green Field"), a Delaware corporation with its principal place of business in Lafayette, Louisiana.

82. Green Field was a start-up company whose primary business was providing well services specializing in turbine-powered hydraulic fracturing services ("fracking services").

83. At that time, hydraulic fracturing was a new and promising industry, and many companies were expanding into the market.

84. Natural gas was seen as a much cleaner and cost effective alternative to coal for power generation, and U.S. consumption of natural gas was rising. Green Field's fracking services were in high demand; margins were high; and the technology being used by Green Field far exceeded that of its competitors.

85. Green Field had exclusive access to turbine engines that utilized a patented technology for use in Well Services.[1]

86. Several years earlier, in or around 2006, Ted Lee McIntyre, II ("McIntyre"), invented an oil field turbine stimulation pump that utilizes the split shaft turbine or free turbine to control the flow rate and fluid pressure during oilfield pumping operations (the "Invention").

---

[1] Under the Equipment Purchase Agreement (defined below), "Well Services" means only procedures or services performed down hole in oil and gas wells such as: pump down work, cementing services, acidizing and chemical pumping, fracturing services, gravel packing and sand control services, coiled tubing, nitrogen pumping services, wireline, turbine testing and handling, and rig work including well services and plug and abandonment.

87.     On January 1, 2006, McIntyre granted MTT Properties L.L.C. ("MTTP"), a Louisiana entity he owned, the exclusive right to make, have made, use, offer for sale, and sell the Invention.

88.     On or about August 25, 2010, McIntyre filed a Non-Provisional Patent Application ("Patent Application") for the Invention related to "hydraulic fracturing of earth formations, and more particularly to the hydraulic fracturing of hydrocarbon bearing formations, e.g. oil and gas sands, for the purpose of increasing the production rate and total amount of recovery of the hydrocarbons from a well completed in such a formation." Patent Application, line 20.

89.     The Patent Application was registered by the United States Patent and Trademark Office on July 19, 2011, under the mark "Frac Stack Pack."

90.     In general terms, the technology made it possible to take used helicopter engines (similar to those used by the military in the Iraq and Afghanistan wars) and refurbish and modify the engines to be used as turbine frac units in the oil fields of Texas and other shale plays around the country.

91.     With the Frac Stack Pack technology, the turbines are fueled with natural gas from the wellhead—thus avoiding the significant cost of providing diesel to power the turbine frac units used in hydraulic fracturing.

92.     After the Patent Application was filed, and shortly before the patent was registered, on July 8, 2011, MTTP entered an Equipment Purchase Agreement with Hub City Industries, the predecessor to Green Field ("Equipment Purchase Agreement").

93.     Under the Equipment Purchase Agreement, Hub City Industries (later Green Field) was granted the exclusive license and right to purchase the turbine engines used by MTTP in connection with McIntyre's Invention for use in Well Services.

94. The Equipment Purchase Agreement did not transfer any ownership interests in MTTP's intellectual property.

95. MTTP's rights and obligations under the Equipment Purchase Agreement were subsequently assigned to another entity, Turbine Powered Technology, L.L.C. ("TPT"), a Louisiana limited liability company located in Louisiana.

96. McIntyre is the principal of TPT and TPT was owned 50% by MTTP and 50% by Green Field.

97. Following MTTP's transfer to TPT, Green Field, through its ownership of TPT, held a 50% ownership interest in the right to make, have made, use, offer for sale, and sell the Invention.

98. On September 22, 2011, TPT and Green Field entered the Turbine Driven Equipment License Agreement ("Green Field License Agreement"), under which TPT granted Green Field (1) a royalty-free, exclusive fully transferable and assignable worldwide license to the Frac Stack Pack trademark and (2) a perpetual, irrevocable, royalty-free, fully transferable and assignable, exclusive license to the Frac Stack Pack technology.

99. Pursuant to the Green Field License Agreement, Green Field had exclusive rights to use, sell, lease, commercialize, or otherwise deal with the Frac Stack Pack™ equipment that it purchased (under the exclusive Equipment Purchase Agreement) from TPT in the Well Services business.

100. The Green Field License Agreement and the Equipment Purchase Agreement did not preclude TPT from using or practicing rights under its Intellectual Property outside the Well Services business.

101.	Although Green Field owned 50% of TPT, it did not otherwise have any rights to use or practice TPT's Intellectual Property in any business other than Well Services.

102.	Utilizing its exclusive access to the Frac Stack Pack technology equipment, Green Field negotiated a contract with Shell dated September 2, 2011 (the Contract for High Pressure Fracturing Services), under which Shell prepaid $42.5 million to Green Field for the purchase, mobilization, modification and preparation of equipment and services provided under the agreement.

103.	With a lucrative contract with Shell and plans of business expansion, Green Field was poised to be an extremely successful player in the emerging hydraulic fracturing industry.

**B.	Mr. Moreno, GE and GEOG initiate discussions for joint venture opportunities.**

104.	Unexpectedly, the natural gas market trends reversed in 2012.

105.	A mild winter reduced natural gas prices and caused producers to reduce drilling activity.  Significant capacity additions and high costs combined with low natural gas prices to further depress margins in the fracture stimulation industry in mid to late 2012.

106.	Shell, by far Green Field's most significant customer, pulled back significantly out of onshore natural gas development in North America, including completely eliminating its Eagle Ford shale position, and terminated its contract with Green Field.

107.	Green Field was left in a precarious position in need of capital and revenue streams.

108.   Beginning in September of 2012, Mr. Moreno began searching for capital investment partners for Green Field in its present fracking business and, because Green Field potentially had access to the Invention technology through its 50% ownership interest in TPT, for Green Field to diversify into what would be a new sector for Green Field, power generation.

109.   The Intellectual Property owned by TPT that was involved in the Frac Stack Pack technology for hydraulic fracturing could also be used for turbine power generators applicable to other industries.

110.   Robert Nardelli, an acquaintance of Mr. Moreno who was the former CEO of Chrysler and a former executive of General Electric Company ("GE"), had knowledge that GE had long been interested in the commercialization of turbine power generation.  In September 2012, Mr. Nardelli made an introduction between Mr. Moreno and certain executives of GE.  They, in turn, introduced Mr. Moreno to Mike Hosford ("Hosford") of GEOG and Kevin Skillern ("Skillern") of GE Capital.

111.   With that introduction, Mr. Moreno approached GE and GEOG about forming a joint venture to be operated in Lafayette, Louisiana, involving both fracking and power generation businesses.

112.   These initial meetings took place in September and October 2012. Hosford and other GE representatives first spoke with Mr. Moreno on September 13, 2012, meeting in person shortly thereafter.  Throughout late 2012, Mr. Moreno continued to discuss with Hosford a partnership with GE in both fracking and power generation.

113.   GE expressed a desire at the initial meeting to immediately form a joint venture and the parties began working together along three simultaneous tracks: (1) the financial details, including how profits and losses would be borne; (2) business

operations, including the necessary paperwork and employees on each side; and (3) engineering and manufacturing aspects, including what engines to use, safety specifications, and reporting.

114. Over the next few weeks, a general exchange of marketing presentations took place. GE first went to Louisiana to look at the technology in October, 2012.

115. Face-to-face meetings occurred on or about October 5, 2012, with Mr. Moreno explaining the unique turbine driven technology in fracking as well as power generation applications to GE's oil and gas group.

116. On or about October 18, 2012, Mr. Moreno met with GE and GEOG personnel at Greenfield's offices and assembly facility in Lafayette, Louisiana.

117. On October 22, 2012, GE forwarded a non-disclosure agreement to facilitate the development of a "structural equity investment" by GE.

118. On November 16, 2012, Mr. Moreno met with representatives from GE who informed him that GE was looking forward to building their relationship.

119. During the period from October 2012 through February 2013, the negotiations among Green Field, GE, GEOG, and Mr. Moreno escalated quickly.

120. The initial courtship that had included formal meetings between Mr. Moreno and various representatives from GE and GEOG rapidly progressed, with GE and GEOG exercising substantial authority over business operations of the ongoing turbine business in Lafayette, Louisiana.

121. During this five (5) month period, the parties conducted engineering and production due diligence including field visits to Louisiana, product demonstrations, meetings with potential customers, financial reviews, and market evaluations.

122. The parties were in constant communication, generating thousands of e-mails. These communications were on all levels, from senior executives to salaried engineers, consistent with the need to get to market as quickly as possible.

123. From October to December of 2012, GE and GEOG looked at several avenues of investment in the Invention technology while working with Mr. Moreno on the details of both Green Field's fracking business and the power generation side.

124. This project was known internally at GE and GEOG as "Project Cayenne" and, at that time, included both power generation and fracking.

125. Mr. Moreno believed that the parties had agreed to all of the substantive terms concerning the formation of a joint venture. More specifically, Mr. Moreno believed the parties agreed that a joint venture would be established between him (or an entity controlled by him) on one side, and GE and GEOG (or one of GE's subsidiaries), on the other side.

126. The parties would then establish a separate entity through which they would jointly develop and manufacture power generation units with a capacity of 1-5 megawatts.

127. The parties would contribute equally to the venture, with Mr. Moreno contributing capital, employees, his entrepreneurial skills, an existing contract with SandRidge Energy ("SandRidge"), his ability to secure other contracts, and technology acquired from McIntyre.

128. GE would contribute capital, technology, employees, industry knowledge, and brand.

129. Finally, TPT would serve as the packager.

130. Through their joint equity interest, the parties would share equally in profits and losses.

131. Ultimately, GE would have the option to buy out Mr. Moreno after three years. Through this arrangement, GE ensured that it could utilize Mr. Moreno's entrepreneurial skills to get a new line of products to the market quickly and more effectively than it could on its own using a technology that was already a natural fit for its business. Mr. Moreno, in turn, secured funding for this venture and a valuable client for TPT and GFES.

132. The financial terms were that GE, through one of its subsidiaries, would invest $200 million into the venture with $100 million committed to fracking equipment and $100 million committed to power generation units, all of which was to be conducted in Lafayette, Louisiana.

**C.     The parties enter non-disclosure agreements, a supplier agreement, and a memorandum of understanding.**

133. As an integral part of the parties' discussion, Green Field entered into broad ranging non-disclosure agreements ("NDA") with GEOG, GE Aero, and GE Capital. Initial drafts of the NDA were circulated in October 2012 as part of a "structured equity investment" by GE. The NDA was executed in December 2012.

134. On November 16, 2012, Mr. Moreno and his team met with a large number of GE and GEOG executives and employees, and a wide range of topics were discussed, including: (1) the value of the product and expected availability of equipment; (2) the technology, including engine acquisition and intellectual property and licensing issues; (3) customers, contract terms, and the customer's specifications; (4) the competitive landscape; (5) who would comprise the management team; and (6) financial

considerations, including projected financials, capital expenditure requirements, methods of funding, and projected cash needs.

135.   The parties also entered a Supplier Agreement that detailed where and how the parties would work together, who would be in charge of various aspects of the business, and what each party would be contributing to the "PowerGen NewCo" through which they would partner.

136.   on January 7, 2013, GE Aero signed a Memorandum of Understanding addressing a joint development study, supply agreement and commercialization of 1-5 megawatt power generators.

137.   GE had access to surplus jet engines that it manufactured and, seeing an additional benefit to its own company operations, GE and GEOG insisted that the parties refurbish GE engines instead of Honeywell engines so that GE could sell its surplus engines to the venture.

138.   Engineers for GE drafted a "Joint Development" program for the parties to work on in developing the technology to GE specifications (including the use of Honeywell engines), circulating a draft as early as February 7, 2013.

139.   Much more than just a lender or investor in the business, GE and GEOG demonstrated their active involvement and right of control, inserting themselves into the engineering operations of the business, visiting the factory floor multiple times in Louisiana to dictate that operations must conform to "GE standards," including safety protocols and the use of safety gear.  Multiple teams of GE engineers traveled to Louisiana beginning in October 2012 and continuing through September 2013 to meet with and collaborate to develop the new technology to "GE standards," and GE engineers made internal GE technology available for use in the venture.

140. Mr. Moreno did not perceive these directions as being given merely as advice to plan for a prospective joint venture in the future; rather, he understood them to be orders that were required to be implemented immediately in an agreed-upon joint venture.

141. As expected, GE's and GEOG's instructions were followed, consistent with GE's and GEOG's rights to control the operations as a partner in this venture.

142. Believing that a joint venture had been established, Mr. Moreno negotiated a contract with SandRidge wherein that venture would supply power generation units to SandRidge.

143. SandRidge announced on January 11, 2013 that it would utilize the power generation technology, and the parties were actively collaborating in order to deliver to SandRidge under the contract.

144. Indeed, engineers from GE had been active in participating in the development of the technology well before this, with initial visits and coordination beginning virtually immediately after Hosford's contact with Mr. Moreno in October 2012.

**D.    GE and GEOG publicly announce their collaboration with Mr. Moreno.**

145. On January 7, 2013, GE and GEOG issued a press release announcing their collaboration with Mr. Moreno to develop power generation technology.

146. That release demonstrated the mutual excitement about the project, quoting Mr. Moreno saying, "We're thrilled to be collaborating with GE," and Hosford of GEOG saying, "This collaboration may help us deliver innovative solutions that solve some of the biggest industry challenges."

147. GE, GEOG, and Mr. Moreno later announced their collaboration at GE's Oil & Gas Worldwide Forum in Florence, Italy, which was held from January 27

through 29, 2013. Over 200 of GE and GEOG's top customers worldwide were in attendance.

148. This presentation, entitled "Facing the Challenge: Unlocking the Potential of Unconventional Resources through Collaboration," was made by Mr. Moreno and Hosford and was touted by GE and GEOG as an example of GE's and GEOG's joint venture strategies with emerging new technologies.

149. During this time, GE and GEOG made technical visits to Louisiana to assess the progress and status of the first power generation units.

**E.    Mr. Moreno discontinues his search for joint venture partners and the parties negotiate capital funding and financing.**

150. It was made clear to GE and GEOG that Mr. Moreno was seeking a total of $200 million in capital, divided $100 million to support fracking business capital expenditures and $100 million for the power generation business opportunity.

151. On or about March 8, 2013, Hosford and Lee Cooper ("Cooper") of GE's corporate office presented the idea of capital finance for both fracking and power generation to GE's CEO, Jeffrey R. Immelt ("Immelt"). Recognizing the need for capital to fund the venture's contracts (including SandRidge), GE began to look expeditiously for a funding mechanism in order to avoid losing the progress and contracts that were already secured.

152. Immelt instructed them to focus only on the power generation business and decided to provide funding out of his "own" corporate budget to facilitate a quicker closing and to demonstrate within the GE organization his commitment to entering into a power generation business with Mr. Moreno.

153. In fact, Immelt told Hosford to get Mr. Moreno $25 million by the end of the week. *See* **Exhibit A**.

- 22 -

154.     Following this meeting, Hosford and Cooper phoned Mr. Moreno to relay Immelt's approval of funding by GE.   Duncan O'Brien was then brought in by GE to move forward with drafting documents and ironing out further details.

155.     During that phone call, Hosford, O'Brien and Cooper told Mr. Moreno that he should cease pitching joint venture relationships with other companies and/or private equity firms.

156.     At this point, GE and GEOG were fully and unequivocally committed to exclusively funding their contribution to the parties' venture.

157.     Mr. Moreno moved forward in reliance on GE's and GEOG's commitment to be a funding source for the venture.

158.     Mr. Moreno also acted in reliance upon, and complied with, GE's and GEOG's instruction to cease searching for other potential joint venture partners because he felt that the GE family of corporations was a good fit as a partner in light of GE's heritage and experience in the generator and turbine lines of business. GE, as a financial partner, also committed sufficient capital investment and, as a strategic partner, contributed greater benefit than a mere investor or lender would supply.

159.     Significantly, Mr. Moreno ensured that enormous sums were invested in developing the technology to GE's specifications in order to fulfill commitments to clients – an expense that would have been unnecessary but for GE's insistence and its continued participation.

160.     GE and GEOG knew that Mr. Moreno stopped discussions with potential joint venture partners based on their instruction and commitment to fully fund the amounts they agreed were needed to support the venture.

- 23 -

161.   On March 21, 2013, Mr. Moreno had dinner with business development representatives from GE to discuss the "guts" of the $100 million equity investment in the PowerGen model.  This model had been developed in collaboration with GE and was being marketed internally within GE to several of its different business units.

162.   Later in March 2013, Mr. Moreno was invited by Daniel C. Heintzelmen, President and CEO of GEOG, to attend a dinner in New Orleans, Louisiana, held on April 23, 2013, the night before GE's annual shareowners meeting, saying: "We are extending this invitation to some of our key partners and would be delighted if you could join us . . . ."

163.   Prior to the dinner, Hosford and the GE team developed a business plan for the venture (as early as April 19, 2013), complete with projected income statements and a schedule of anticipated revenues.

164.   At the April 23, 2013 dinner in New Orleans, Mr. Moreno was introduced as GE's partner to GE's CEO, Jeffrey Immelt, as well as Beth Comstock (GE's senior vice president and Chief Marketing Officer), and more than a dozen GE board members and/or top executives.

165.   Mr. Moreno communicated to Cooper and Comstock that progress on "papering" the parties' joint venture had slowed considerably, owing to various GE bureaucratic entanglements.  In response, GE appointed yet another executive, Colleen Harkness Calhoun ("Calhoun"), to replace Duncan O'Brien.

**F.      The parties continue to document the terms of their agreement.**

166.   In April 2013, Mr. Moreno was called by Cooper and Comstock and was informed that Calhoun, Senior Executive Director of Energy Ventures for GE, was assigned and given authority to further document the terms of the parties' agreement.

- 24 -

167. On April 3, 2013, Calhoun and Mr. Moreno met in Schenectady to further document the details of the agreement.

168. In Mr. Moreno's opinion, by the evening of April 3, 2013, all remaining material elements of the joint venture had been agreed to by Mr. Moreno, on one hand, and GE and GEOG, on the other. Afterwards, a celebratory dinner was held among Mr. Moreno, Calhoun of GE, and Steve Bolze ("Bolze") of GE Power and Water. According to Mr. Moreno, all that remained, still, was to "paper" the transaction. This process moved more slowly than the parties would have liked.

169. The business plan agreed upon by Mr. Moreno, GE, and GEOG was to ramp up the production of the turbines in Louisiana, establish a steady revenue stream, and then sell the business in 3 to 4 years.

170. The parties also agreed that Mr. Moreno would contribute capital, customer contacts, and the expertise he gained during his many years of experience in the oil and gas exploration and production industry.

171. GE's and GEOG's calculations forecasted that the business would have substantial net worth within 4 years.

172. On April 4, 2013, Calhoun sent Mr. Moreno an e-mail confirming the "key terms" of the parties' agreement. *See* **Exhibit B**.

173. Among other things, the "key terms" included the following:

> $200 MM commitment by GE for Preferred equity in PowerGen New Co. (PGNC)
>
> PGNC will have IP, PG contracts, and pledge of equipment that is purchased by the entity
>
> . . . .

GE to have negative control rights over the entity for items such as leverage on entity, change of control, replacement of key personnel, etc.

. . . .

TPT to package powergen and frac spreads exclusively for PGNC.

Prior to funding determination by GE that safety and quality issues for existing equipment in field and equipment to be deployed meets mutually agreed upon thresholds.

Initial GE funding of $50 MM by [April 29]

- $5MM for product development to industrialize the GE C7 and the C35 GE.

- $[25]MM for equipment 2 frac spreads

    o Payments to TPT. When complete units will be leases to Greenfield for deployment to [Shell]. PGNC to receive lease payment at agreed upon rate over useful life of asset

- $[20]MM for equipment to be used for powergen units

    o Funds to be used to pay TPT for 100MW of power gen equipment

    o Equipment for [40 MW] of power under contract

. . . .

PGNC will liquidate at the earlier of [three years from date of agreement] or as mutually agreed by shareholders and preferred equity

- GE will have the right to buy the PGNC for the [the higher of X multiple of EBIDTA or 20% less than 1 year GE's trailing EBITDA multiple]

- In the event that GE does not exercise its option to buy the company then

- 26 -

> Greenfield can purchase PGNC for same amount
>
> - In the event that neither party exercises its purchase option than entity will be sold to a 3rd party or shares registered for public sale

174. After a couple of phone calls between Mr. Moreno and Calhoun and some brief additional emails, it was clear to Mr. Moreno that the parties were in agreement on all of the essential terms of their venture.

175. Stated differently, Mr. Moreno understood that there was: (i) a mutual promise or undertaking by the parties to create a joint venture in which the parties would share in the profits and losses; (ii) an understanding of what each party's contribution to would be; and (iii) a measure of joint proprietorship, management or control over the venture.

176. In addition, Mr. Moreno believed that, by their emails, words and conduct, GE and GEOG manifested an intention to be bound as joint venturers with him.

177. In the months that followed, Mr. Moreno, who also intended to be bound as a joint venturer with GE and GEOG, continued to fulfill his agreed upon obligations.

**G.  GE and GEOG require that Green Field divest the power generation line of business.**

178. In or around late March or early April 2013, the parties agreed to exclude the fracking capital expenditure funding and focus on power generation only.

179. GE and GEOG insisted that Green Field not be included in the power generation line of business and that it remain independent of Green Field as a separate entity.

180.  Green Field authorized Mr. Moreno to pursue the power generation independently.  In return, Green Field would have the new company as a valuable client providing a lucrative source of revenue and would further profit through its equity ownership in TPT.

181.  GE, through its subsidiary GEOG, remained committed to invest $100 million in the power generation business with the separate company.

**H.     Mr. Moreno forms TGS, as required by GE and GEOG.**

182.  As described above, GE and GEOG had refused to partner with Green Field and insisted that the power generation business be placed into a new entity.

183.  Thus, there was no opportunity for Green Field, whose business had always been in fracking services, to receive funding directly from GE and GEOG for a power generation business.

184.  Moreover, Green Field did not have a license or any rights to the Invention technology for use outside of Well Services, as those rights belonged to TPT.

185.  Because Green Field was a 50% owner of TPT, Mr. Moreno presented Green Field and its bondholders with the business opportunity related to the development, construction, sale, and rental of turbine and gas-engine powered power generation.

186.  Green Field did not have the capacity to enter a new business industry.

187.  However, Green Field would benefit from the parties' venture continuing in an entity separate from Green Field by gaining the new business as a customer.

188.  Green Field's shareholders and directors gave consent for Mr. Moreno and TPT to pursue the power generation business opportunity with GE and GEOG outside of Green Field.

189.   On March 7, 2013, in furtherance of the parties' agreement, Mr. Moreno formed TGS to serve as the new company insisted upon by GE and GEOG.  Mr. Moreno's ownership interest in TGS was through TGS's initial member, MOR DOH Holdings, L.L.C. ("MMH").

190.   As the parties had agreed, GEOG's ownership interest in TGS would accrue upon GEOG's contribution to the joint venture.

## I.   GEOG issues a $25 million convertible bridge loan, secured by TGS's assets and Mr. Moreno's personal guarantee, which GE promised would never be called.

191.   After TGS was formed, GE and GEOG delayed the $100 million of funding that they had committed to provide.

192.   On May 1, 2013, Hosford sent an e-mail entitled "Moreno JV" outlining the development of the "partnership" and the steps needed to move the process forward.  In his email, Hosford described himself as "embarrassed" by GE's conduct and informed Comstock that GE's delay "is [not] how to start a relationship with a partner."  *See* Exhibit A.

193.   GE and GEOG first claimed that a "safety engineering study" had to be completed before the full funding could take place.

194.   However, recognizing that the funding was needed before that study could be finalized, Calhoun, on behalf of GE and GEOG, provided $25 million to TGS in May 2013 in the form of a convertible loan, as a short-term work-around to uphold GE's and GEOG's funding obligations.  GE and GEOG required TGS to execute a short-term, temporary Senior Secured Promissory Note (the "Note") for the $25 million investment.

195.   On May 13, 2013, the Note was signed and GEOG wired $25 million to TGS's bank account in Louisiana.

196.   The Note contained Negative Covenants that materially restricted TGS's operations and prohibited TGS from, among other things, selling its property, incurring debt, making investments, paying dividends, lending or advancing money to employees, or forming subsidiaries.

197.   In short, through the Note, GE and GEOG exerted nearly complete operational and managerial control over TGS.

198.   Unlike an ordinary note evidencing a loan, this Note also included a "Term Sheet," that described many of the key terms underlying the structure of the parties' joint venture.  A copy of the Term Sheet is attached as **Exhibit C** and is incorporated herein by reference.

199.   Consistent with what the parties already had agreed to as partners, the terms set forth in the Term Sheet included, among other things, that the $25 million "convertible loan" from GEOG to TGS would be converted into TGS preferred membership interests on or about June 15, 2013 (the time the parties expected the safety study and other formal paperwork to be completed).

200.   Ultimately, GEOG was to invest $100 million for a 50% stake in TGS.

201.   As the parties had agreed previously, TGS used the $25 million to purchase the turbines and other equipment in furtherance of the parties' business plan.

202.   Shortly before May 13, 2013, Calhoun requested that Mr. Moreno personally guarantee the loan and execute a Guarantee Agreement to "make the finance folks happy."

203.   Calhoun told Mr. Moreno "not to worry" about the personal guarantee, because the loan would be converted to equity within 30 days and the Guarantee Agreement "would never be called."

204.   GE and GEOG also required that TGS execute a Security Agreement granting GEOG a security interest in all of TGS's assets, including both tangible and intangible assets, which notably includes TGS's rights to the Intellectual Property and other technology that made this venture attractive to GE and GEOG.

205.   By obtaining a secured interest in TGS's rights to the Intellectual Property and other technology, if GE and GEOG later reneged on their obligations and called their investment a loan—knowing that such a "loan" could not be repaid—GE and GEOG could exploit the situation by foreclosing on the intangible assets and seize the rights to the technology, leaving their partners, Mr. Moreno and TGS, with nothing.

206.   Mr. Moreno's understanding was that the parties never intended for the Note, Guarantee Agreement, or Security Agreement to be enforceable by GE or GEOG.

207.   Mr. Moreno also understood the $25,000,000.00 payment to TGS to be GE's and GEOG's initial equity investment in the joint venture that the parties intended to form.

## J.      The Term Sheet.

208.   The eleven (11) page Term Sheet memorialized the structure of the venture among Mr. Moreno, TGS, GE and GEOG, with TGS being the vehicle through which it would operate.  For instance, under the heading of TGS Tax Treatment, the Term Sheet says:

> TGS will be treated **as a partnership** for US tax purposes and none of TGS, its directors or officers, Moreno, MMH or any of their affiliates will take any action that may result in TGS not being treated as a partnership (*e.g.*, filing a "check the box" election to treat TGS as a corporation for US tax purposes).

The **parties will discuss and agree to relevant partnership tax provisions** (including income allocation and IRC Section 704(c) methods) prior to the completion of the First Contribution. (emphasis added).

209. The Term Sheet also evidenced, in writing, the community of interest and combination of property, financial resources, effort, skill and knowledge the parties had already committed to verbally.

210. In addition, the Term Sheet, which contains no merger or integration clause, memorialized the parties' agreement to share profits and losses.

211. And, although the Distribution Waterfall set out in the Term Sheet calls for a repayment of investments first, it ultimately provides both parties with the right to share in the profits.

212. The Term Sheet provides that GE's and GEOG's contribution of $100 million (including conversion of the Loan to Preferred Interests in TGS) would not be repaid if the business failed and, likewise, Mr. Moreno's contribution would similarly be lost if the business failed.

213. Consistent with the terms previously agreed to by the parties, the Term Sheet notes a mutual right of control over the business venture.

214. The Term Sheet provides that both GE and MMH, TGS's parent company, would be represented on the Board of Managers.

215. Although the Term Sheet allows MMH to appoint three board members to GE's 2 (with 2 independent members appointed by the Board of Managers), the Term Sheet also provides that the approval of GE's designees is required for a number of actions.

216. In addition, the Term Sheet states that, following the funding of the $25 million convertible loan, GE and GEOG were to make the "First Contribution" on or about June 15, 2013.

217. The "First Contribution" consisted of converting the $25 million convertible loan into preferred membership equity plus $25 million in additional cash.

218. This total of $50 million in initial funding from GE and GEOG is consistent with the agreement previously reached by the parties and was noted in Calhoun's April 4, 2013 e-mail to Mr. Moreno. *See* Exhibit B.

219. The Term Sheet was exceptionally detailed and set forth the material rights and obligations of the parties including, but not limited to, the parties' business plan and respective contributions.

**K.** **GE and GEOG fail to execute the final documents memorializing the parties' agreement and fail to provide the additional funding they promised to provide.**

220. During the period May 13, 2013 through June 15, 2013, GE and GEOG made no efforts whatsoever toward honoring their obligations to "work diligently and in good faith towards the execution of definitive documents" to memorialize the parties' agreement or to provide required funding, despite repeated e-mail requests from Mr. Moreno to do so.

221. According to the Term Sheet, funding of the First Contribution was subject to completion of the following:

(i)     Definitive agreements for the overall transaction,

(ii)    TGS, GFES, and TPT entering into assembly, installation, product development, maintenance and licensing agreements,

(iii)   GFES board and GFES minority stockholder, TPT governing body and Marine Turbine Technologies, L.L.C. governing body approvals and consents, including, with respect to GFES,

board and minority stockholder waivers of corporate opportunities regarding the transactions,

(iv)    Fairness opinion regarding related party assets of the transactions among TGS, GFES and TPT,

(v)    GE internal approvals,

(vi)    The turbine powergen units ("TPU") passing a GE engineering peer and risk review,

(vii)    GE approval of applicable TPU engineering designs, and

(viii)    Completion of environmental, health and safety and product safety/liability due diligence, including, but not limited to, site visits and written assessments/reports by GE personnel and/or GE consultants, discussions with TPT management and responses from TPT management to due diligence questions raised by GE.

222.    All such conditions pertaining to the First Contribution were either fully performed by TGS and Mr. Moreno or waived by GE and GEOG.

223.    As such, GE and GEOG breached their obligations by, among other things, failing to make the First Contribution and failing to put forth good faith efforts towards the execution of definitive documents memorializing the parties' agreement.

224.    Despite their failure to pursue good faith efforts towards the execution of definitive documents memorializing the parties' agreement, GE and GEOG required TGS, Green Field, and TPT to enter into an assembly, installation, product development, maintenance and licensing agreement for turbine power generators.

225.    In June 2013, TGS complied and executed an Agreement for the Manufacture and Sale of Turbine Powered Generators with TPT, as contractor, and Green Field, the contract manager.

226.    Under that agreement, TPT was required to manufacture and deliver to TGS, and TGS was required to purchase from TPT, a minimum of 100 Mw of Turbine Powered Generators per annual production cycle.

- 34 -

227.   TGS was required to make deposits to Green Field by July 1, 2013 for the first production cycle.

228.   TGS made the required payments to Green Field and TPT under that Agreement—totaling in excess of $28,000,000—in reliance on the promises by GE and GEOG that they would provide funding as agreed.

229.   In addition to entering into the Agreement for the Manufacture and Sale, TPT commenced a search for real estate to build a new, larger facility to accommodate the production demands set forth by GE and GEOG.

230.   Throughout this period, GE continued to actively involve itself in TGS's  engineering process, with multiple teams visiting the site and conducting reviews.

231.   In addition, on July 16, 2013, Hosford collaborated with Mr. Moreno, Rick Fontova, and GE marketing personnel to develop the business model for the parties' venture and to identify potential clients.  Not a single person involved in developing the technology or the business ever suggested that GE's participation was limited to that of a lender but, instead, each acted as active partners or joint venturers.

**L.     GE and GEOG misrepresent to Mr. Moreno that the joint venture was going forward and would be funded as promised.**

232.   Despite the breaches by GE and GEOG, representatives of GE and GEOG continued to mislead and induce Mr. Moreno into relying on the promise that their funding of the joint venture was imminent.

233.   In or around July 2013, Hosford phoned Mr. Moreno to inform him that Edoardo Padeletti of GEOG, who was based in Italy, would be replacing Calhoun and that he would facilitate funding of the joint venture and "button up" any loose ends.

234.   Mr. Moreno received a call from Padeletti who apologized to Mr. Moreno for GE's lack of action and assured Mr. Moreno that GE was moving forward with the joint venture.

235.   Indeed, Padeletti told Mr. Moreno that "I only have a one-way ticket from Italy and have been instructed by upper management not to leave the U.S. until all matters involving the joint venture have been finalized and funded."

236.   GE and GEOG did not fulfill that promise, as they refused to provide funding and refused to negotiate and execute final documents memorializing the joint venture.

237.   In or around August 2013, a meeting was held in Houston, Texas with Mr. Moreno, Hosford, Padeletti and Hasan Dandashly, GE's Operation Chief.

238.   On August 9, 2013, Hosford e-mailed Fontova to discuss a potential opportunity for the parties to do business with Devon Energy, and to update Fontova on some meetings between the parties' technical teams.  Hosford noted that, from GE's perspective, they had entered the "Last Mile."

239.   At that meeting, Mr. Moreno was again given assurances that the power generation line of business was moving forward; and Dandashly personally stated that "although new to the job," he was instructed by corporate management to finalize all pending matters and get the business operational.

240.   On or about August 14, 2013, GE and GEOG completed the second "Product Engineering Review of Power Generation Units."

241.   Both reviews passed GE standards and were approved.  This represented the culmination of months of work.

**M.    GE's new director repudiates GE's obligations under the Term Sheet.**

242.    On or about September 29, 2013, Mr. Moreno was informed by Padeletti that GE's New Corporate Mergers and Acquisitions director, John Flannery, did not feel comfortable participating in the joint venture the parties had contemplated, claiming that the Green Field financial situation was the reason for the "buyers' remorse."

243.    Then, in or around October 2013, Hosford and Padeletti informed Mr. Moreno that Flannery unilaterally decided to "kill" the joint venture.

244.    On October 4, 2013, Flannery met with Bob Nardelli, Wayne Teetsel, a Noteholder of GFES who participated telephonically, and Mr. Moreno to discuss Flannery's decision to repudiate GE's agreements.

245.    On or about October 27, 2013, Green Field filed for bankruptcy protection.  The Green Field bankruptcy did not involve TGS.

**N.    GE's and GEOG's attempt to collect on the Note, Guarantee Agreement and Security Agreement.**

246.    After refusing to negotiate and execute definitive documents consummating the transaction set forth in the Term Sheet; refusing to provide the additional funding to TGS; failing to convert the Note into Preferred Interests; and refusing to cancel the Note and surrender it to Mr. Moreno and TGS, in breach of their promise not to call the Note, the Security Agreement, or Guarantee Agreement, and contrary to the parties' prior agreement, GE and GEOG demanded repayment of the $25 million convertible loan.

247.    As a result of GE and GEOG's breaches of their obligations, Mr. Moreno and TGS suffered substantial damages.

248.  GE's and GEOG's breaches also deprived TGS of the funds necessary to operate as a business, resulting in lost profits and a diminution in the value of TGS.

249.  Due to GE's and GEOG's breaches, TPT has placed Mr. Moreno and TGS in default of the Agreement for the Manufacture and Sale of Turbine Power Generators and has made additional claims against them for accounts payables incurred in manufacturing the TPUs, including accounts payables for components which were mandated by GE and GEOG and which increased the cost to build the TPUs by nearly 50%.

250.  In June 2013, Powermeister LLC, in an effort to provide funding for TGS until GE funded its $100 million commitment, made a $20 million investment in MMH, with a right of return if GE did not fund its $100 million commitment to TGS.

251.  Powermeister LLC has exercised its right of return of its investment.

252.  But for GE's and GEOG's breaches, Mr. Moreno would have acquired ownership of a 50% share of a profitable business venture that, by GE's and GEOG's own calculations, would have had substantial net worth in just four years.

## FIRST COUNTERCLAIM
### (Breach of the Term Sheet)

253.  Paragraphs 1 through 252 are realleged.

254.  As set forth in the Term Sheet, GE and GEOG agreed to work diligently and in good faith towards the execution of definitive documents necessary to consummate the business venture described in the Term Sheet.

255.  Mr. Moreno has performed, and/or is willing to perform, all of his obligations under the Term Sheet.  Indeed, among other things, Mr. Moreno contributed capital; formed TGS in accordance with the instructions of GE and GEOG; and provided

customer contacts and valuable experience he gained during his many years operating in the oil and gas exploration and production industry.

256.   Mr. Moreno executed the Note and Security Agreement in his capacity as TGS's CEO, and as the CEO of TGS's parent, and TGS used the proceeds of the Note to purchase equipment to conduct the business of the joint venture and/or partnership.

257.   Mr. Moreno also executed the Guarantee Agreement.

258.   In addition, Mr. Moreno and TGS entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and made payments in excess of $28,000,000.

259.   GE and GEOG, however, repudiated their agreement to work diligently and in good faith towards the execution of any documents necessary to consummate the transaction described in the Term Sheet.

260.   In doing so, GE and GEOG failed to cooperate with Mr. Moreno and TGS.  In fact, GE and GEOG not only failed to work diligently and in good faith towards their obligations under the Term Sheet, GE and GEOG failed to take any actions for more than two months following the execution of the Term Sheet despite repeated requests from Mr. Moreno and TGS.

261.   Without cause, and for improper motives, GE and GEOG then failed to cooperate with Mr. Moreno and TGS, refused to negotiate, much less execute, the documents contemplated by the Term Sheet, and failed and refused to perform their obligations as described more fully above.

262.   GE and GEOG have also refused to convert the Note to an ownership interest in TGS.  Rather, GE and GEOG have demanded payment on the Note and filed

this action against Mr. Moreno and TGS to enforce the Note, the Guarantee Agreement, and the Security Agreement.

263. If GE and GEOG had not breached their obligations under the Term Sheet, the parties' joint venture and/or partnership would have been duly formed.

264. Mr. Moreno and TGS are entitled to recover all damages, including damages caused by GE and GEOG's breach of the Term Sheet and delay in performance.

## SECOND COUNTERCLAIM
### (Breach of Duty of Good Faith and Fair Dealing)

265. Paragraphs 1 through 264 are realleged.

266. Although the Term Sheet contemplated the execution of additional documents, the parties reached agreement on all of the material terms of the transaction described in the Term Sheet and completed their negotiations of what they regarded as the transaction's essential elements.

267. In other words, while the Term Sheet reflects that certain matters were left open for further discussion, those matters were not deemed by the parties to be material.

268. In fact, Defendants began performing in connection with the parties' transaction on the good faith understanding that agreement on the non-material, yet unsettled, matters would follow.

269. In that regard, the Term Sheet imposed an express duty upon GEOG and GE to work diligently and in good faith towards the execution of documents reflecting all terms, so as to finalize the parties' business venture.

270. The Term Sheet also imposed implied duties of good faith and fair dealing upon GEOG and GE to fulfill their obligations to Mr. Moreno and TGS and to refrain from any actions that could impair or injure the rights of Mr. Moreno and TGS.

- 40 -

These duties were in addition to, and were separate and distinct from, GEOG's and GE's express duties under the Term Sheet.

271. Thus, GE and GEOG were obligated to cooperate and exert their best efforts in the creation and negotiation of definitive documents necessary to finalize and fully document the parties' business venture.

272. GEOG and GE breached their express duty to work diligently and in good faith towards the execution of documents reflecting all terms so as to finalize the transaction contemplated by the Term Sheet. In fact, despite repeated requests from Mr. Moreno, GEOG and GE took no steps whatsoever towards preparing and executing any documentation subsequent to entering into the Term Sheet.

273. Such inaction also resulted in a breach of GEOG's and GE's implied duties of good faith and fair dealing.

274. In the alternative, if, after Defendants are given an opportunity to take discovery and present evidence, the finder of fact were to conclude that the parties had not reached agreement on all of the material terms of the transaction contemplated by the Term Sheet, the Term Sheet nonetheless imposed an express duty upon GEOG and GE to work diligently and in good faith towards the execution of definitive documents necessary to consummate the transaction set forth therein.

275. GEOG and GE breached their express duty to work diligently and in good faith towards the execution of definitive documents necessary to consummate the transaction set forth in the Term Sheet. In fact, despite repeated requests from Mr. Moreno, GEOG and GE took no steps whatsoever towards executing any documents subsequent to entering into the Term Sheet.

276.    GEOG and GE also breached their express and implied duties of good faith and fair dealing by acting in concert with each other in an attempt to defeat the rights that Mr. Moreno and TGS acquired under the Term Sheet.

277.    As a direct and proximate result of GEOG's and GE's breach of their express and implied duties of good faith and fair dealing, Mr. Moreno and TGS have suffered damages in an amount to be determined at trial.

### THIRD COUNTERCLAIM
**(Promissory Estoppel)**

278.    Paragraphs 1 through 277 are realleged.

279.    GE and GEOG clearly and unambiguously made representations and promises to Mr. Moreno and TGS that they would, among other things, provide $100 million to fund the parties' business venture, including an additional $25 million by June 13, 2013.

280.    GE and GEOG also clearly and unambiguously represented to TGS and Mr. Moreno that the $25,000,000 "loan" to TGS would not need to be repaid, but instead, would be converted into an ownership interest in TGS.

281.    In executing the Note, Security Agreement and Guarantee Agreement, TGS and Mr. Moreno reasonably and justifiably relied on GE's and GEOG's representations.

282.    GE and GEOG were aware that substantially all of TGS's assets would be tied up in the equipment purchased with the proceeds of the Note, and that repayment at the Maturity Date would not be possible.

283.    GE and GEOG knew or should have known that Mr. Moreno and TGS would rely on their representations and it was foreseeable that Mr. Moreno and TGS would rely on their representations.

- 42 -

284. In reliance on GE's and GEOG's representations, Mr. Moreno ceased searching for other potential joint venture partners and contributed his own capital and customer contacts, skill and experience in furtherance of the parties' business venture.

285. In reliance on GE's and GEOG's representations, TGS and Mr. Moreno also changed their position to their detriment by, among other things, using the $25,000,000 to purchase engines and other equipment in furtherance of the parties' business venture.

286. TGS and Mr. Moreno also entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and made payments thereunder in excess of $28,000,000 in reliance on GE's and GEOG's representations that they would fund the parties' business venture.

287. When GE and GEOG demanded payment on the Note, rather than converting the Note to an ownership interest in TGS, all of theTGS's funds were tied up in equipment.

288. Moreover, as a result of GE's and GEOG's refusal to negotiate and execute documents finalizing the terms of the parties' business venture, and due to GE's and GEOG's refusal to provide the funding they promised to provide, TPT has placed Mr. Moreno and TGS in default of the Agreement for the Manufacture and Sale of Turbine Power Generators and has made additional claims against them for accounts payables.

289. TGS and Mr. Moreno have incurred, and will continue to incur, actual damages in an amount to be determined at trial as a result of their detrimental reliance on GEOG's and GE's misrepresentations.

## FOURTH COUNTERCLAIM
### (Fraud and Fraud in the Inducement)

290. Paragraphs 1 through 289 are realleged.

291. GE and GEOG knowingly and intentionally made several material misrepresentations of fact, suppressed the truth, and/or failed to disclose material facts, as more particularly described above and as may be discovered in the course of this litigation, in order to induce Mr. Moreno and TGS to execute the Note, Guarantee Agreement and Security Agreement and/or in order to obtain an unjust advantage over them or to cause a loss or inconvenience to them, including but not limited to:

a.    advising Mr. Moreno and TGS that a "safety engineering study" had to be completed prior to funding the parties' venture;

b.    advising Mr. Moreno and TGS that the Note and Security Agreement were merely a stop-gap measure;

c.    advising Mr. Moreno that the Guarantee Agreement "would never be called" because the Note would be converted into equity within 30 days;

d.    making representations and engaging in other intentional conduct to cause Mr. Moreno and TGS to believe that they were committed to entering into a joint venture and would provide all promised funding, when in fact, they had no intention of going forward; and

e.    failing to disclose to Mr. Moreno and TGS that they did not intend to enter into and fund the joint venture as promised.

292. GE and GEOG knew that these material representations were false and that they never intended to fund the parties' business venture or become an equal partner in the business.

293.   GE and GEOG made these material representations with the intention of inducing Mr. Moreno and TGS to rely upon them to their detriment.

294.   GE and GEOG had a duty to disclose to Mr. Moreno and TGS that they did not intend to enter into or fund the parties' business venture.

295.   Mr. Moreno and TGS had no reason to know that GE's and GEOG's representations were not truthful and had no reason to know that GE and GEOG did not intend to abide by their agreement to fund the parties' business, but rather intended to enforce the Note, Security Agreement and Guarantee Agreement.

296.   Mr. Moreno and TGS relied upon GE's and GEOG's material representations to their detriment.

297.   But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS would have pursued other investment opportunities, which opportunities have now been lost.

298.   But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS never would have executed the Note, the Security Agreement in which TGS pledged all of its tangible and intangible assets under the promise that the "loan" would be converted to equity in TGS, or the Guarantee Agreement.

299.   But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS never would have entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and would not have made payments in excess of $28,000,000.

300.   Accordingly, TGS and Mr. Moreno are entitled to rescission of the Loan Documents, including but not limited to the Note, the Security Agreement, and Guarantee Agreement, plus damages including out-of-pocket expenses, lost profits,

diminution of the value of TGS, attorneys' fees and interest, and all other damages in such amounts as shall be proven at trial.

## FIFTH COUNTERCLAIM
### (Unjust Enrichment)

301.    Paragraphs 1 through 300 are realleged.

302.    Recovery of the Note, Security Agreement and Guarantee Agreement, contrary to the promises and representations made by GE and GEOG, would result in unjust enrichment of GE and GEOG at the expense of Mr. Moreno and TGS.

303.    Such enrichment contravenes equity and good conscience.

304.    Accordingly, Mr. Moreno and TGS are entitled to be compensated to the extent to which GE and GEOG have been unjustly enriched.

## JURY DEMAND

305.    Mr. Moreno and TGS demand a trial by jury on all issues.

**WHEREFORE**, Defendants Turbine Generation Services L.L.C. and Michel B. Moreno demand judgment:

1.      Dismissing Plaintiff's Complaint with prejudice;

2.      Awarding damages to Mr. Moreno and TGS incurred as a result of GE's and GEOG's breaches of the Term Sheet and express and implied duties of good faith and fair dealing, and for promissory estoppel, fraud and fraud in the inducement, and unjust enrichment, including but not limited to rescinding the Loan Documents and awarding recovery of out-of-pocket expenses, damages for delay, lost profits, diminution of the value of TGS, of attorneys' fees and interest, and such other damages in such amounts as shall be proven at trial; and

3.      Granting such other and further relief as the Court deems just and proper.

- 46 -

Dated:   New York, New York
         April 6, 2016

PHILLIPS LYTLE LLP

By: *Sean C. McPhee*_____
         Sean C. McPhee
         Anna Mercado Clark
Attorneys for Defendants
*Turbine Generation Services, L.L.C.*
*and Michel B. Moreno*
The New York Times Building
620 Eighth Avenue, 23rd Floor
New York, NY  10018-1405
Telephone No. (212) 759-4888
smcphee@phillipslytle.com
aclark@phillipslytle.com

Doc #01-2910664.7

# Appendix E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————

GE OIL & GAS, INC.,

<table>
<tr><td>Plaintiff,</td><td>Index No. 652296/2015</td></tr>
</table>

v.

TURBINE GENERATION SERVICES, L.L.C., and
MICHEL B. MORENO,

Defendants.

———————————————————————

TURBINE GENERATION SERVICES, L.L.C., and
MICHEL B. MORENO,

Third-Party Plaintiffs,

Index No. 595013/2016

v.

**AMENDED THIRD-
PARTY COMPLAINT**

GENERAL ELECTRIC COMPANY,

Third-Party Defendant.

———————————————————————

As required by the Court's March 30, 2016 Decision and Order (NYSCEF

Doc. No. 171), without waiver and with full reservation of all rights and remedies,

Defendants/Third-Party Plaintiffs, Turbine Generation Services, L.L.C. ("TGS") and

Michel B. Moreno ("Mr. Moreno" and collectively with TGS "Defendants"), by their

attorneys, Phillips Lytle LLP, hereby re-allege the claims in their Amended Third-Party

Complaint against Third-Party Defendant, General Electric Company ("GE" or "Third-

Party Defendant") so as to conform to the Court's March 4, 2016 Decision and Order on

Plaintiff's motion for partial summary judgment (NYSCEF Doc. No. 159), and allege as

follows upon information and belief:

## THE PARTIES

1.　　　TGS is a limited liability company with a principal place of business in Lafayette, Louisiana.

2.　　　Mr. Moreno is an individual who resides in the State of Texas.

3.　　　GE is a domestic business corporation with a principal executive office located at 3135 Easton Turnpike, Fairfield, Connecticut 06828.

## FACTUAL BACKGROUND

**A.　　Development and licensing of the "Frac Stack Pack™" technology**

4.　　　Mr. Moreno, a successful entrepreneur with years of experience in the oil and gas exploration and production industry, now resides in Texas, but continues to own property and business interests in Louisiana.

5.　　　In the 1990s and 2000s, Mr. Moreno founded, developed, and ultimately sold several successful companies in various sub-sectors of the oil and gas industry.

6.　　　In 2011, Mr. Moreno became involved with Green Field Energy Services, Inc. ("GFES" or "Green Field"), a Delaware corporation with its principal place of business in Lafayette, Louisiana.

7.　　　Green Field was a start-up company whose primary business was providing well services specializing in turbine-powered hydraulic fracturing services ("fracking services").

8.　　　At that time, hydraulic fracturing was a new and promising industry, and many companies were expanding into the market.

9.     Natural gas was seen as a much cleaner and cost effective alternative to coal for power generation, and U.S. consumption of natural gas was rising.  Green Field's fracking services were in high demand; margins were high; and the technology being used by Green Field far exceeded that of its competitors.

10.    Green Field had exclusive access to turbine engines that utilized a patented technology for use in Well Services.[1]

11.    Several years earlier, in or around 2006, Ted Lee McIntyre, II ("McIntyre"), invented an oil field turbine stimulation pump that utilizes the split shaft turbine or free turbine to control the flow rate and fluid pressure during oilfield pumping operations (the "Invention").

12.    On January 1, 2006, McIntyre granted MTT Properties L.L.C. ("MTTP"), a Louisiana entity he owned, the exclusive right to make, have made, use, offer for sale, and sell the Invention.

13.    On or about August 25, 2010, McIntyre filed a Non-Provisional Patent Application ("Patent Application") for the Invention related to "hydraulic fracturing of earth formations, and more particularly to the hydraulic fracturing of hydrocarbon bearing formations, e.g. oil and gas sands, for the purpose of increasing the production rate and total amount of recovery of the hydrocarbons from a well completed in such a formation." Patent Application, line 20.

14.    The Patent Application was registered by the United States Patent and Trademark Office on July 19, 2011, under the mark "Frac Stack Pack."

---

[1] Under the Equipment Purchase Agreement (defined below), "Well Services" means only procedures or services performed down hole in oil and gas wells such as: pump down work, cementing services, acidizing and chemical pumping, fracturing services, gravel packing and sand control services, coiled tubing, nitrogen pumping services, wireline, turbine testing and handling, and rig work including well services and plug and abandonment.

15.     In general terms, the technology made it possible to take used helicopter engines (similar to those used by the military in the Iraq and Afghanistan wars) and refurbish and modify the engines to be used as turbine frac units in the oil fields of Texas and other shale plays around the country.

16.     With the Frac Stack Pack technology, the turbines are fueled with natural gas from the wellhead—thus avoiding the significant cost of providing diesel to power the turbine frac units used in hydraulic fracturing.

17.     After the Patent Application was filed, and shortly before the patent was registered, on July 8, 2011, MTTP entered an Equipment Purchase Agreement with Hub City Industries, the predecessor to Green Field ("Equipment Purchase Agreement").

18.     Under the Equipment Purchase Agreement, Hub City Industries (later Green Field) was granted the exclusive license and right to purchase the turbine engines used by MTTP in connection with McIntyre's Invention for use in Well Services.

19.     The Equipment Purchase Agreement did not transfer any ownership interests in MTTP's intellectual property.

20.     MTTP's rights and obligations under the Equipment Purchase Agreement were subsequently assigned to another entity, Turbine Powered Technology, L.L.C. ("TPT"), a Louisiana limited liability company located in Louisiana.

21.     McIntyre is the principal of TPT and TPT was owned 50% by MTTP and 50% by Green Field.

22.     Following MTTP's transfer to TPT, Green Field, through its ownership of TPT, held a 50% ownership interest in the right to make, have made, use, offer for sale, and sell the Invention.

23.     On September 22, 2011, TPT and Green Field entered the Turbine Driven Equipment License Agreement ("Green Field License Agreement"), under which TPT granted Green Field (1) a royalty-free, exclusive fully transferable and assignable worldwide license to the Frac Stack Pack trademark and (2) a perpetual, irrevocable, royalty-free, fully transferable and assignable, exclusive license to the Frac Stack Pack technology.

24.     Pursuant to the Green Field License Agreement, Green Field had exclusive rights to use, sell, lease, commercialize, or otherwise deal with the Frac Stack Pack™ equipment that it purchased (under the exclusive Equipment Purchase Agreement) from TPT in the Well Services business.

25.     The Green Field License Agreement and the Equipment Purchase Agreement did not preclude TPT from using or practicing rights under its Intellectual Property outside the Well Services business.

26.     Although Green Field owned 50% of TPT, it did not otherwise have any rights to use or practice TPT's Intellectual Property in any business other than Well Services.

27.     Utilizing its exclusive access to the Frac Stack Pack technology equipment, Green Field negotiated a contract with Shell dated September 2, 2011 (the Contract for High Pressure Fracturing Services), under which Shell prepaid $42.5 million to Green Field for the purchase, mobilization, modification and preparation of equipment and services provided under the agreement.

28. With a lucrative contract with Shell and plans of business expansion, Green Field was poised to be an extremely successful player in the emerging hydraulic fracturing industry.

**B.    Mr. Moreno, GE and GEOG initiate discussions for joint venture opportunities.**

29. Unexpectedly, the natural gas market trends reversed in 2012.

30. A mild winter reduced natural gas prices and caused producers to reduce drilling activity.  Significant capacity additions and high costs combined with low natural gas prices to further depress margins in the fracture stimulation industry in mid to late 2012.

31. Shell, by far Green Field's most significant customer, pulled back significantly out of onshore natural gas development in North America, including completely eliminating its Eagle Ford shale position, and terminated its contract with Green Field.

32. Green Field was left in a precarious position in need of capital and revenue streams.

33. Beginning in September of 2012, Mr. Moreno began searching for capital investment partners for Green Field in its present fracking business and, because Green Field potentially had access to the Invention technology through its 50% ownership interest in TPT, for Green Field to diversify into what would be a new sector for Green Field, power generation.

34. The Intellectual Property owned by TPT that was involved in the Frac Stack Pack technology for hydraulic fracturing could also be used for turbine power generators applicable to other industries.

35.     Robert Nardelli, an acquaintance of Mr. Moreno who was the former CEO of Chrysler and a former executive of General Electric Company ("GE"), had knowledge that GE had long been interested in the commercialization of turbine power generation.  In September 2012, Mr. Nardelli made an introduction between Mr. Moreno and certain executives of GE.  They, in turn, introduced Mr. Moreno to Mike Hosford ("Hosford") of GEOG and Kevin Skillern ("Skillern") of GE Capital.

36.     With that introduction, Mr. Moreno approached GE and GEOG about forming a joint venture to be operated in Lafayette, Louisiana, involving both fracking and power generation businesses.

37.     These initial meetings took place in September and October 2012. Hosford and other GE representatives first spoke with Mr. Moreno on September 13, 2012, meeting in person shortly thereafter.  Throughout late 2012, Mr. Moreno continued to discuss with Hosford a partnership with GE in both fracking and power generation.

38.     GE expressed a desire at the initial meeting to immediately form a joint venture and the parties began working together along three simultaneous tracks: (1) the financial details, including how profits and losses would be borne; (2) business operations, including the necessary paperwork and employees on each side; and (3) engineering and manufacturing aspects, including what engines to use, safety specifications, and reporting.

39.     Over the next few weeks, a general exchange of marketing presentations took place.  GE first went to Louisiana to look at the technology in October, 2012.

40.     Face-to-face meetings occurred on or about October 5, 2012, with Mr. Moreno explaining the unique turbine driven technology in fracking as well as power generation applications to GE's oil and gas group.

41.     On or about October 18, 2012, Mr. Moreno met with GE and GEOG personnel at Greenfield's offices and assembly facility in Lafayette, Louisiana.

42.     On October 22, 2012, GE forwarded a non-disclosure agreement to facilitate the development of a "structural equity investment" by GE.

43.     On November 16, 2012, Mr. Moreno met with representatives from GE who informed him that GE was looking forward to building their relationship.

44.     During the period from October 2012 through February 2013, the negotiations among Green Field, GE, GEOG, and Mr. Moreno escalated quickly.

45.     The initial courtship that had included formal meetings between Mr. Moreno and various representatives from GE and GEOG rapidly progressed, with GE and GEOG exercising substantial authority over business operations of the ongoing turbine business in Lafayette, Louisiana.

46.     During this five (5) month period, the parties conducted engineering and production due diligence including field visits to Louisiana, product demonstrations, meetings with potential customers, financial reviews, and market evaluations.

47.     The parties were in constant communication, generating thousands of e-mails.  These communications were on all levels, from senior executives to salaried engineers, consistent with the need to get to market as quickly as possible.

48. From October to December of 2012, GE and GEOG looked at several avenues of investment in the Invention technology while working with Mr. Moreno on the details of both Green Field's fracking business and the power generation side.

49. This project was known internally at GE and GEOG as "Project Cayenne" and, at that time, included both power generation and fracking.

50. Mr. Moreno believed that the parties had agreed to all of the substantive terms concerning the formation of a joint venture. More specifically, Mr. Moreno believed the parties agreed that a joint venture would be established between him (or an entity controlled by him) on one side, and GE and GEOG (or one of GE's subsidiaries), on the other side.

51. The parties would then establish a separate entity through which they would jointly develop and manufacture power generation units with a capacity of 1-5 megawatts.

52. The parties would contribute equally to the venture, with Mr. Moreno contributing capital, employees, his entrepreneurial skills, an existing contract with SandRidge Energy ("SandRidge"), his ability to secure other contracts, and technology acquired from McIntyre.

53. GE would contribute capital, technology, employees, industry knowledge, and brand.

54. Finally, TPT would serve as the packager.

55. Through their joint equity interest, the parties would share equally in profits and losses.

56. Ultimately, GE would have the option to buy out Mr. Moreno after three years. Through this arrangement, GE ensured that it could utilize Mr. Moreno's entrepreneurial skills to get a new line of products to the market quickly and more effectively than it could on its own using a technology that was already a natural fit for its business. Mr. Moreno, in turn, secured funding for this venture and a valuable client for TPT and GFES.

57. The financial terms were that GE, through one of its subsidiaries, would invest $200 million into the venture with $100 million committed to fracking equipment and $100 million committed to power generation units, all of which was to be conducted in Lafayette, Louisiana.

**C.    The parties enter non-disclosure agreements, a supplier agreement, and a memorandum of understanding.**

58. As an integral part of the parties' discussions, Green Field entered into broad ranging non-disclosure agreements ("NDA") with GEOG, GE Aero, and GE Capital. Initial drafts of the NDA were circulated in October 2012 as part of a "structured equity investment" by GE. The NDA was executed in December 2012.

59. On November 16, 2012, Mr. Moreno and his team met with a large number of GE and GEOG executives and employees, and a wide range of topics were discussed, including: (1) the value of the product and expected availability of equipment; (2) the technology, including engine acquisition and intellectual property and licensing issues; (3) customers, contract terms, and the customer's specifications; (4) the competitive landscape; (5) who would comprise the management team; and (6) financial considerations, including projected financials, capital expenditure requirements, methods of funding, and projected cash needs.

60.     The parties also entered a Supplier Agreement that detailed where and how the parties would work together, who would be in charge of various aspects of the business, and what each party would be contributing to the "PowerGen NewCo" through which they would partner.

61.     On January 7, 2013, GE Aero signed a Memorandum of Understanding addressing a joint development study, supply agreement and commercialization of 1-5 megawatt power generators.

62.     GE had access to surplus jet engines that it manufactured and, seeing an additional benefit to its own company operations, GE and GEOG insisted that the parties refurbish GE engines instead of Honeywell engines so that GE could sell its surplus engines to the venture.

63.     Engineers for GE drafted a "Joint Development" program for the parties to work on in developing the technology to GE specifications (including the use of Honeywell engines), circulating a draft as early as February 7, 2013.

64.     Much more than just a lender or investor in the business, GE and GEOG demonstrated their active involvement and right of control, inserting themselves into the engineering operations of the business, visiting the factory floor multiple times in Louisiana to dictate that operations must conform to "GE standards," including safety protocols and the use of safety gear. Multiple teams of GE engineers traveled to Louisiana beginning in October 2012 and continuing through September 2013 to meet with and collaborate to develop the new technology to "GE standards," and GE engineers made internal GE technology available for use in the venture.

65. Mr. Moreno did not perceive these directions as being given merely as advice to plan for a prospective joint venture in the future; rather, he understood them to be orders that were required to be implemented immediately in an agreed-upon joint venture.

66. As expected, GE's and GEOG's instructions were followed, consistent with GE's and GEOG's rights to control the operations as a partner in this venture.

67. Believing that a joint venture had been established, Mr. Moreno negotiated a contract with SandRidge Energy wherein that venture would supply power generation units to SandRidge.

68. SandRidge announced on January 11, 2013 that it would utilize the power generation technology, and the parties were actively collaborating in order to deliver to SandRidge under the contract.

69. Indeed, engineers from GE had been active in participating in the development of the technology well before this, with initial visits and coordination beginning virtually immediately after Hosford's contact with Mr. Moreno in October 2012.

**D.    GE and GEOG publicly announce their collaboration with Mr. Moreno.**

70. On January 7, 2013, GE and GEOG issued a press release announcing their collaboration with Mr. Moreno to develop power generation technology.

71. That release demonstrated the mutual excitement about the project, quoting Mr. Moreno saying, "We're thrilled to be collaborating with GE," and Hosford of GEOG saying, "This collaboration may help us deliver innovative solutions that solve some of the biggest industry challenges."

72. GE, GEOG, and Mr. Moreno later announced their collaboration at GE's Oil & Gas Worldwide Forum in Florence, Italy, which was held from January 27

through 29, 2013. Over 200 of GE and GEOG's top customers worldwide were in attendance.

73. This presentation, entitled "Facing the Challenge: Unlocking the Potential of Unconventional Resources through Collaboration," was made by Mr. Moreno and Hosford and touted by GE and GEOG as an example of GE's and GEOG's joint venture strategies with emerging new technologies.

74. During this time, GE and GEOG made technical visits to Louisiana to assess the progress and status of the first power generation units.

**E.    Mr. Moreno discontinues his search for joint venture partners and the parties negotiate capital funding and financing.**

75. It was made clear to GE and GEOG that Mr. Moreno was seeking a total of $200 million in capital, divided $100 million to support fracking business capital expenditures and $100 million for the power generation business opportunity.

76. On or about March 8, 2013, Hosford and Lee Cooper ("Cooper") of GE corporate offices presented the idea of capital finance for both fracking and power generation to GE CEO Jeffrey R. Immelt ("Immelt"). Recognizing the need for capital to fund the venture's contracts (including SandRidge), GE began to look expeditiously for a funding mechanism in order to avoid losing the progress and contracts that were already secured.

77. Immelt instructed them to focus only on the power generation business and decided to provide funding out of his "own" corporate budget to facilitate a quicker closing and to demonstrate within the GE organization his commitment to entering into a power generation business with Mr. Moreno.

78.     In fact, Immelt told Hosford to get Mr. Moreno $25 million by the end of the week.  *See* **Exhibit A**.

79.     Following this meeting, Hosford and Cooper phoned Mr. Moreno to relay Immelt's approval of funding by GE.  Duncan O'Brien was then brought in by GE to move forward with drafting documents and ironing out further details.

80.     During that phone call, Hosford, O'Brien and Cooper told Mr. Moreno that he should cease pitching joint venture relationships with other companies and/or private equity firms.

81.     At this point, GE and GEOG were fully and unequivocally committed to exclusively funding their contribution to the parties' venture.

82.     Mr. Moreno moved forward in reliance on GE's and GEOG's commitment to be a funding source for the venture.

83.     Mr. Moreno also acted in reliance upon, and complied with, GE's and GEOG's instruction to cease searching for other potential joint venture partners because he felt that the GE family of corporations was a good fit as a partner in light of GE's heritage and experience in the generator and turbine lines of business. GE, as a financial partner, also committed sufficient capital investment and, as a strategic partner, contributed greater benefit than a mere investor or lender would supply.

84.     Significantly, Mr. Moreno ensured that enormous sums were invested in developing the technology to GE's specifications in order to fulfill commitments to clients – an expense that would have been unnecessary but for GE's insistence and its continued participation.

85.     GE and GEOG knew that Mr. Moreno stopped discussions with potential joint venture partners based on their instruction and commitment to fully fund the amounts they agreed were needed to support the venture.

86.     On March 21, 2013, Mr. Moreno had dinner with business development representatives from GE to discuss the "guts" of the $100 million equity investment in the PowerGen model. This model had been developed in collaboration with GE and was being marketed internally within GE to several of its different business units.

87.     Later in March 2013, Mr. Moreno was invited by Daniel C. Heintzelmen, President and CEO of GEOG, to attend a dinner in New Orleans, Louisiana, held on April 23, 2013, the night before GE's annual shareowners meeting, saying: "We are extending this invitation to some of our key partners and would be delighted if you could join us . . . ."

88.     Prior to the dinner, Hosford and the GE team developed a business plan for the venture (as early as April 19, 2013), complete with projected income statements and a schedule of anticipated revenues.

89.     At the April 23, 2013 dinner in New Orleans, Mr. Moreno was introduced as GE's partner to GE's CEO, Jeffrey Immelt, as well as Beth Comstock (GE's senior vice president and Chief Marketing Officer), and more than a dozen GE board members and/or top executives.

90.     Mr. Moreno communicated to Cooper and Comstock that progress on "papering" the parties' joint venture had slowed considerably, owing to various GE bureaucratic entanglements. In response, GE appointed yet another executive, Colleen Harkness Calhoun ("Calhoun"), to replace Duncan O'Brien.

**F.     The parties continue to document the terms of their agreement.**

91.     In April 2013, Mr. Moreno was called by Cooper and Comstock and was informed that Calhoun, Senior Executive Director of Energy Ventures for GE, was assigned and given authority to further document the terms of the parties' agreement.

92.     On April 3, 2013, Calhoun and Mr. Moreno met in Schenectady to further document the details of the agreement.

93.     In Mr. Moreno's opinion, by the evening of April 3, 2013, all remaining material elements of the joint venture had been agreed to by Mr. Moreno, on one hand, and GE and GEOG, on the other.  Afterwards, a celebratory dinner was held among Mr. Moreno, Calhoun of GE, and Steve Bolze ("Bolze") of GE Power and Water.  According to Mr. Moreno, all that remained, still, was to "paper" the transaction.  This process moved more slowly than the parties would have liked.

94.     The business plan agreed upon by Mr. Moreno, GE, and GEOG was to ramp up the production of the turbines in Louisiana, establish a steady revenue stream, and then sell the business in 3 to 4 years.

95.     The parties also agreed that Mr. Moreno would contribute capital, customer contacts, and the expertise he gained during his many years of experience in the oil and gas exploration and production industry.

96.     GE's and GEOG's calculations forecasted that the business would have substantial net worth within 4 years.

97.     On April 4, 2013, Calhoun sent Mr. Moreno an e-mail confirming the "key terms" of the parties' agreement.  *See* **Exhibit B**.

98.     Among other things, the "key terms" included the following:

$200 MM commitment by GE for Preferred equity in PowerGen New Co. (PGNC)

PGNC will have IP, PG contracts, and pledge of equipment that is purchased by the entity

. . . .

GE to have negative control rights over the entity for items such as leverage on entity, change of control, replacement of key personnel, etc.

. . . .

TPT to package powergen and frac spreads exclusively for PGNC.

Prior to funding determination by GE that safety and quality issues for existing equipment in field and equipment to be deployed meets mutually agreed upon thresholds.

Initial GE funding of $50 MM by [April 29]

- $5MM for product development to industrialize the GE C7 and the C35 GE.

- $[25]MM for equipment 2 frac spreads

  o Payments to TPT. When complete units will be leases to Greenfield for deployment to [Shell]. PGNC to receive lease payment at agreed upon rate over useful life of asset

- $[20]MM for equipment to be used for powergen units

  o Funds to be used to pay TPT for 100MW of power gen equipment

  o Equipment for [40 MW] of power under contract

  . . . .

PGNC will liquidate at the earlier of [three years from date of agreement] or as mutually agreed by shareholders and preferred equity

- GE will have the right to buy the PGNC for the [the higher of X multiple of EBIDTA or 20% less than 1 year GE's trailing EBITDA multiple]

- In the event that GE does not exercise its option to buy the company then Greenfield can purchase PGNC for same amount

- In the event that neither party exercises its purchase option than entity will be sold to a 3rd party or shares registered for public sale

99.     After a couple of phone calls between Mr. Moreno and Calhoun and some brief additional emails, it was clear to Mr. Moreno that the parties were in agreement on all of the essential terms of their venture.

100.    Stated differently, Mr. Moreno understood that there was: (i) a mutual promise or undertaking by the parties to create a joint venture in which the parties would share in the profits and losses; (ii) an understanding of what each party's contribution would be; and (iii) a measure of joint proprietorship, management or control over the venture.

101.    In addition, Mr. Moreno believed that, by their emails, words and conduct, GE and GEOG manifested an intention to be bound as joint venturers with him.

102.    In the months that followed, Mr. Moreno, who also intended to be bound as a joint venturer with GE and GEOG, continued to fulfill his agreed upon obligations.

**G.** **GE and GEOG require that Green Field divest the power generation line of business.**

103.   In or around late March or early April 2013, the parties agreed to exclude the fracking capital expenditure funding and focus on power generation only.

104.   GE and GEOG insisted that Green Field not be included in the power generation line of business and that it remain independent of Green Field as a separate entity.

105.   Green Field authorized Mr. Moreno to pursue the power generation independently.  In return, Green Field would have the new company as a valuable client providing a lucrative source of revenue and would further profit through its equity ownership in TPT.

106.   GE, through its subsidiary GEOG, remained committed to invest $100 million in the power generation business with the separate company.

**H.** **Mr. Moreno forms TGS, as required by GE and GEOG.**

107.   As described above, GE and GEOG had refused to partner with Green Field and insisted that the power generation business be placed into a new entity.

108.   Thus, there was no opportunity for Green Field, whose business had always been in fracking services, to receive funding directly from GE and GEOG for a power generation business.

109.   Moreover, Green Field did not have a license or any rights to the Invention technology for use outside of Well Services, as those rights belonged to TPT.

110.   Because Green Field was a 50% owner of TPT, Mr. Moreno presented Green Field and its bondholders with the business opportunity related to the development, construction, sale, and rental of turbine and gas-engine powered power generation.

111.     Green Field did not have the capacity to enter a new business industry.

112.     However, Green Field would benefit from the parties' venture continuing in an entity separate from Green Field by gaining the new business as a customer.

113.     Green Field's shareholders and directors gave consent for Mr. Moreno and TPT to pursue the power generation business opportunity with GE and GEOG outside of Green Field.

114.     On March 7, 2013, in furtherance of the parties' agreement, Mr. Moreno formed TGS to serve as the new company insisted upon by GE and GEOG.  Mr. Moreno's ownership interest in TGS was through TGS's initial member, MOR DOH Holdings, L.L.C. ("MMH").

115.     As the parties had agreed, GEOG's ownership interest in TGS would accrue upon GEOG's contribution to the joint venture.

**I.      GEOG issues a $25 million convertible bridge loan, secured by TGS's assets and Mr. Moreno's personal guarantee, which GE promised would never be called.**

116.     After TGS was formed, GE and GEOG delayed the $100 million of funding that they had committed to provide.

117.     On May 1, 2013, Hosford sent an e-mail entitled "Moreno JV" outlining the development of the "partnership" and the steps needed to move the process forward.  In his email, Hosford described himself as "embarrassed" by GE's conduct and informed Comstock that GE's delay "is [not] how to start a relationship with a partner." *See* Exhibit A.

118.     GE and GEOG first claimed that a "safety engineering study" had to be completed before the full funding could take place.

119.    However, recognizing that funding was needed before that study could be finalized, Calhoun, on behalf of GE and GEOG, provided $25 million to TGS in May 2013 in the form of a convertible loan, as a short-term work-around to uphold GE's and GEOG's funding obligations.  GE and GEOG required TGS to execute a short-term, temporary Senior Secured Promissory Note (the "Note") for the $25 million investment.

120.    On May 13, 2013, the Note was signed and GEOG wired $25 million to TGS's bank account in Louisiana.

121.    The Note contained Negative Covenants that materially restricted TGS's operations and prohibited TGS from, among other things, selling its property, incurring debt, making investments, paying dividends, lending or advancing money to employees, or forming subsidiaries.

122.    In short, through the Note, GE and GEOG exerted nearly complete operational and managerial control over TGS.

123.    Unlike an ordinary note evidencing a loan, this Note also included a "Term Sheet," that described many of the key terms underlying the structure of the parties' joint venture.  A copy of the Term Sheet is attached as **Exhibit C** and is incorporated herein by reference.

124.    Consistent with what the parties already had agreed to as partners, the terms set forth in the Term Sheet included, among other things, that the $25 million "convertible loan" from GEOG to TGS would be converted into TGS preferred membership interests on or about June 15, 2013 (the time the parties expected the safety study and other formal paperwork to be completed).

125.    Ultimately, GEOG was to invest $100 million for a 50% stake in TGS.

126.    As the parties had agreed previously, TGS used the $25 million to purchase the turbines and other equipment in furtherance of the parties' business plan.

127.    Shortly before May 13, 2013, Calhoun requested that Mr. Moreno personally guarantee the loan and execute a Guarantee Agreement to "make the finance folks happy."

128.    Calhoun told Mr. Moreno "not to worry" about the personal guarantee, because the loan would be converted to equity within 30 days and the Guarantee Agreement "would never be called."

129.    GE and GEOG also required that TGS execute a Security Agreement granting GEOG a security interest in all of TGS's assets, including both tangible and intangible assets, which notably includes TGS's rights to the Intellectual Property and other technology that made this venture attractive to GE and GEOG.

130.    By obtaining a secured interest in TGS's rights to the Intellectual Property and other technology, if GE and GEOG later reneged on their obligations and called their investment a loan—knowing that such a "loan" could not be repaid—GE and GEOG could exploit the situation by foreclosing on the intangible assets and seize the rights to the technology, leaving their partners, Mr. Moreno and TGS, with nothing.

131.    Mr. Moreno's understanding was that the parties never intended for the Note, Guarantee Agreement, or Security Agreement to be enforceable by GE or GEOG.

132.    Mr. Moreno also understood that the $25,000,000.00 payment to TGS was GE's and GEOG's initial equity investment in the joint venture that the parties intended to form.

**J.     The Term Sheet.**

133.     The eleven (11) page Term Sheet memorialized the structure of the
venture among Mr. Moreno, TGS, GE and GEOG, with TGS being the vehicle through
which it would operate.  For instance, under the heading of TGS Tax Treatment, the Term
Sheet says:

> TGS will be treated **as a partnership** for US tax
> purposes and none of TGS, its directors or officers,
> Moreno, MMH or any of their affiliates will take any
> action that may result in TGS not being treated as a
> partnership (*e.g.*, filing a "check the box" election to
> treat TGS as a corporation for US tax purposes).
>
> The **parties will discuss and agree to relevant
> partnership tax provisions** (including income allocation
> and IRC Section 704(c) methods) prior to the
> completion of the First Contribution. (emphasis added).

134.     The Term Sheet also evidenced, in writing, the community of interest
and combination of property, financial resources, effort, skill and knowledge the parties had
already committed to verbally.

135.     In addition, the Term Sheet, which contains no merger or integration
clause, memorialized the parties' agreement to share profits and losses.

136.     And, although the Distribution Waterfall set out in the Term Sheet
calls for a repayment of investments first, it ultimately provides both parties with the right to
share in the profits.

137.     The Term Sheet provides that GE's and GEOG's contribution of
$100 million (including conversion of the Loan to Preferred Interests in TGS) would not be
repaid if the business failed and, likewise, Mr. Moreno's contribution would similarly be lost
if the business failed.

- 23 -

138.    Consistent with the terms previously agreed to by the parties, the Term Sheet notes a mutual right of control over the business venture.

139.    The Term Sheet provides that both GE and MMH, TGS's parent company, would be represented on the Board of Managers.

140.    Although the Term Sheet allows MMH to appoint three board members to GE's 2 (with 2 independent members appointed by the Board of Managers), the Term Sheet also provides that the approval of GE's designees is required for a number of actions.

141.    In addition, the Term Sheet states that, following the funding of the $25 million convertible loan, GE and GEOG were to make the "First Contribution" on or about June 15, 2013.

142.    The "First Contribution" consisted of converting the $25 million convertible loan into preferred membership equity plus $25 million in additional cash.

143.    This total of $50 million in initial funding from GE and GEOG is consistent with the agreement previously reached by the parties and was noted in Calhoun's April 4, 2013 e-mail to Mr. Moreno.  *See* Exhibit B.

144.    The Term Sheet was exceptionally detailed and set forth the material rights and obligations of the parties including, but not limited to, the parties' business plan and respective contributions.

**K.    GE and GEOG fail to execute the final documents memorializing the parties' agreement and fail to provide the additional funding they promised to provide.**

145.    During the period May 13, 2013 through June 15, 2013, GE and GEOG made no efforts whatsoever toward honoring their obligations to "work diligently and in good faith towards the execution of definitive documents" to memorialize the

parties' agreement or to provide required funding, despite repeated e-mail requests from Mr. Moreno to do so.

146. According to the Term Sheet, funding of the First Contribution was subject to completion of the following:

    (i)    Definitive agreements for the overall transaction,

    (ii)    TGS, GFES, and TPT entering into assembly, installation, product development, maintenance and licensing agreements,

    (iii)    GFES board and GFES minority stockholder, TPT governing body and Marine Turbine Technologies, L.L.C. governing body approvals and consents, including, with respect to GFES, board and minority stockholder waivers of corporate opportunities regarding the transactions,

    (iv)    Fairness opinion regarding related party assets of the transactions among TGS, GFES and TPT,

    (v)    GE internal approvals,

    (vi)    The turbine powergen units ("TPU") passing a GE engineering peer and risk review,

    (vii)    GE approval of applicable TPU engineering designs, and

    (viii)    Completion of environmental, health and safety and product safety/liability due diligence, including, but not limited to, site visits and written assessments/reports by GE personnel and/or GE consultants, discussions with TPT management and responses from TPT management to due diligence questions raised by GE.

147. All such conditions pertaining to the First Contribution were either fully performed by TGS and Mr. Moreno or waived by GE and GEOG.

148. As such, GE and GEOG breached their obligations by, among other things, failing to make the First Contribution and failing to put forth good faith efforts towards the execution of definitive documents memorializing the parties' agreement.

149.     Despite their failure to pursue good faith efforts towards the execution of definitive documents memorializing the parties' agreement, GE and GEOG required TGS, Green Field, and TPT to enter into an assembly, installation, product development, maintenance and licensing agreement for turbine power generators.

150.     In June 2013, TGS complied and executed an Agreement for the Manufacture and Sale of Turbine Powered Generators with TPT, as contractor, and Green Field, the contract manager.

151.     Under that agreement, TPT was required to manufacture and deliver to TGS, and TGS was required to purchase from TPT, a minimum of 100 Mw of Turbine Powered Generators per annual production cycle.

152.     TGS was required to make deposits to Green Field by July 1, 2013 for the first production cycle.

153.     TGS made the required payments to Green Field and TPT under that Agreement—totaling in excess of $28,000,000—in reliance on the promises by GE and GEOG that they would provide funding as agreed.

154.     In addition to entering into the Agreement for the Manufacture and Sale, TPT commenced a search for real estate to build a new, larger facility to accommodate the production demands set forth by GE and GEOG.

155.     Throughout this period, GE continued to actively involve itself in TGS's engineering process, with multiple teams visiting the site and conducting reviews.

156.     In addition, on July 16, 2013, Hosford collaborated with Mr. Moreno, Rick Fontova, and GE marketing personnel to develop the business model for the parties' venture and to identify potential clients.  Not a single person involved in developing the

technology or the business ever suggested that GE's participation was limited to that of a lender but, instead, each acted as active partners or joint venturers.

**L.     GE and GEOG misrepresent to Mr. Moreno that the joint venture was going forward and would be funded as promised.**

157.    Despite the breaches by GE and GEOG, representatives of GE and GEOG continued to mislead and induce Mr. Moreno into relying on the promise that their funding of the joint venture was imminent.

158.    In or around July 2013, Hosford phoned Mr. Moreno to inform him that Edoardo Padeletti of GEOG, who was based in Italy, would be replacing Calhoun and that he would facilitate funding of the joint venture and "button up" any loose ends.

159.    Mr. Moreno received a call from Padeletti who apologized to Mr. Moreno for GE's lack of action and assured Mr. Moreno that GE was moving forward with the joint venture.

160.    Indeed, Padeletti told Mr. Moreno that "I only have a one-way ticket from Italy and have been instructed by upper management not to leave the U.S. until all matters involving the joint venture have been finalized and funded."

161.    GE and GEOG did not fulfill that promise, as they refused to provide funding and refused to negotiate and execute final documents memorializing the joint venture.

162.    In or around August 2013, a meeting was held in Houston, Texas with Mr. Moreno, Hosford, Padeletti and Hasan Dandashly, GE's Operation Chief.

163.    On August 9, 2013, Hosford e-mailed Fontova to discuss a potential opportunity for the parties to do business with Devon Energy, and to update Fontova on

some meetings between the parties' technical teams. Hosford noted that, from GE's perspective, they had entered the "Last Mile."

164. At that meeting, Mr. Moreno was again given assurances that the power generation line of business was moving forward; and Dandashly personally stated that "although new to the job," he was instructed by corporate management to finalize all pending matters and get the business operational.

165. On or about August 14, 2013, GE and GEOG completed the second "Product Engineering Review of Power Generation Units."

166. Both reviews passed GE standards and were approved. This represented the culmination of months of work.

**M.    GE's new director repudiates GE's obligations under the Term Sheet.**

167. On or about September 29, 2013, Mr. Moreno was informed by Padeletti that GE's New Corporate Mergers and Acquisitions director, John Flannery, did not feel comfortable participating in the joint venture the parties had contemplated, claiming that the Green Field financial situation was the reason for the "buyers' remorse."

168. Then, in or around October 2013, Hosford and Padeletti informed Mr. Moreno that Flannery unilaterally decided to "kill" the joint venture.

169. On October 4, 2013, Flannery met with Bob Nardelli, Wayne Teetsel, a Noteholder of GFES who participated telephonically, and Mr. Moreno to discuss Flannery's decision to repudiate GE's agreements.

170. On or about October 27, 2013, Green Field filed for bankruptcy protection. The Green Field bankruptcy did not involve TGS.

**N.** **GEOG's and GE's attempt to collect on the Note, Guarantee Agreement and Security Agreement.**

171.   After refusing to negotiate and execute definitive documents consummating the transaction set forth in the Term Sheet; refusing to provide the additional funding to TGS; failing to convert the Note into Preferred Interests; and refusing to cancel the Note and surrender it to Mr. Moreno and TGS, in breach of their promise not to call the Note, the Security Agreement, or Guarantee Agreement, and contrary to the parties' prior agreement, GE and GEOG demanded repayment of the $25 million convertible loan.

172.   As a result of GE and GEOG's breaches of their obligations, Mr. Moreno and TGS suffered substantial damages.

173.   GE's and GEOG's breaches also deprived TGS of the funds necessary to operate as a business, resulting in lost profits and a diminution in the value of TGS.

174.   Due to GE's and GEOG's breaches, TPT has placed Mr. Moreno and TGS in default of the Agreement for the Manufacture and Sale of Turbine Power Generators and has made additional claims against them for accounts payables incurred in manufacturing the TPUs, including accounts payables for components which were mandated by GE and GEOG and which increased the cost to build the TPUs by nearly 50%.

175.   In June 2013, Powermeister LLC, in an effort to provide funding for TGS until GE funded its $100 million commitment, made a $20 million investment in MMH, with a right of return if GE did not fund its $100 million commitment to TGS.

176.   Powermeister LLC has exercised its right of return of its investment.

177.    But for GE's and GEOG's breaches, Mr. Moreno would have acquired ownership of a 50% share of a profitable business venture that, by GE's and GEOG's own calculations, would have had substantial net worth in just four years.

## FIRST CAUSE OF ACTION
### (Breach of the Term Sheet)

178.    Paragraphs 1 through 177 are realleged.

179.    As set forth in the Term Sheet, GE and GEOG agreed to work diligently and in good faith towards the execution of definitive documents necessary to consummate the business venture described in the Term Sheet.

180.    Mr. Moreno has performed, and/or is willing to perform, all of his obligations under the Term Sheet.  Indeed, among other things, Mr. Moreno contributed capital; formed TGS in accordance with the instructions of GE and GEOG; and provided customer contacts and valuable experience he gained during his many years operating in the oil and gas exploration and production industry.

181.    Mr. Moreno executed the Note and Security Agreement in his capacity as TGS's CEO, and as the CEO of TGS's parent, and TGS used the proceeds of the Note to purchase equipment to conduct the business of the joint venture and/or partnership.

182.    Mr. Moreno also executed the Guarantee Agreement.

183.    In addition, Mr. Moreno and TGS entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and made payments in excess of $28,000,000.

184. GE and GEOG, however, repudiated their agreement to work diligently and in good faith towards the execution of any documents necessary to consummate the transaction described in the Term Sheet.

185. In doing so, GE and GEOG failed to cooperate with Mr. Moreno and TGS. In fact, GE and GEOG not only failed to work diligently and in good faith towards their obligations under the Term Sheet, GE and GEOG failed to take any action for more than two months following the execution of the Term Sheet despite repeated requests from Mr. Moreno and TGS.

186. Without cause, and for improper motives, GE and GEOG then failed to cooperate with Mr. Moreno and TGS, refused to negotiate, much less execute, execute the documents contemplated by the Term Sheet, and failed and refused to perform their obligations as described more fully above.

187. GE and GEOG have also refused to convert the Note to an ownership interest in TGS. Rather, GE and GEOG have demanded payment on the Note and filed this action against Mr. Moreno and TGS to enforce the Note, the Guarantee Agreement, and the Security Agreement.

188. If GE and GEOG had not breached their obligations under the Term Sheet, the parties' joint venture and/or partnership would have been duly formed.

189. Mr. Moreno and TGS are entitled to recover all damages, including damages caused by GE and GEOG's breach of the Term Sheet and delay in performance.

## SECOND CAUSE OF ACTION
**(Breach of Duty of Good Faith and Fair Dealing)**

190. Paragraphs 1 through 189 are realleged.

191.     Although the Term Sheet contemplated the execution of additional documents, the parties reached agreement on all of the material terms of the transaction described in the Term Sheet and completed their negotiations of what they regarded as the transaction's essential elements.

192.     In other words, while the Term Sheet reflects that certain matters were left open for further discussion, those matters were not deemed by the parties to be material.

193.     In fact, Defendants began performing in connection with the parties' transaction on the good faith understanding that agreement on the non-material, yet unsettled, matters would follow.

194.     In that regard, the Term Sheet imposed an express duty upon GEOG and GE to work diligently and in good faith towards the execution of documents reflecting all terms, so as to finalize the parties' business venture.

195.     The Term Sheet also imposed implied duties of good faith and fair dealing upon GEOG and GE to fulfill their obligations to Mr. Moreno and TGS and to refrain from any actions that could impair or injure the rights of Mr. Moreno and TGS. These duties were in addition to, and were separate and distinct from, GEOG's and GE's express duties under the Term Sheet.

196.     Thus, GE and GEOG were obligated to cooperate and exert their best efforts in the creation and negotiation of definitive documents necessary to finalize and fully document the parties' business venture.

197.     GEOG and GE breached their express duty to work diligently and in good faith towards the execution of documents reflecting all terms so as to finalize the transaction contemplated by the Term Sheet.  In fact, despite repeated requests from Mr.

Moreno, GEOG and GE took no steps whatsoever towards preparing and executing any documentation subsequent to entering into the Term Sheet.

198.    Such inaction also resulted in a breach of GEOG's and GE's implied duties of good faith and fair dealing.

199.    In the alternative, if, after Defendants are given the opportunity to take discovery and present evidence, the finder of fact were to conclude that the parties had not reached agreement on all of the material terms of the transaction contemplated by the Term Sheet, the Term Sheet nonetheless imposed an express duty upon GEOG and GE to work diligently and in good faith towards the execution of definitive documents necessary to consummate the transaction set forth therein.

200.    GEOG and GE breached their express duty to work diligently and in good faith towards the execution of definitive documents necessary to consummate the transaction set forth in the Term Sheet.  In fact, despite repeated requests from Mr. Moreno, GEOG and GE took no steps whatsoever towards executing any documents subsequent to entering into the Term Sheet.

201.    GEOG and GE also breached their express and implied duties of good faith and fair dealing by acting in concert with each other in an attempt to defeat the rights that Mr. Moreno and TGS acquired under the Term Sheet.

202.    As a direct and proximate result of GEOG's and GE's breach of their express and implied duties of good faith and fair dealing, Mr. Moreno and TGS have suffered damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Promissory Estoppel)

203.    Paragraphs 1 through 202 are realleged.

204.    GE and GEOG clearly and unambiguously made representations and promises to Mr. Moreno and TGS that they would, among other things, provide $100 million to fund the parties' business venture, including an additional $25 million by June 13, 2013.

205.    GE and GEOG also clearly and unambiguously represented to TGS and Mr. Moreno that the $25,000,000 "loan" to TGS would not need to be repaid, but instead, would be converted into an ownership interest in TGS.

206.    In executing the Note, Security Agreement and Guarantee Agreement, TGS and Mr. Moreno reasonably and justifiably relied on GE's and GEOG's representations.

207.    GE and GEOG were aware that substantially all of TGS's assets would be tied up in the equipment purchased with the proceeds of the Note, and that repayment at the Maturity Date would not be possible.

208.    GE and GEOG knew or should have known that Mr. Moreno and TGS would rely on their representations and it was foreseeable that Mr. Moreno and TGS would rely on their representations.

209.    In reliance on GE's and GEOG's representations, Mr. Moreno ceased searching for other potential joint venture partners and contributed his own capital and customer contacts, skill and experience in furtherance of the parties' business venture.

210.    In reliance on GE's and GEOG's representations, TGS and Mr. Moreno also changed their position to their detriment by, among other things, using the

$25,000,000 to purchase engines and other equipment in furtherance of the parties' business venture.

211.    TGS and Mr. Moreno also entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and made payments thereunder in excess of $28,000,000 in reliance on GE's and GEOG's representations that they would fund the parties' business venture.

212.    When GE and GEOG demanded payment on the Note, rather than converting the Note to an ownership interest in TGS, all of TGS's funds were tied up in equipment.

213.    Moreover, as a result of GE's and GEOG's refusal to negotiate and execute documents finalizing the terms of the parties' business venture, and due to GE's and GEOG's refusal to provide the funding they promised to provide, TPT has placed Mr. Moreno and TGS in default of the Agreement for the Manufacture and Sale of Turbine Power Generators and has made additional claims against them for accounts payables.

214.    TGS and Mr. Moreno have incurred, and will continue to incur, actual damages in an amount to be determined at trial as a result of their detrimental reliance on GEOG's and GE's misrepresentations.

## FOURTH CAUSE OF ACTION
### (Fraud and Fraud in the Inducement)

215.    Paragraphs 1 through 214 are realleged.

216.    GE and GEOG knowingly and intentionally made several material misrepresentations of fact, suppressed the truth, and/or failed to disclose material facts, as more particularly described above and as may be discovered in the course of this litigation, in order to induce Mr. Moreno and TGS to execute the Note, Guarantee Agreement and

Security Agreement and/or in order to obtain an unjust advantage over them or to cause a loss or inconvenience to them, including but not limited to:

    a.    advising Mr. Moreno and TGS that a "safety engineering study" had to be completed prior to funding the parties' venture;

    b.    advising Mr. Moreno and TGS that the Note and Security Agreement were merely a stop-gap measure;

    c.    advising Mr. Moreno that the Guarantee Agreement "would never be called" because the Note would be converted into equity within 30 days;

    d.    making representations and engaging in other intentional conduct to cause Mr. Moreno and TGS to believe that they were committed to entering into a joint venture and would provide all promised funding, when in fact, they had no intention of going forward; and

    e.    failing to disclose to Mr. Moreno and TGS that they did not intend to enter into and fund the joint venture as promised.

217.    GE and GEOG knew that these material representations were false and that they never intended to fund the parties' business venture or become an equal partner in the business.

218.    GE and GEOG made these material representations with the intention of inducing Mr. Moreno and TGS to rely upon them to their detriment.

219.    GE and GEOG had a duty to disclose to Mr. Moreno and TGS that they did not intend to enter into or fund the parties' business venture.

220.    Mr. Moreno and TGS had no reason to know that GE's and GEOG's representations were not truthful and had no reason to know that GE and GEOG did not intend to abide by their agreement or fund the parties' business venture, but rather intended to enforce the Note, Security Agreement and Guarantee Agreement.

221.    Mr. Moreno and TGS relied upon GE's and GEOG's material representations to their detriment.

222.    But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS would have pursued other investment opportunities, which opportunities have now been lost.

223.    But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS never would have executed the Note, the Security Agreement in which TGS pledged all of its tangible and intangible assets under the promise that the "loan" would be converted to equity in TGS, or the Guarantee Agreement.

224.    But for GE's and GEOG's fraudulent misrepresentations and nondisclosures, Mr. Moreno and TGS never would have entered the Agreement for the Manufacture and Sale of Turbine Powered Generators in favor of TPT and would not have made payments in excess of $28,000,000.

225.    Accordingly, TGS and Mr. Moreno are entitled to rescission of the Loan Documents, including but not limited to the Note, the Security Agreement, and Guarantee Agreement, plus damages including out-of-pocket expenses, lost profits,

diminution of the value of TGS, attorneys' fees and interest, and all other damages in such amounts as shall be proven at trial.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

226.    Paragraphs 1 through 225 are realleged.

227.    Recovery of the Note, Security Agreement and Guarantee Agreement, contrary to the promises and representations made by GE and GEOG, would result in unjust enrichment of GE and GEOG at the expense of Mr. Moreno and TGS.

228.    Such enrichment contravenes equity and good conscience.

229.    Accordingly, Mr. Moreno and TGS are entitled to be compensated to the extent to which GE and GEOG have been unjustly enriched.

## SIXTH CAUSE OF ACTION
### (Contribution and Indemnity)

230.    Paragraphs 1 through 229 are realleged.

231.    GE undertook certain obligations in connection with the Term Sheet.

232.    As set forth above, GE was required, among other things, to work diligently and in good faith efforts towards the execution of documents necessary to consummate the transaction described in the Term Sheet.

233.    GE breached its obligations and, as a result, GEOG has commenced the main action underlying this third-party action, exposing Mr. Moreno and TGS to potential liability.

234.    In addition, as set forth above, GE fraudulently induced Mr. Moreno to execute the Note, Security Agreement and Guaranty Agreement.

235.    By reason of the foregoing, TGS and Mr. Moreno are entitled to common law indemnity and/or contribution from GE in the amount of any liability of TGS and/or Mr. Moreno to GEOG.

**WHEREFORE**, Defendants and Third-Party Plaintiffs Turbine Generation Services L.L.C. and Michel B. Moreno demand judgment:

1)    Awarding damages to Mr. Moreno and TGS incurred as a result of GE's and GEOG's breaches of the Term Sheet and express and implied duties of good faith and fair dealing, and for promissory estoppel, fraud and fraud in the inducement, and unjust enrichment, including but not limited to rescinding the Loan Documents and awarding recovery of out-of-pocket expenses, damages for delay, lost profits, diminution of the value of TGS, attorneys' fees and interest, and such other damages in such amounts as shall be proven at trial;

2)    Ordering GE to provide indemnity and/or contribution to TGS and Mr. Moreno for any potential liability of TGS and/or Mr. Moreno to GEOG; and

3)    Granting such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         April 6, 2016

PHILLIPS LYTLE LLP


By: *Sean C. McPhee*
    _____
        Sean C. McPhee
        Anna Mercado Clark
    Attorneys for Defendants and
      Third-Party Plaintiffs
    *Turbine Generation Services, L.L.C.*
    *and Michel B. Moreno*
    The New York Times Building
    620 Eighth Avenue, 23rd Floor
    New York, NY  10018-1405
    Telephone No. (212) 759-4888
    smcphee@phillipslytle.com
    aclark@phillipslytle.com

Doc #01-2937136.5